IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SEIFULLAH ABDUL-SALAAM, | : | No. 4:02-CV-2124 |
| | : | |
| Petitioner | : | (Judge Jones) |
| | : | |
| v. | : | |
| | : | |
| JEFFREY BEARD, Commissioner, | : | THIS IS A CAPITAL CASE |
| Pennsylvania Department of | : | |
| Corrections; WILLIAM S. | : | |
| STICKMAN, Superintendent of the | : | |
| State Correctional Institution at Greene; | : | |
| and JOSEPH P. MAZURKIEWICZ, | : | |
| Superintendent of the State Correctional | : | |
| Institution at Rockview, | : | |
| | : | |
| Respondents | : | |

## MEMORANDUM

### July 7, 2008

Pending before the Court is Petitioner Seifullah Abdul-Salaam's ("Abdul-Salaam" or "Petitioner") Motion for Relief on the Merits ("Merits Motion"), filed on April 6, 2007. (Doc. 118.) Abdul-Salaam is seeking relief on the merits of two of the claims presented in his previously-filed petition for writ of habeas corpus. (*See* Doc. 8.) The Court has jurisdiction to review these habeas claims pursuant to 28 U.S.C. § 1331 and the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996) (codified at 28 U.S.C. § 2254), and we have reviewed the submissions of the parties as well as heard oral

argument.  For the reasons set forth below, the Merits Motion will be denied and the Court will stay these federal habeas proceedings and place them in abeyance pending exhaustion of the claims presented in Abdul-Salaam's newly-filed third state post-conviction petition, (Doc. 109).

## I.     FACTUAL AND PROCEDURAL HISTORY

The intricate facts underlying this death penalty homicide case, which is before the Court pursuant to Abdul-Salaam's petition for writ of habeas corpus (Doc. 8), are well known to the parties and need not be restated in detail here.  As such, this brief summary of the factual and procedural background follows.[1]

On the morning of August 19, 1994, Abdul-Salaam and Scott Anderson traveled to the town of New Cumberland, Pennsylvania in a borrowed Suzuki Sidekick.  When they reached New Cumberland, they parked their vehicle in an alley around the corner from the D & S Coin Shop, which was located on Fourth Street and owned by Dale Rishel.  Abdul-Salaam approached the coin shop, knocked on the front door and entered.  Anderson followed and entered the shop shortly thereafter.  Mr. Vinh Tran, a Fourth Street resident, observed these events.

Once inside the shop, Abdul-Salaam asked Mr. Rishel about gold coins he

---

[1] The Pennsylvania Supreme Court summarized these facts from the evidence presented at the guilt phase of Abdul-Salaam's trial.  *See Commonwealth v. Abdul-Salaam*, 678 A.2d 342, 345-46 (Pa. 1996).

believed were located there.  Mr. Rishel informed him that he did not carry such coins and suggested another dealer.  Abdul-Salaam then pulled a revolver from under his shirt and he and Anderson attempted to subdue Mr. Rishel.  The front window of the shop was broken in the process.  Mr. Rishel, however, was overcome by the men, who taped his face and legs and tied his arms behind his back.

When Mr. Tran heard the shop's front window break, he alerted his landlord, who subsequently called 911.  Officer Willis Cole of the New Cumberland Police Department responded to the call.  He parked his squad car on Fourth Street and approached the coin shop on foot.  As he did so, Abdul-Salaam and Anderson apparently became aware of his presence, and finding no rear door to the shop, exited the front door.

Abdul-Salaam was able to flee the scene, but Officer Cole intercepted Anderson.  As he prepared to handcuff Anderson, Abdul-Salaam reappeared from the alley where the Suzuki Sidekick was parked.  He sprinted towards Officer Cole, shooting as he ran.  Officer Cole was able to return fire, hitting Abdul-Salaam in the leg.  However, Abdul-Salaam continued to shoot at Officer Cole. Officer Cole then staggered into Fourth Street and collapsed after receiving a bullet through his heart.  Various witnesses who lived and/or worked in the neighborhood

witnessed these events as they unfolded.

After the shooting, Abdul-Salaam and Anderson fled the scene, dropping the revolver used to shoot Officer Cole as they ran.  They reached the Suzuki and proceeded in the direction of Harrisburg.  However, police were soon able to pursue them after receiving a description of the Suzuki and the perpetrators on police radio.  A high speed chase ensued, but Abdul-Salaam and Anderson lost control of the Suzuki and had to abandon the vehicle, fleeing on foot.  Anderson was apprehended several blocks from the abandoned vehicle.  Abdul-Salaam was arrested later that morning near the home of his girlfriend while the two were walking her dog.

Upon his arrest, Abdul-Salaam requested treatment for his leg wound and was transported to a local hospital and accompanied by a police officer.  Abdul-Salaam asked the officer, "What are my options?"  After readvising Abdul-Salaam of his right to remain silent and right to counsel, the officer told Abdul-Salaam to speak with an attorney.  Abdul-Salaam then stated, "All I'm going to say is that 'Scotty Love' did it."  "Scotty Love" is an alias for Scott Anderson.

Abdul-Salaam's trial commenced on March 9, 1995, in the Court of Common Pleas for Cumberland County, Pennsylvania ("trial court" or "Cumberland County court") after jury selection.  Among other things, various

4

witnesses testified as to the events surrounding the robbery and killing of Officer

Cole.  On March 15, 1995, after a six day trial, Abdul-Salaam was convicted of

robbery, conspiracy, and the first degree murder of Officer Cole.  The following

day the trial court reconvened for the sentencing hearing.  After concluding that the

aggravating circumstances proven by the Commonwealth outweighed the

mitigating circumstances proven by the defense, the jury unanimously sentenced

Abdul-Salaam to death.  Accordingly, on March 24, 1995, the trial court imposed

the sentence of death rendered by the jury.

On direct appeal, the Pennsylvania Supreme Court affirmed Abdul-Salaam's

conviction and sentence by its order of June 18, 1996.  *Commonwealth v. Abdul-*

*Salaam*, 678 A.2d 342 (Pa. 1996) ("*Abdul-Salaam I*").  Following the conclusion

of the direct appeal, then-Governor Thomas J. Ridge signed a warrant scheduling

Abdul-Salaam's execution for the week of October 27, 1996.  Abdul-Salaam then

filed a motion for a stay of execution in the Pennsylvania Supreme Court on

October 10, 1996, and a stay was issued on October 25, 1996, *see Commonwealth*

*v. Abdul-Salaam*, 684 A.2d 539 (Pa. 1996), pending the resolution of Abdul-

Salaam's petition for writ of certiorari by the United States Supreme Court.  That

petition was denied on March 31, 1997.  *Abdul-Salaam v. Pennsylvania*, 520 U.S.

1157 (1997).

On April 29, 1997, then-Governor Ridge signed a second warrant scheduling Abdul-Salaam's execution for the week of May 25, 1997. Abdul-Salaam filed a motion for a stay of execution in the trial court in order to obtain state post-conviction review of his conviction and sentence. The Honorable Kevin A. Hess of the Cumberland County court issued a stay of execution on May 22, 1997.

In addition to filing the motion for a stay of execution, on May 13, 1997, Abdul-Salaam filed a *pro se* petition ("First PCRA Petition") for relief under Pennsylvania's Post-Conviction Relief Act ("PCRA"), 42 Pa. C.S.A. § 9541, *et seq*. Counsel was appointed to represent Abdul-Salaam and an amended petition was filed on September 23, 1997. Following hearings in late 1997 and early 1998, the trial court, now serving as PCRA court, denied all of Abdul-Salaam's claims for relief on November 12, 1998. *Commonwealth v. Abdul-Salaam*, 94-1499 Crim. Term, *In re* Post-Conviction Relief Hearing (filed Nov. 12, 1998) (Hess, J.) (Doc. 19-2 at 108-123) ("PCRA Op."). The Pennsylvania Supreme Court affirmed that decision on December 31, 2001. *Commonwealth v. Abdul-Salaam*, 808 A.2d 558 (Pa. 2001) ("*Abdul-Salaam II*"). On January 10, 2002, Abdul-Salaam filed an application for reconsideration of Pennsylvania Supreme Court's December 31, 2001, decision.

While this application was pending, Abdul-Salaam filed a second state post-

conviction petition ("Second PCRA Petition") in the trial court on February 28, 2002.  On July 10, 2002, the PCRA court issued a notice of its intention to dismiss the Second PCRA Petition, and on July 18, 2002, it entered an order giving Abdul-Salaam twenty (20) days within which to show cause why his Second PCRA Petition should not be dismissed without a hearing.  In response to that order, Abdul-Salaam asserted, *inter alia*, that any dismissal of his Second PCRA Petition while his request for re-argument was pending on his First PCRA Petition would be premature.  The PCRA court agreed and withheld judgment in the case pending disposition of the First PCRA Petition.  Subsequently, on September 20, 2002, the Pennsylvania Supreme Court denied Abdul-Salaam's application for reconsideration of his First PCRA Petition.

On October 22, 2002, then-Governor Mark Schweiker signed Abdul-Salaam's third death warrant, scheduling his execution for December 12, 2002. Because the PCRA court had not yet acted on the Second PCRA Petition and given the imminent execution date, on November 8, 2002, Abdul-Salaam filed an emergency motion for a stay of execution in the Pennsylvania Supreme Court.  On that same day, the PCRA court filed its opinion pursuant to Pa. R. App. P. 1925 in support of its denial of the Second PCRA Petition.  *Commonwealth v. Abdul-Salaam*, 94-1499 Crim. Term, *In re* Opinion Pursuant to Rule 1925 (filed Nov. 8,

2002) (Hess, J.).  After hearing oral argument on one of Abdul-Salaam's claims presented in his Second PCRA Petition, on December 4, 2002, the Pennsylvania Supreme Court issued an order denying Abdul-Salaam's November 8, 2002, request for a stay of execution.  An opinion followed on December 12, 2002. *Commonwealth v. Abdul-Salaam*, 812 A.2d 497 (Pa. 2002) ("*Abdul-Salaam III*").

In the meantime, on November 25, 2002, Abdul-Salaam filed in this Court a motion for a stay of execution, as well as for appointment of counsel and leave to proceed *in forma pauperis*.  (Doc. 1.)  The Court granted the motion by Order dated December 9, 2002, staying Abdul-Salaam's execution pending disposition of the forthcoming habeas petition.  (Doc. 6.)

Abdul-Salaam filed his habeas petition on March 25, 2003.  (Doc. 8.) Respondents, represented by the Cumberland County District Attorney, filed a response to the petition on August 11, 2003.  (Doc. 19.)  On October 27, 2003, Abdul-Salaam filed his reply memorandum.  (Doc. 23.)

On that same day, Abdul-Salaam filed a motion for omnibus intermediate relief in habeas corpus proceedings, requesting various forms of relief, including the right to conduct additional discovery and to have the Court conduct an evidentiary hearing on a number of his claims.  (Doc. 22.)  Following responsive and reply briefing, the Court granted in part and denied in part the motion on July

26, 2004. (Doc. 33.) Specifically, among other things, the Court denied Abdul-Salaam's request for an evidentiary hearing, but permitted Abdul-Salaam to conduct limited discovery.

In permitting limited discovery, the Court allowed Abdul-Salaam to: (1) propound an interrogatory regarding whether the Commonwealth had provided the so-called Harlacker Report (which contains information about one Tony Clifton) to trial or appellate defense counsel, (2) inspect certain biological evidence, and (3) take limited depositions. (*See* Doc. 33 at 8-10.) Subsequent to the Court's determination, the parties reached a stipulation, filed August 11, 2004, (Doc. 35), in lieu of the interrogatory regarding the Harlacker Report. The stipulation stated, in relevant part:

> [T]he parties agree that based upon the state of the full record before this Court that there is no evidence that the Harlacker Report was provided to Petitioner's counsel at any time prior to April 16, 1998, and Respondents do not contend to the contrary.

(Doc. 35.)

The Court also permitted Abdul-Salaam to inspect all remaining biological evidence in order to determine whether additional discovery and/or scientific testing of such would be appropriate. (Doc. 9-10.) Following that inspection, Abdul-Salaam filed a second motion for discovery on March 1, 2005, seeking the Court's permission to conduct DNA testing of apparent blood found on the

9

steering wheel of the Suzuki sport utility vehicle, presented by the Commonwealth as the getaway vehicle.  (Doc. 43.)

Following additional briefing on the motion, oral argument, and an evidentiary hearing, on August 11, 2005, the Court granted in part Abdul-Salaam's motion and allowed his expert to gather the apparent blood evidence from the steering wheel and to conduct DNA testing.  (*See* Doc. 77.)  Respondents took an interlocutory appeal of that Order to the United States Court of Appeals for the Third Circuit.  (*See* Doc. 78.)  On October 6, 2005, the Third Circuit Court dismissed the appeal for lack of appellate jurisdiction.  (*See* Doc. 83.)  Respondents then filed in this Court a motion for a stay of the Court's August 11, 2005, Order, (Doc. 85), which the Court granted on January 2, 2006, (Doc. 87).  The Court also stayed the August 11, 2005, Order, pending Respondents' appeal to the United States Supreme Court.  (*Id.*)  Respondents' petition for writ of certiorari was denied on May 22, 2006.  *Beard v. Abdul-Salaam*, 126 S. Ct. 2295 (May 22, 2006).

Following these interlocutory appellate proceedings, biological evidence from the steering wheel was gathered and DNA testing was conducted.  The results of testing established that the blood gathered from the steering wheel was not Abdul-Salaam's; rather, the blood on the wheel was that of the co-defendant, Scott Anderson.  Respondents do not contest the results of this DNA testing.

On January 16, 2007, while the instant action remained pending, Abdul-Salaam protectively filed a third state post-conviction petition ("Third PCRA Petition") in the Cumberland County court.  (*See* Doc. 109.)  In the petition, Abdul-Salaam presented the results of his expert Dr. Blake's testing of the steering wheel.  Additionally, Abdul-Salaam requested that the court hold the petition in abeyance pending this Court's disposition of the instant motion.  To date, the PCRA court has taken no action on the Third PCRA Petition.

In the instant motion, Abdul-Salaam has presented the Court with a rather unique scenario.  Rather than asking the Court to consider the entire habeas corpus petition (Doc. 8), Abdul-Salaam now requests that the Court bypass many of the issues presented in the petition and instead grant relief on the merits of only two of his habeas claims.[2]  In the first of the two claims Abdul-Salaam wishes the Court to consider,[3] set forth in his habeas petition as Claim IV, Abdul-Salaam claims that the Commonwealth withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963),[4] when it failed to disclose the existence of blood

---

[2] In his suggestions regarding the future course of the litigation, Abdul-Salaam does suggest, *inter alia*, that should the Court deny the instant motion on the merits, it must still address the other claims in the habeas petition, (Doc. 8).  (*See* Doc. 150 at 34-35.)

[3] For purposes of analysis, the Court has reordered the claims.

[4] Briefly, in *Brady* the United States Supreme Court established the principle that a defendant has a due process right to request and receive evidence in the government's possession that is material to his guilt or punishment, and that failure to adhere to this principle constitutes a

remaining on the steering wheel which, after subsequent DNA testing, proved to be that of Scott Anderson and not Abdul-Salaam.  In his second claim, set forth in his habeas petition as Claim I, Abdul-Salaam claims that the Commonwealth withheld exculpatory evidence in violation of *Brady* when it failed to provide to defense counsel the Harlacker Report containing information from Tony Clifton, which report suggests that Abdul-Salaam was not the man discussing a robbery with Scott Anderson in a vehicle the night before the robbery and killing of Officer Cole.  We will now turn to the factual background underpinning each claim.

## A.   *Brady*-Blood Claim

At Abdul-Salaam's original 1995 trial in the Cumberland County court, Donald P. Bloser, Jr., a forensic scientist with the Pennsylvania State Police Crime Laboratory, testified on behalf of the Commonwealth that when he tested the Suzuki steering wheel for the presence of blood he found Type B blood, which matched Abdul-Salaam's blood type to within ten percent (10%) of the population.[5]  (Trial, Notes of Testimony ("NT") 3/14/95 at 125.)  Mr. Bloser, however, performed this testing without using DNA testing modalities.  (*Id.* at

---

violation irrespective of the good faith or bad faith of the prosecution.  *Brady*, 373 U.S. at 86-88.

[5] Mr. Bloser also tested for blood type a pair of blue jeans and two pairs of boxer shorts belonging to Abdul-Salaam and found Type B blood on all of the items.  (NT 3/14/95 at 118-19.)

118.)  Rather, he separated the Type B blood to identify enzymes which would

further narrow the results.  (*Id.* at 120-21.)  When the Commonwealth asked why

he did not get results on two enzymes he had tested, Mr. Bloser stated,

> A:    I did not get a result.  There was not enough blood there to do
>       those two.
>
> Q:    Not enough blood on the steering wheel?
>
> A:    Yes.

(*Id.* at 121.)  On cross examination, Mr. Bloser further testified:

> Q:    Now, can you recognize on that photograph [of the steering wheel]
>       discolored areas on the steering wheel consistent with the blood which
>       you found when it was delivered to you for testing?
>
> A:    Yes.
>
> Q:    And your testimony is that even with this quantity of discoloration
>       that we see, there was insufficient blood for the purposes of doing the
>       Isoenzyme tests?
>
> A:    On some I got three of the five enzymes.  So I used most of it for the
>       three.  And I did not have enough - - what I used for the last two did
>       not give me results.

                                   * * *

> Q:    And I guess you tried to remove all of the blood from the
>       wheel?
>
> A:    As much as I could.

(*Id.* at 124, 128.)

13

In light of Mr. Bloser's trial testimony, before the PCRA court Abdul-Salaam asserted that the Commonwealth violated his due process rights in violation of *Arizona v. Youngblood*, 488 U.S. 51 (1988),[6] when it consumed the entire blood sample for testing.  In relying on *Youngblood*, Abdul-Salaam contended that the police had destroyed the entire blood sample in bad faith.  The PCRA court disagreed, however, finding that Abdul-Salaam had failed to offer evidence that the blood sample was in fact destroyed in bad faith.  PCRA Op. at 16.  Noting that "[t]he presence or absence of bad faith by the police must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed," *Youngblood*, 488 U.S. at 56 n.1, the PCRA court denied Abdul-Salaam's claim that his due process rights were violated when the entire blood sample was used.  PCRA Op. at 16.

In his habeas petition filed in this Court, Abdul-Salaam originally raised this same claim regarding the blood evidence pursuant to *Youngblood*.  (*See* Doc. 8 at 84-88.)  In support of that claim, at the hearing on Abdul-Salaam's second motion for discovery, the Court heard testimony from Mr. Bloser.  Specifically, Mr. Bloser

---

[6] Briefly, in *Youngblood* the Supreme Court held that when considering evidence lost by the government, "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," a defendant must show that the government acted in bad faith in order to demonstrate a due process violation.  *Youngblood*, 488 U.S. at 57-58.

14

read from his lab notes which had been generated contemporaneously with his

work on the case.  His notes read, in pertinent part,

> Inside [an evidence box] is one dark green steering wheel with
> suspected blood.  Lots of blood, but on different areas.

(Discovery Hearing, Notes of Testimony ("NT") 8/2/05 at 36-37, Doc. 107.)  He

also testified as follows:

> Q:   Do I understand your testimony to be, sir, that when you
> handed off the wheel to the fingerprint folks, that in your view
> there was blood remaining on the wheel?
>
> A:   I could not say it was blood, I did not test it, but it looked like it
> was possible blood.
>
> * * *
>
> Q:   Are you suggesting, after having read that [his own trial
> testimony], that you meant to say that there was still remaining
> blood on the steering wheel?
>
> A:   The question was, was there - - the results mean there was not
> enough blood on the steering wheel, not enough - - and I said
> not enough - - they said not enough blood on the steering
> wheel, I said yes, for - -
>
> Q:   But you meant - -
>
> A:   - - the enzymes.  I did not - - of the sample I collected.  Of the
> sample - - of the sample I collected there was not enough blood.
>
> Q:   That's what you're saying now.  My question is, your answer at
> the time was that there was not enough - - you responded yes to
> the question that there's no remaining blood - -

15

A:      I answered the question yes.

(NT 8/5/05 at 51-52.)

By Memorandum and Order dated August 11, 2005, the Court found that

Abdul-Salaam had demonstrated good cause for his discovery request, and that

state exhaustion of the request in the context of this case was not required.  (*See*

Doc. 77.)  As a result, the Court crafted a protocol for examination of remaining

biological evidence on the steering wheel, removal of a sample, and for DNA

testing of the same.  (*See id.* at 12-14.)

Pursuant to the Court's directives, Abdul-Salaam's DNA expert, Dr. Edward

T. Blake of the Forensic Science Associates in Richmond, California, conducted

the DNA testing of the biological evidence remaining on the steering wheel in

cooperation with Respondents.  Dr. Blake subsequently authored three reports,

which were provided to Respondents and the Court.  (*See* Docs. 99, 101, 116.)

These reports, read together, establish that the blood recovered from the steering

wheel according to our protocols was that of the co-defendant, Scott Anderson,

rather than Abdul-Salaam's.  To reiterate, Respondents have not contested the

results of this DNA testing.

## B.     *Brady*-Clifton Claim

Approximately four months after the killing of Officer Cole, New

Cumberland Police Officer Brian Nailor prepared a report dated December 29, 1994, which describes his attempts to follow up on a tip that a previously unidentified man may have information on the robbery and killing of Officer Cole. (*See* Petitioner's Appendix, Ex. 1, Doc. 11) ("Nailor Report").  Through information provided by several persons, Officer Nailor tracked down Viola Troyan, a woman who had an individual named Tony Clifton in her employ around the time of Officer Cole's killing.  According to Ms. Troyan,

> Tony would talk about being involved with the two (2) guys that were in prison for shooting a Police Officer in New Cumberland. . . . [H]e was with them in a vehicle and that they had talked about robbing a jewelry store in New Cumberland and when he found out what they were going to do, he didn't want any part of it, they dropped him off at a gas station and he walked back across the bridge into Harrisburg.

(Nailor Report at 2.)

Officer Nailor then spoke with Clifton's ex-girlfriend, Terri Garret, and her daughter, Tasha, by telephone.  Both women recalled, "Tony saying something about being with some guys and that they were talking about doing something stupid at a coin store and when Tony found out what was going to happen, he got out of the vehicle and walked back."  (*Id.* at 3-4.)

Finally, Officer Nailor attempted to find Tony Clifton, but was unsuccessful. He did note, however, Clifton's ties to both Pennsylvania (through his employer and acquaintances) and Virginia (through relatives and a criminal history in that

state).  (*Id.* at 4.)

Officer Nailor's report of December 29, 1994, was provided to Abdul-Salaam's defense counsel prior to the trial.  (Doc. 8 at 26.)  Clifton was not called as a witness at trial, and in fact the record indicates that he was located by Abdul-Salaam's appellate counsel in February 1998, approximately three years after Abdul-Salaam was convicted and sentenced.  (*Id.*)

As stated above, Abdul-Salaam filed his counseled First PCRA Petition on September 23, 1997.  Hearings on the petition took place in late 1997 and early 1998.  After as aforestated Abdul-Salaam's PCRA counsel located Clifton, he signed a declaration on February 12, 1998, describing his knowledge of the robbery and killing of Officer Cole.  (*See* Petitioner's Appendix, Ex. 2, Doc. 11) ("Clifton Declaration").  Specifically, he stated the following:

> On the night of August 18th 1994, I approached Gary [Miller, manager of the Midnight Special] inside the Midnight Special [bar in Harrisburg] and asked whether he knew anyone at the bar that could give me a ride home.  Gary indicated he might be able to find someone that could provide me with a ride home and he approached another man inside the bar whom I now know was Scott Anderson.  I was able to hear Gary ask Scott whether Scott could give me a ride and overheard Scott ask Gary whether I was "cool."  I understood Scott's question of Gary as an attempt to determine whether I could be trusted.  Gary indicated he knew me and that I could be trusted.

> Very early in the morning, I along with Scott Anderson, and another black man that I had not previously met left the Midnight Special and got into a car driven by Scott Anderson.  As we pulled out of the

18

parking lot and Scott Anderson began speaking with the other man and pretty soon it became clear to me that they were discussing plans to commit a robbery. Although I did not hear what the specific target of the robbery was, I did understand that the robbery was of a jewelry or coin store across the river from Harrisburg. It was clear that the robbery was Scott Anderson's plan and he was the one in charge. It was also clear that the other man agreed to do the robbery as Anderson had planed [sic] it. When I realized what was going on I became frightened and asked them to drop me off at the next intersection which they did.

I managed to get home by myself and as I didn't have to go to work the next day, I slept in and woke up in the afternoon. Later that same day I was watching TV when the show I was watching was interrupted for a special news report about a shooting of a police officer that had taken place in New Cumberland. The report indicated that the officer had been shot during a robbery and immediately, I began to think about the conversation that I overheard the night before. The TV report said that the police had captured two suspects in the shooting and showed pictures of the two men that had been taken into custody.

I immediately recognized one of those men as Scott Anderson, the same man planing [sic] the robbery as he was driving me home. However, the pictures of the other man in custody I did not recognize and had never seen before. This man was most definitely not the man that was in the front seat with Scott Anderson as Scott discussed his plans for a robbery.

* * *

A couple months later I was approached by a Detective from Cumberland County. Apparently, some of my friends had told the police about what I had told them about how I had been given a ride by one of the men arrested for the shooting of the officer. I do not recall the name of the Detective from Cumberland County that interviewed me. All I can remember was that he was a large white man in plain clothes that showed me law enforcement identification from Cumberland County.

This Detective began to ask me about the events of August 18th

19

and August 19th and I proceeded to tell him what I have stated in this Affidavit/Declaration.  I recall that as I was talking to him he was taking notes and asked me several times to slow down so he could catch up with what I was telling him.  I also recall that he asked me specifically if the other individual in the car with Scott Anderson on the night of August 18th was Seifullah Abdul-Salaam.  I told him that the other man in the car was most definitely not the other man shown on TV on August 19, 1994 when Scott Anderson was arrested.

I have since been shown a single photograph of a man that has been identified to me as Seifullah Abdul-Salaam.  This was the same man that I saw on TV who was identified as one of the robbers.  As I told the detective from Cumberland County in 1995, I am positive that Seifullah Abdul-Salaam was not the other man in the car with Scott Anderson and myself on the night of August 18, 1994.

(Clifton Declaration at 1-3.)

In light of Clifton's Declaration, Abdul-Salaam filed a supplement to the amended First PCRA Petition, which argued, in relevant part, that the Commonwealth had failed to provide defense counsel with information on the identity of the officer who had interviewed Clifton after submission of the Nailor Report and before trial, as well as information on Clifton's whereabouts.  (*See* Petitioner's Appendix, Ex. 3, Doc. 11) ("Petitioner's PCRA Supplement").  Abdul-Salaam requested, *inter alia*, that the PCRA court conduct an evidentiary hearing on the Clifton issue; that the Commonwealth identify the officer who interviewed Clifton; and that the Commonwealth produce a copy of the notes and police report of that officer.  (*Id.* at 13-14.)  The Commonwealth filed an answer to Petitioner's

PCRA Supplement, but did not at the time provide the requested information.

Instead of conducting a separate evidentiary hearing, the PCRA Court continued to hear evidence in early 1998 in proceedings on the First PCRA Petition.  In particular, on April 16, 1998, Abdul-Salaam called as a witness Officer Nailor.  During his testimony Officer Nailor identified Detective John Harlacker of the Dauphin County Criminal Investigation Division ("CID") as the "person that actually spoke to Mr. Clifton."  (PCRA Hearing, Notes of Testimony ("NT") 4/16/98 at 11.)  Mr. Nailor also provided a copy of the report which detailed Detective Harlacker's efforts to gather information on Tony Clifton in January 1995.  (*See* Petitioner's Appendix, Ex. 5, Doc. 11) ("Harlacker Report").  Further, Mr. Nailor provided a transmittal sheet showing that Detective Harlacker faxed his report to New Cumberland Police Chief Oren Kauffman and the Cumberland County CID on January 17, 1995, approximately two months prior to the commencement of jury selection in Abdul-Salaam's case.  (*See id.*)  Officer Nailor also expressed his opinion that the Cumberland County District Attorney's ("D.A.") Office received the Harlacker Report at that time as well.  (NT 4/16/98 at 21.)  Detective Norman Chronister of the Cumberland County D.A.'s Office also

testified at the PCRA hearings that the Commonwealth's prosecuting attorneys[7]

were provided with the Harlacker Report prior to commencement of jury selection.

(NT 4/22/98 at 16-17.)

As a result of the foregoing, Detective Harlacker was called and testified

about his investigation and interview of Tony Clifton.  Detective Harlacker

testified that he interviewed Clifton in January 1995 in Harrisburg, Pennsylvania.

(*Id.* at 37-38.)  At that time, Clifton explained to Harlacker that he had been with

Scott Anderson in a vehicle driven by another unknown individual in the early

morning hours of August 19, 1994.  (*Id.* at 38.)  Anderson and the unknown

individual were discussing a plan to rob a coin shop the next day.  (*Id.*)  The day

after the robbery of the coin shop and killing of Officer Cole, Clifton saw

Anderson on the local news covering the incident, but was not sure that the other

man identified as a suspect in the killing (Abdul-Salaam) was the same man who

had been in the vehicle with Anderson and Clifton.  (*Id.* at 39.)  Clifton did tell

Detective Harlacker, however, that he was willing to look at a photographic array

or a lineup in order to identify the man from the vehicle.  (*Id.* at 39-40.)  Detective

Harlacker testified that neither he, nor to his knowledge, any other detective

---

[7] Prosecuting the case for the Commonwealth were then-District Attorney, and now Pennsylvania Supreme Court Justice Michael J. Eakin, and Assistant District Attorney Allison Taylor.

followed up with Clifton about such an identification. (*Id.* at 40.) He simply

"gathered the information and forwarded it." (*Id.*)

Detective Harlacker transmitted his report to Chief Kauffman of the New

Cumberland Police Department within days of interviewing Clifton, but received

no further requests from that Department, Cumberland County CID, or the

Cumberland County D.A.'s Office. (NT 4/22/98 at 37.) Detective Harlacker did

indicate, however, that he would have performed further investigation after the

report was transmitted, had it been requested of him. (*Id.*)

Tony Clifton also testified at the PCRA hearing.[8] Clifton testified that he

had been drinking the night he got in the vehicle with Anderson and the

unidentified man, but was still able to remember what he saw and heard in the

vehicle. (NT 4/23/98 at 101-02.) When Clifton saw the television news coverage,

he focused mainly on the photograph of Anderson because he remembered him

from the vehicle. (*Id.* at 105.) When asked about the unidentified individual in the

vehicle, Clifton provided the following testimony:

> Q:   Mr. Clifton, the other individual that was in the car along with
> Mr. Anderson, did you have an opportunity to see that
> individual?

---

[8] While Clifton did make some corrections to his affidavit during his testimony, (NT 4/23/98 at 91-92, 110, 119-20), generally his testimony reflected the declarations made in the affidavit.

23

A:      Yeah, I saw him.

Q:      You saw him approach the vehicle and get into the front of the
        vehicle with Mr. Anderson?

A:      No, I didn't see him get in, but when I looked up he was like I
        told you.  You know, I was like leaning out the window.  When
        he got in the car and started the car, I looked up to see who was
        getting in and who was driving, right, okay?

Q:      Okay.

A:      I looked up and I seen the dude, the other guy.

* * *

Q:      You did see the other gentleman in the car; is that correct?

A:      Yeah.

Q:      Okay.  Were you able to see the other gentleman's profile, the
        side of his face?

A:      Yeah.

Q:      Okay.  Were you able to see the back of his head?

A:      Yeah.

Q:      Were you able to get an idea of his approximate size?

A:      Yeah.

* * *

Mr. Nickerson:      Mr. Abdul-Salaam, please stand up.

Q:      Mr. Clifton, I would ask you to look at the gentleman that's

24

standing next to me right now, is this the gentleman that was in the car with Scott Anderson on the early morning hours of August the 19th, 1994?

A:      Not when I was in the car.

(*Id.* at 106-08.)

Finally, at the PCRA hearing, Abdul-Salaam's trial counsel, Speros Lappas, Esquire, testified about both Clifton and the Harlacker Report.  Attorney Lappas indicated that he did have knowledge of Clifton's existence prior to trial through Detective Nailor's report, but he did not "recall making an issue out of Mr. Clifton's existence."  (NT 4/23/98 at 157.)  Further, he did not recall receiving the Harlacker Report prior to trial.  (*Id.* at 126.)

## II.     REVIEWABILITY OF CLAIMS

The instant motion has been fully briefed and the Court has heard oral argument.  Thus, the motion is ripe for disposition.

A habeas corpus petition pursuant to 28 U.S.C. § 2254 is the proper mechanism for a prisoner to challenge the "fact or duration" of his confinement. *Preiser v. Rodriguez*, 411 U.S. 475, 498-99 (1973).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Rather, federal habeas review is restricted to claims based "on the ground that [petitioner] is in custody in

violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §

2254(a); *Estelle*, 502 U.S. at 67-68; *see also Johnson v. Rosemeyer*, 117 F.3d 104,

109 (3d Cir. 1997).

Before a court may review a § 2254 petition, the petitioner must demonstrate

exhaustion of state court remedies and lack of procedural default.[9]  Only then may

the court examine the merits of the petition.

### A.      Exhaustion

Habeas corpus relief cannot be granted unless all available state remedies

have been exhausted, or there is an absence of available state corrective process, or

circumstances exist that render such process ineffective to protect the rights of the

applicant.  *See* 28 U.S.C. § 2254(b)(1).  The exhaustion requirement is grounded

on principles of comity in order to ensure that state courts have the initial

opportunity to review federal constitutional challenges to state convictions.  *See*

*Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000).

---

[9] 28 U.S.C. § 2254(b)(1) provides the following:

(b)(1) An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted unless it appears
that –
          (A) the applicant has exhausted the remedies available in the courts of the
State; or
          (B)(i) there is an absence of available State corrective process; or
          (ii) circumstances exist that render such process ineffective to protect the
rights of the applicant.

A state prisoner exhausts state remedies by giving the "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  Respect for the state court system requires that the petitioner demonstrate that the claims in question have been "fairly presented to the state courts." *Castille v. Peoples*, 489 U.S. 346, 351 (1989).  Fair presentation also requires the petitioner to raise the claim in a procedural context in which the state courts can consider it on the merits.  *Id.*

If a petitioner presents unexhausted habeas claims to a federal court, but state procedural rules bar further state court review, the federal court will excuse the failure to exhaust and treat the claims as exhausted.  *Wenger v. Frank*, 266 F.3d 218, 223 (3d Cir. 2001); *Lines v. Larkin*, 208 F.3d 153, 160 (3d Cir. 2000); *see Teague v. Lane*, 489 U.S. 288, 297-98 (1989).  Although deemed exhausted, such claims are considered procedurally defaulted.  *Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *Lines*, 208 F.3d at 160.

A federal habeas court cannot review the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice, or that a fundamental miscarriage of justice will result if the court does not review the claims.  *See McCandless v. Vaughn*, 172 F.3d 255, 260

27

(3d Cir. 1999); *Coleman*, 501 U.S. at 750; *Caswell v. Ryan*, 953 F.2d 853, 857,

861-62 (3d Cir. 1992).  To demonstrate cause for a procedural default, the

petitioner must show that some objective external factor impeded petitioner's

efforts to comply with the state's procedural rule.  *See Murray v. Carrier*, 477 U.S.

478, 488 (1986).  To demonstrate actual prejudice, the petitioner must show "not

merely that the errors . . . created a *possibility* of prejudice, but that they worked to

his *actual* and substantial disadvantage, infecting [the entire proceeding] with error

of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982)

(emphasis in original).

Alternatively, a federal court may excuse a procedural default if the

petitioner demonstrates that failure to review the claim will result in a fundamental

miscarriage of justice.  *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000);

*Wenger*, 266 F.3d at 224.  The miscarriage of justice exception applies only in

extraordinary cases where a "constitutional violation has probably resulted in the

conviction of one who is actually innocent."  *Murray*, 477 U.S. at 496.

Finally, even when a petitioner properly exhausts a claim, a federal court

may not review it on the merits if a state court's decision rests on a violation of a

state procedural rule that is independent of the federal question presented and

adequate to support the judgment.  *Whitney v. Horn*, 280 F.3d 240, 252-53 (3d Cir.

28

2002); *Leyva v. Williams*, 504 F.3d 357, 365-66 (3d Cir. 2007).

### B.      Standard of Review for Claims Under 28 U.S.C. § 2254

Section 2254(d) of Title 28 of the United States Code provides, in pertinent

part, that an application for a writ of habeas corpus premised on a claim previously

adjudicated on the merits in state court shall not be granted unless:

> (1) [the decision] was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) [the decision] was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  To establish that the decision was contrary to federal law, "it

is not sufficient for the petitioner to show merely that his interpretation of Supreme

Court precedent is more plausible than the state court's; rather, the petitioner must

demonstrate that Supreme Court precedent *requires* the contrary outcome." *Matteo*

*v. Superintendent*, 171 F.3d 877, 888 (3d Cir. 1999) (emphasis in original).

Similarly, a federal court will only find a state court decision to be an unreasonable

application of federal law if the decision, "evaluated objectively and on the merits,

resulted in an outcome that cannot reasonably be justified under existing Supreme

Court precedent." *Id.* at 890.

Further, under 28 U.S.C. § 2254(e)(1), a federal court is required to presume

that a state court's findings of fact are correct.  A petitioner may only rebut this

29

presumption with clear and convincing evidence of the state court's error. *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions); *Matteo*, 171 F.3d at 888; *Thomas v. Varner*, 428 F.3d 492, 497-98 (3d Cir. 2005).  This presumption of correctness applies to both explicit and implicit findings of fact.  *Campbell v. Vaughn*, 209 F.3d 280, 285-86 (3d Cir. 2000).  Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings."  *Mastracchio* v. Vose, 274 F.3d 590, 598 (1st Cir. 2000).

Like the "unreasonable application" prong of paragraph (1), a factual determination should be adjudged "unreasonable" under paragraph (2) only if the court finds that a rational jurist could not reach the same finding on the basis of the evidence in the record.  28 U.S.C. § 2254(d)(2); *Porter v. Horn*, 276 F. Supp. 2d 278, 296 (E.D. Pa. 2003); *see also Torres v. Prunty*, 223 F.3d 1103, 1107-08 (9th Cir. 2000); *cf. Jackson v. Virginia*, 443 U.S. 307, 317 (1979).  "This provision essentially requires the district court to step into the shoes of an appellate tribunal, examining the record below to ascertain whether sufficient evidence existed to support the findings of fact material to the conviction."  *Breighner v. Chesney*, 301

F. Supp. 2d 354, 364 (M.D. Pa. 2004) (citing 28 U.S.C. § 2254(d)(2) and (f)[10]).

Mere disagreement with an inferential leap or credibility judgment of the state

court is insufficient to permit relief.  *Porter*, 276 F. Supp. 2d at 296; *see also*

*Williams v. Taylor*, 529 U.S. 362, 410 (2000); *Hurtado v. Tucker*, 245 F.3d 7, 16

(1st Cir. 2001).  Only when the finding lacks evidentiary support in the state court

record or is plainly controverted by evidence therein should the federal habeas

court overturn a state court's factual determination.  *Porter*, 276 F. Supp. 2d at

296; *see also Williams*, 529 U.S. at 408-10.

## III.   DISCUSSION

Abdul-Salaam's instant motion advances as aforestated two grounds for

relief, both set forth as due process violations under *Brady*.  The Court will now

address the claims in turn.

### A.   *Brady*-Blood Claim

Abdul-Salaam contends that Respondents failed to disclose material

exculpatory evidence in violation of *Brady* when their expert testified at trial that

he had used the entire blood sample taken from the Suzuki steering wheel in

identifying Abdul-Salaam as a participant in the robbery and shooting of Officer

---

[10] "If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such determination."  28 U.S.C. § 2254(f).

Cole.  Further, Abdul-Salaam claims that this *Brady*-blood claim has been

exhausted in the state courts, and as a result this Court may consider the claim on

the merits.  Respondents, however, argue that this claim has not been exhausted in

the state courts because Abdul-Salaam originally brought this claim under

*Youngblood* rather than *Brady*.  After careful review of the record and upon

application of the relevant law, the Court agrees with Respondents as to this claim.

### 1.    Exhaustion

The principle of federal-state comity has long required a state prisoner to

give the state courts an initial opportunity to pass upon and correct alleged

violations of federal rights before a federal court will entertain his habeas petition.

*See Picard v. Connor*, 404 U.S. 270, 275 (1971).  The Supreme Court has

emphasized that to exhaust available state remedies "the federal claim must be

fairly presented to the state courts . . . .  Accordingly, we have required a state

prisoner to present the state courts with the same claim he urges upon the federal

courts."  *Id*. at 275-76 (citations omitted).

The Third Circuit Court of Appeals has also stated that a fair presentation of

a federal claim to the state courts

> requires that the claim brought in federal court be the substantial
> equivalent of that presented to the state courts.  Both the legal theory and
> the facts underpinning the federal claim must have been presented to the
> state courts, and the same method of legal analysis must be available to

the state court as will be employed in the federal court.

*Evans v. Court of Common Pleas*, 959 F.2d 1227, 1231 (3d Cir. 1992) (citations

omitted).

In the instant case, Abdul-Salaam argues that although this claim was

presented to the state courts under the standard set forth in *Youngblood* rather than

under *Brady*, the exhaustion doctrine does not preclude this Court's review of the

*Brady*-blood claim.  In support, he makes two arguments.

First, Abdul-Salaam contends that he has already presented the underlying

blood claim to the state courts in his first state post-conviction litigation, thus he

need not present the blood claim again to the state courts, "even with the new

facts."  (Doc. 118 at 14.)  We disagree.

In his appeals before the state courts as well as in his habeas petition, Abdul-

Salaam relied on *Youngblood* to support his assertion that "Petitioner's right to due

process of law was violated when the Commonwealth consumed an entire blood

sample that would have exculpated him."  (Doc. 8, Issue IV, pp. 84-88.)  The

PCRA court rejected Abdul-Salaam's contention that his due process rights were

violated, reasoning,

> [Abdul-Salaam] here points to the bad faith element of
> *Youngblood* . . . ; namely, that the petitioner's due process rights would
> only have been violated if the police had destroyed the blood sample in
> bad faith. [Abdul-Salaam], however, offers no evidence that the blood

33

sample, in this case, was consumed in bad faith. The evidence is, in fact, to the contrary. The sample involved was consumed while being tested and not as a result of any attempt on the part of the Commonwealth to destroy evidence.

PCRA Op. at 16. The PCRA court's merits analysis clearly turned on the element of bad faith in *Youngblood*, in fact stating, "[Abdul-Salaam] has not proven that there existed any official bad faith when the sample was tested. As such, [Abdul-Salaam]'s claim that his due process rights were violated must and does fail." *Id.* On appeal from the PCRA court decision, the Pennsylvania Supreme Court determined that Abdul-Salaam could have raised this claim in his direct appeal but failed to do so. *Abdul-Salaam II*, 808 A.2d at 560. Consequently, the court deemed the claim waived and refused to review it on the merits. *Id.*

Subsequently, as a result of this Court having permitted Abdul-Salaam to generate relevant discovery in these federal habeas proceedings, the *Youngblood* claim has manifestly evolved into a *Brady* claim, as clearly demonstrated by the facts set forth herein. To wit: the discovery we permitted uncovered measurable blood on the Suzuki steering wheel that has been recovered and tested. While both the *Youngblood* and *Brady* standards relate to the withholding of evidence by the prosecution, the standards are distinguishable. In fact, the consequences of applying a *Youngblood* rather than a *Brady* analysis can be quite serious: under *Youngblood* the defendant bears the substantially greater burden of showing that

34

the police acted in bad faith in destroying the evidence; however, under *Brady*

motivation ceases to be relevant.[11]  *See United States v. Femia*, 9 F.3d 990, 993

(1st Cir. 1993) ("The Supreme Court's jurisprudence divides cases involving

nondisclosure of evidence into two distinct universes.  *Brady* and its progeny

address exculpatory evidence still in the government's possession.  *Youngblood*

and [*California v. Trombetta*, 467 U.S. 479 (1984)] govern cases in which the

government no longer possesses the disputed evidence."); *United States v.

Caicedo-Llanos*, 960 F.2d 158, 161 (D.C. Cir. 1992).

The discovery conducted in the matter *sub judice* has removed the blood

claim from the realm of *Youngblood* and placed it firmly into *Brady* territory.

Based upon the distinct standards in each, and because neither the existence of the

blood nor the *Brady* claim it triggers were ever before the PCRA court, we find

that the state courts must have the opportunity to consider the blood claim under

*Brady* rather than *Youngblood*.  Necessarily then, it follows that Abdul-Salaam's

---

[11] The Court notes that under either *Youngblood* or *Brady*, Abdul-Salaam is obliged to demonstrate that the evidence he seeks is in some fashion material to his defense.  *See Brady*, 373 U.S. at 87 (to implicate due process, evidence must be "material to either guilt or punishment"); *United States v. Bagley*, 473 U.S. 667, 682 (1985) (*Brady*'s materiality requirement forces the defendant to show that there "is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."); *Youngblood*, 488 U.S. at 57 (lost evidence must at least be amenable to tests that might exonerate the defendant).  However, in light of the Court's decision with respect to exhaustion of the *Brady*-blood claim, we need not offer judgment on this issue of materiality at this time.

argument with respect to exhaustion fails.

In his second contention, Abdul-Salaam claims that even if he did present the instant *Brady*-blood claim to the state courts, there is currently no available state court remedy, and thus exhaustion is excused. *See* 28 U.S.C. § 2254(b)(1)(B)(I) (exhaustion is not required if "there is an absence of available State corrective process"); *Porter*, 276 F. Supp. 2d at 292 ("Under the 'futility exception' to the exhaustion requirement, if state procedural rules bar the applicant from seeking further relief on the unexhausted claim in the state courts, the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.") (citations omitted). Respondents counter that Abdul-Salaam has not exhausted the *Brady*-blood claim because he has an adequate remedy at law in the state courts. Specifically, Respondents claim that if Abdul-Salaam is claiming that he has obtained newly discovered evidence through discovery permitted in these habeas corpus proceedings, under the Pennsylvania PCRA statute, he can file a PCRA petition requesting an evidentiary hearing and relief under the PCRA. *See* 42 Pa. C.S.A. § 9545(b)(1)(ii).[12] Respondents contend that

---

[12] That section reads, in pertinent part,

(1) Any petition under this subchapter, including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:

* * *

Abdul-Salaam recognizes this state court remedy by virtue of the fact that he filed

a third PCRA petition in the state court within the time for filing such a petition.

*See* 42 Pa. C.S.A. § 9545(b)(2).[13]

As stated above, the blood claim has evolved with newly established facts

into one that the state courts have not yet considered.[14]  Put another way, we are no

longer dealing with an allegation of blood *destroyed*, but rather, one that involves

---

   (ii) the facts upon which the claim is predicated were unknown to the
petitioner and could not have been ascertained by the exercise of due diligence.

42 Pa. C.S.A. § 9545(b)(1)(ii).

 [13] That section reads

   (2) Any petition invoking an exception provided in paragraph (1) shall be filed
within 60 days of the date the claim could have been presented.

42 Pa. C.S.A. § 9545(b)(2).

 [14] As a result of this finding that the *Brady*-blood claim is in essence a new claim not yet
considered by the state courts, we need not consider Abdul-Salaam's argument that the law of
the case doctrine is applicable here.  *See Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d Cir.
1994) ("The law of the case doctrine limits the extent to which an issue will be reconsidered
once the court has made a ruling on it.").
  In addition, the Court must also reject Abdul-Salaam's alternative argument that *Banks v.
Dretke*, 540 U.S. 668 (2004), controls the exhaustion argument here.  As stated by Abdul-
Salaam, "In *Banks* the Court held that the exhaustion doctrine does not require a habeas
petitioner to return to state court when he uncovers exculpatory evidence in federal habeas
corpus proceedings that was previously hidden or suppressed by the prosecution when the
underlying claim was raised in state post-conviction proceedings and denied."  (Doc. 118 at 16.)
In *Banks*, however, the petitioner's claim began as a *Brady* claim in the state courts and
remained one throughout the state and federal appellate proceedings.  In fact, it was the *Brady*
claim that was denied in state court.  In the instant case, since the state courts have not been
asked to consider the blood claim as one under a separate standard under *Brady*, rather only
under *Youngblood*, the reasoning in *Banks* in inapplicable.

blood *withheld*.  As a result, the PCRA court is entitled to review this claim under

*Brady* rather than *Youngblood*.  *See Evans*, 959 F.2d at 1231 (holding that fair

presentation of federal claim in state court requires that both the legal theory *and*

the facts underpinning the claim must have been presented to the state courts).

And while it is the case that this Court has eliminated the application of

Pennsylvania's post-conviction DNA statute, *see* 42 Pa. C.S.A. § 9543.1, through

the permitting of discovery in these federal habeas proceedings, (*see* Doc. 77),

under 42 Pa. C.S.A. § 9545(b)(1)(ii), that discovery is admissible in further state

court proceedings on Abdul-Salaam's Third PCRA petition.  Consequently, Abdul-

Salaam's second argument in support of exhaustion fails.

### 2.    Procedural Default

Abdul-Salaam also claims that the *Brady*-blood claim is procedurally barred

from further state court review, and as a result the Court may consider the merits of

the claim.  Again, the Court disagrees.

A habeas claim has been procedurally defaulted when "a state court declined

to address a prisoner's federal claims because the prisoner had failed to meet a

state procedural requirement."  *Coleman*, 501 U.S. at 730.  For a federal habeas

claim to be barred by procedural default, however, the state rule must have been

announced prior to its application in the petitioner's case and must have been

"firmly established and regularly followed." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991). Whether the rule was "firmly established and regularly followed" is determined as of the date the default occurred, not the date the state court relied on it, *Doctor v. Walters*, 96 F.3d 675, 684 (3d Cir. 1996), because a petitioner is entitled to notice of how to present a claim in state court, *Ford*, 498 U.S. at 423-24.

In the instant case, this Court has already held that the waiver of this claim found by the Pennsylvania Supreme Court was not based on an adequate state ground creating a procedural bar to its review by this Court. (*See* Doc. 33 at 17-22.) Nevertheless, Abdul-Salaam has presented further arguments in support of a procedural bar. The Court finds none of these arguments availing.

First, Abdul-Salaam contends that because this Court has already decided that the Pennsylvania Supreme Court's waiver ruling is not "adequate" to prevent a merits review in this Court, (*see* Doc. 33 at 17-22), we can and must review the claim now. However, as set forth above, the Court has determined that the *Youngblood* claim is distinguishable from the *Brady* claim, and therefore the state courts have not yet been afforded the opportunity to review the *Brady*-blood claim. Therefore, this argument fails.

Next, in support of his claim for a procedural bar of the *Brady*-blood claim, Abdul-Salaam revisits the Pennsylvania Supreme Court's decision with respect to

39

the *Brady*-Clifton claim.  In *Abdul-Salaam II*, the state supreme court found the

*Brady*-Clifton claim waived because it was not raised on direct appeal, despite the

post-conviction record revealing that the Clifton evidence was provided to Abdul-

Salaam only after the commencement of the post-conviction proceedings.  *Abdul-*

*Salaam II*, 808 A.2d at 560.  Abdul-Salaam contends that because the state court

considered the *Brady*-Clifton claim procedurally barred in such a manner, "there is

every reason to believe that the same procedural analysis will govern the

presentation of the *Brady*-blood claim."  (Doc. 150 at 7.)  Given that the *Brady*-

blood claim has yet to be presented to the state courts, this Court cannot forecast

with any degree of confidence the Pennsylvania Supreme Court's position

regarding the procedural bar on the *Brady*-blood claim simply by examining its

disposition of the *Brady*-Clifton claim.  In practical effect, Abdul-Salaam asks us

to compare apples to oranges, and we must thus reject this additional argument as

well.

Having determined that Abdul-Salaam's arguments with respect to

exhaustion and procedural default fail, the Court holds that Abdul-Salaam has

failed to satisfy the exhaustion requirement with respect to this *Brady*-blood claim.

Thus, the Court is precluded from reviewing the merits of this claim.  The better

way, and indeed the only proper course, is to allow Abdul-Salaam's Third PCRA

Petition to be fully litigated in state court.

**B.   *Brady*-Clifton Claim**

As stated above, Abdul-Salaam claims that Respondents violated his due process rights under *Brady* when they failed to disclose the Harlacker Report containing further material and exculpatory information from Tony Clifton.  This Court has previously held that this claim is not procedurally defaulted.[15]  (*See* Doc. 33 at 17-22.)  However, the Court will reserve judgment on this issue pending Abdul-Salaam's exhaustion of the *Brady*-blood claim before the state courts.

Our decision to withhold judgment here is rooted in the potentially pending cumulative analysis of the PCRA court with respect to the materiality of all the undisclosed evidence.  As a case in point, when considering the Clifton evidence, the PCRA court held that the evidence was immaterial, without having decided whether the evidence had been turned over to defense counsel.  PCRA Op. at 6-9.

The PCRA court properly identified *Kyles v. Whitley*, 514 U.S. 419 (1995), as the controlling precedent for determining materiality of suppressed evidence under *Brady*.  In *Kyles*, the Supreme Court determined that evidence is deemed material when there is "a reasonable probability that, had the evidence had been

_____

[15] By Memorandum and Order dated July 26, 2004, this Court held that the six waivers, including a waiver of the *Brady*-Clifton claim, found by the Pennsylvania Supreme Court were not based on an adequate state ground creating a procedural bar to their review by this Court. (See Doc. 33 at 17-22.)

disclosed to the defense, the result of the proceeding would have been different."
*Id*. at 433.  In order for evidence to be material, it is not necessary that the evidence
establish by a preponderance that disclosure of the evidence would have resulted in
an acquittal.  *Id*. at 434-35.  Importantly, the Court stated, "We evaluate the
tendency and force of the undisclosed evidence item by item; there is no other way.
We evaluate its cumulative effect for purposes of materiality . . . ."  *Id*. at 437 n.10.

In the instant case, the PCRA court, without the benefit of the DNA
evidence discovered through these federal habeas proceedings, did not err in its
cumulative analysis of materiality for purposes of determining whether a *Brady*
violation that had a reasonable probability of affecting the result of the trial had
occurred relative to the Clifton evidence.  Simply put, the learned PCRA court
could not measure what it did not know.  However, under the *Kyles* precedent, the
Clifton evidence and DNA evidence, taken together, must now be considered
cumulatively for purposes of materiality and determining "if there is a reasonable
probability that, had the evidence been disclosed to the defense, the result of the
proceeding would have been different."  *Id*. at 433.  The Court is convinced that,
for purposes of a determination of materiality of any allegedly suppressed evidence
under *Kyles*, the DNA evidence must be placed into the proverbial mix along with

the previously weighed Clifton evidence.

### C.     Stay and Abeyance

Due to the Court's determination that Abdul-Salaam has not exhausted his state remedies as to the *Brady*-blood claim, yet another procedural obstacle in this protracted and complex case has arisen.  Abdul-Salaam's habeas petition before this Court has now become mixed; that is, it includes both exhausted and unexhausted claims.  *See* 28 U.S.C. § 2254(b)(1) ("[a]n application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State"); *see, e.g.*, *Rhines v. Weber*, 544 U.S. 269, 277-78 (2005); *Crews v. Horn*, 360 F.3d 146, 147 (3d Cir. 2004).  Thus, as it stands, this Court could not grant Abdul-Salaam's habeas petition even if we were to determine that any portion of it had merit.  *See Crews*, 360 F.3d at 154.  Abdul-Salaam has anticipated this problem, however, and has requested that the Court stay the proceedings and place them in abeyance pending exhaustion of his state remedies for the *Brady*-blood claim, should the Court conclude that it may not address the merits of that claim.  We agree and will grant that request subject to the conditions hereafter set forth.

In *Rhines*, the Supreme Court found that under certain circumstances it is appropriate to stay and abey the federal habeas proceedings while the petitioner

exhausts his unexhausted claims in state court.  *Id.* at 277-78.  In particular, the Supreme Court held that "it likely would be an abuse of discretion for a district court to deny a stay and to dismiss a mixed petition if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics."  *Id.* at 278.

Under the circumstances presented in this case, *Rhines* counsels in favor of a stay of litigation in this case while Abdul-Salaam exhausts the review process on his Third PCRA petition.  However, this stay will be conditioned upon Abdul-Salaam returning to federal court within thirty (30) days of the conclusion of his state court proceedings on his Third PCRA Petition.  *See id.*, 544 U.S. at 278 ("district courts should place reasonable time limits on a petitioner's trip to state court and back") (citing *Zarvela v. Artuz*, 254 F.3d 374, 381 (2d Cir. 2001) (thirty days is a reasonable time interval to give a petitioner to return to federal court following pendency of state court proceedings)).  In order to keep this matter moving forward, the Court will require Abdul-Salaam to file status reports with the Court at ninety (90) day intervals until the state court processes are completed.[16]

---

[16] These status reports need not be detailed, but should include sufficient information to allow us to ascertain the procedural posture of the state court proceedings.

Abdul-Salaam's failure to provide the Court with the requested status reports will result in the Court vacating the stay of litigation on his habeas corpus petition.

## IV.    CONCLUSION

This Court is acutely cognizant that we are now at a point nearly a decade and a half after the murder of Officer Cole. We recognize as well that the complex nature of habeas corpus jurisprudence is virtually indecipherable to individuals such as Officer Cole's family members.  Justifiably, they seek an end to what to them must appear a frustratingly, if not maddeningly, long trip up and down the ladders of the state and federal courts.  We know too that our decision today will continue that painful sojourn.

But this is a court of law, and we are sworn to provide justice to all.  In particular, this case presents yet another scenario triggered by DNA recovery and testing modalities that were not utilized in a 1995 trial.  The decision on whether the newly discovered evidence is material, as Abdul-Salaam argues, or is a red herring, as Respondents posit, will be left for another day.  We are fully confident that the experienced and knowledgeable PCRA court is in the best position to weave the additional facts that have now been uncovered into an appropriate analysis.

For the foregoing reasons, Abdul-Salaam's Merits Motion will be denied.

Abdul-Salaam's *Brady* claim based on the blood evidence established through discovery in these habeas proceedings is unexhausted and must be presented to the state courts.  As a result of this determination, the Court will reserve judgment on the merits of Abdul-Salaam's *Brady* claim based on the Clifton information.  This case will be stayed pending exhaustion of Abdul-Salaam's unexhausted claims in the state courts.  If Abdul-Salaam is denied state post-conviction relief, he will have thirty (30) days from the time of denial to resume his habeas corpus proceedings before this Court.

An appropriate Order shall be entered.