IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SEIFULLAH ABDUL-SALAAM, | : | No. 4:02-CV-2124 |
| | : | |
| Petitioner | : | Hon. John E. Jones III |
| | : | |
| v. | : | |
| | : | |
| JEFFREY BEARD, Commissioner, | : | THIS IS A CAPITAL CASE |
| Pennsylvania Department of | : | |
| Corrections; WILLIAM S. | : | |
| STICKMAN, Superintendent of the | : | |
| State Correctional Institution at Greene; | : | |
| and JOSEPH P. MAZURKIEWICZ, | : | |
| Superintendent of the State Correctional | : | |
| Institution at Rockview, | : | |
| | : | |
| Respondents | : | |

## MEMORANDUM

### April 24, 2014

Pending before the Court is a counseled petition for writ of habeas corpus,
filed pursuant to 28 U.S.C. § 2254, on behalf of Petitioner Seifullah Abdul-Salaam
("Petitioner" or "Abdul-Salaam"), a state inmate under sentence of death and
currently incarcerated at the State Correctional Institution at Greene ("SCI-
Greene") in Waynesburg, Pennsylvania. (Doc. 8.) Abdul-Salaam is challenging
his 1995 convictions and sentence in the Court of Common Pleas of Cumberland
County, Pennsylvania. For the reasons set forth below, and after careful
consideration of the petition, this Court concludes that Petitioner's claims are

without merit.  Thus, the petition for writ of habeas corpus will be denied.

## I.   FACTUAL AND PROCEDURAL HISTORY

On March 15, 1995, Abdul-Salaam was found guilty of first degree

murder, robbery, and conspiracy, following a six-day jury trial in the Court of

Common Pleas of Cumberland County, Pennsylvania ("trial court" or

"Cumberland County court").  The Pennsylvania Supreme Court summarized the

relevant facts as follows:

> The record reveals that on the morning of August 19, 1994, [Abdul-Salaam] and Scott Anderson drove toward the town of New Cumberland, Pennsylvania in a borrowed Suzuki Sidekick.  First, in Camp Hill, Pennsylvania, then outside of New Cumberland, the two men asked for directions.  At approximately 10:30 a.m., [Abdul-Salaam] and Anderson arrived in New Cumberland and parked their car in Maple Alley.  Maple Alley runs perpendicular to Fourth Street. [Abdul-Salaam] walked across Fourth Street to the D&S Coin Shop which was owned by Mr. Dale Rishel.  The coin shop was a one-room building with storefront windows.  [Abdul-Salaam] knocked on the door to the coin shop and entered.  A resident of Fourth Street, Mr. Vinh Tran, observed [Abdul-Salaam] pass him on the street and noted that [Abdul-Salaam] knocked on the coin shop door, since few people knocked before entering.  Anderson followed and entered the coin shop shortly thereafter, carrying gloves and a bag.  Again, Mr. Tran observed Anderson and found remarkable Anderson's heavy clothing on such a warm summer's morning.
>
> Once inside the coin shop, [Abdul-Salaam] asked Mr. Rishel about specific gold coins.  Mr. Rishel responded that he did not carry that inventory but suggested another dealer.  [Abdul-Salaam] then pulled a revolver from under his shirt and he and Anderson came across the counter onto Mr. Rishel to subdue him.  The front window of the store was broken during this altercation.  Mr. Rishel was taped across the

2

face and around his legs, and his hands were tied behind his back with a cord.  [Abdul-Salaam] kicked Mr. Rishel in the head, while Anderson began to go through Mr. Rishel's goods.

Immediately upon hearing the breaking of the front window of the coin shop, Mr. Tran alerted his landlord, Mr. James Howie, of the situation.  Mr. Howie called 911.  Officer Willis Cole of the New Cumberland Police Department ultimately responded to the 911 call. Officer Cole parked his squad car on Fourth Street in front of Mr. David Michael's barbershop, which is on the same side of Fourth Street as the coin shop.  As Officer Cole approached the coin shop, the perpetrators apparently became aware of his presence and, finding no rear escape, exited the front door, first [Abdul-Salaam], then Anderson.

[Abdul-Salaam] was able to escape from the scene, however, Officer Cole intercepted Anderson.  Officer Cole ordered Anderson to lie face down and prepared to handcuff him.  Mr. Michaels watched as [Abdul-Salaam], with his back against a building and revolver drawn, reappeared from Maple Alley as if he had circled part of the block. [Abdul-Salaam] then sprinted from the alley toward Officer Cole shooting at Officer Cole as he ran.  Having been warned by individuals in the street, Officer Cole was able to return [Abdul-Salaam]'s fire, hitting [Abdul-Salaam] in the leg.  However, [Abdul-Salaam] continued shooting.  Officer Cole staggered into the middle of Fourth Street and collapsed after receiving a bullet through his heart.  These events, literally unfolding in front of them, were observed by various witnesses who lived and/or worked in the neighborhood, including Mr. Rishel, Mr. Tran, Mr. Howie, and Mr. Michaels.

[Abdul-Salaam] and Anderson fled the scene, dropping the revolver used to kill Officer Cole as they ran.  They returned to their car and proceeded in the direction of Harrisburg.

After receiving a description of the Suzuki and of [Abdul-Salaam] and Anderson via police radio, Officer Rodney Smith of the Middlesex Township Police Department spotted and pursued the two individuals

outside of Harrisburg. After a high speed chase, [Abdul-Salaam] and Anderson lost control of the Suzuki which then came to a stop. The men abandoned the car, fleeing on foot. As [Abdul-Salaam] exited the vehicle, he looked directly at Officer Smith. Anderson was found several blocks away and was arrested. Shortly thereafter, [Abdul-Salaam] was arrested in an alley near the home of his girlfriend, Christina Reeves, while the two were walking her dog.

Ms. Reeves agreed to allow the police to search her home, where [Abdul-Salaam] occasionally spent the night. She also signed a consent form indicating that the police were searching for a handgun and clothing. Pursuant to the search, the police found a briefcase in Ms. Reeves' bedroom closet which contained ammunition and correspondence belonging to [Abdul-Salaam].

After his arrest, [Abdul-Salaam] invoked his right to counsel and his right to remain silent. [Abdul-Salaam] requested treatment for his leg wound and was taken to a local hospital accompanied by a custodial officer, Detective Victor Rivera. [Abdul-Salaam] and the officer engaged in small talk when [Abdul-Salaam] asked the officer, "What are my options?" The officer readvised [Abdul-Salaam] of his rights and told him that he could tell his attorney whatever it was that he wanted to tell him. [Abdul-Salaam] then stated: "All I'm going to say is that 'Scotty Love' did it." No follow-up questions were asked by Detective Rivera.

At trial, various witnesses, including Mr. Rishel, Mr. Tran, Mr. Howie, Mr. Michaels, and Officer Smith, testified as to the events surrounding the robbery and the murder of Officer Cole. Among those witnesses, a ballistics expert was able to match the revolver left at the scene with the bullet recovered from Officer Cole's body and a Pennsylvania State Police Officer employed in the Latent Print and Automated Fingerprint Identification sections of the Laboratory Division was able to match [Abdul-Salaam]'s fingerprint with a latent fingerprint found in the Suzuki.

*Commonwealth v. Abdul-Salaam*, 678 A.2d 342, 345-47 (Pa. 1996) ("*Abdul-*

*Salaam-I*").  The penalty phase commenced on the following day, March 16, 1995.

During the penalty phase, the jury found four aggravating circumstances: (1) the

victim was a peace officer who was killed in the performance of his duties, *see* 42

Pa. Cons. Stat. § 9711(d)(1); (2) Abdul-Salaam committed a killing while in the

perpetration of a felony (robbery), *see* 42 Pa. Cons. Stat. § 9711(d)(6); (3) in the

commission of the offense, Abdul-Salaam knowingly created a grave risk of death

to another person in addition to the victim of the offense, *see* 42 Pa. Cons. Stat. §

9711(d)(7); and (4) Abdul-Salaam has a significant history of felony convictions

involving the use or threat of violence to the person, *see* 42 Pa. Cons. Stat. §

9711(d)(9).  The jury also found one mitigating circumstance: "[a] background that

includes both physical and mental abuse does have a negative impact on a person's

development and therefore his future behavior," *see* 42 Pa. Cons. Stat. § 9711(e)(8)

(relating to the character and record of the defendant).  The jury concluded that the

aggravating circumstances outweighed the mitigating circumstances and returned a

sentence of death, *see* 42 Pa. Cons. Stat. § 9711(c)(1)(iv).

On March 24, 1995, the trial court formally imposed the sentence of death

for first degree murder rendered by the jury.  In addition, Abdul-Salaam was

sentenced to concurrent terms of imprisonment of four (4) to eighteen (18) years

on the robbery conviction, one and one half (1-1/2) to five (5) years and

prosecution costs on the conspiracy conviction.

Represented by his trial counsel, Spero T. Lappas, Esquire, Abdul-Salaam filed a timely direct appeal to the Pennsylvania Supreme Court,[1] raising six (6) claims for relief.  Specifically, Abdul-Salaam presented the following issues for review, as characterized by the Pennsylvania Supreme Court:

> 1.  Does a suppression court err by denying a pre-trial motion to suppress eyewitness identifications where the witnesses had a poor opportunity to observe the perpetrator, and where the identifications follow prejudicial pre-trial exposure to the defendant, in-person and in media reports?
>
> 2.  Does a suppression court err when it refuses to suppress a statement which results from custodial interrogation after the defendant's expression of his desire to exercise his rights to silence and to counsel?
>
> 3.  Does a suppression court err when it denies a motion to suppress the fruits of the warrantless search of a closed container, where there is no effective consent for the search?
>
> 4.  Does a trial court err in denying a defense motion for payment of eyewitness expert witness expenses, when the Commonwealth's case is based in large part on eyewitness identifications?
>
> 5.  Does a trial court err in denying the defendant's pre-trial motions which are aimed to preclude the death penalty in a case where the Commonwealth did not file or serve any Rule 352 notice at formal arraignment?

---

[1] The appeal of a death sentence is directly to the Pennsylvania Supreme Court rather than to the Superior Court.  *See* 42 Pa. Cons. Stat. § 9711(h).

6.  Does a trial court err by failing to charge the jury that if they were not convinced that the defendant fired the fatal shot, that could be considered a mitigating factor?

(Doc. 197, Vol. 1, Ex. 1, App.'s Br, at 2.)

The Pennsylvania Supreme Court affirmed Abdul-Salaam's convictions and sentence by its order of June 18, 1996.  *Abdul-Salaam-I*, 678 A.2d 342 (Pa. 1996). Following the conclusion of the direct appeal, then-Governor Thomas J. Ridge signed a warrant scheduling Abdul-Salaam's execution for the week of October 27, 1996.  Abdul-Salaam then filed a motion for a stay of execution in the Pennsylvania Supreme Court on October 10, 1996, and a stay was issued on October 25, 1996, *see Commonwealth v. Abdul-Salaam*, 684 A.2d 539 (Pa. 1996), pending the resolution of Abdul-Salaam's petition for writ of certiorari by the United States Supreme Court.  That petition was denied on March 31, 1997. *Abdul-Salaam v. Pennsylvania*, 520 U.S. 1157 (1997).

On April 29, 1997, then-Governor Ridge signed a second warrant scheduling Abdul-Salaam's execution for the week of May 25, 1997.  Abdul-Salaam filed a motion for a stay of execution in the trial court in order to obtain state post-conviction review of his convictions and sentence.  The Honorable Kevin A. Hess of the Cumberland County court issued a stay of execution on May 22, 1997.

In addition to filing the motion for a stay of execution, on May 13, 1997,

7

Abdul-Salaam filed a *pro se* petition ("First PCRA Petition") for relief under

Pennsylvania's Post-Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. §§ 9541-

9546.  Counsel was appointed to represent Abdul-Salaam and an amended petition

was filed on September 23, 1997.  (Doc. 197, Vol. 1, Ex. 4.)  In the amended

petition, Abdul-Salaam raised the following claims:

> I.  Ineffective assistance of counsel at capital sentencing rendered
> Seifullah Abdul-Salaam's death sentence constitutionally infirm and
> requires relief under the Sixth, Eighth and Fourteenth Amendments to
> the United States Constitution and the corresponding portions of the
> Pennsylvania Constitution.

> II.  The prosecutor violated the dictates of *Brady v. Maryland* and its
> progeny, the due process clause of the Fourteenth Amendment to the
> United States Constitution and the corresponding portions of the
> Pennsylvania Constitution when it withheld Petitioner's juvenile
> records from Petitioner.

> III.  Petitioner[ ] was denied due process of law guaranteed under the
> State and Federal Constitutions when the court failed to instruct the
> jury during the penalty phase that it could find mitigation under 42
> Pa.C.S. § 9711(e)(2) & (3).  Petitioner was also denied the effective
> assistance of counsel at trial and on appeal when trial counsel failed to
> request such an instruction and when appellate counsel failed to
> litigate this issue on direct appeal.

> IV.  Petitioner is entitled to relief from his death sentence because the
> arbitrary, inconsistent and unprincipled broadening of the (d)(9)
> aggravating circumstance - - "felony convictions involving the use or
> threat of violence to the person" - - to include juvenile adjudications
> of delinquency deprived Petitioner of his rights under the Eighth and
> Fourteenth Amendments to the United States Constitution and the
> corresponding portions of the Pennsylvania Constitution.

V.  Pennsylvania's "significant history" of violent felony convictions aggravating circumstance is unconstitutionally vague on its face and as it was applied to Petitioner, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Pennsylvania Constitution.

VI.  Petitioner's death sentence must be vacated because the "proportionality review" performed by the Pennsylvania Supreme Court did not provide him the meaningful appellate review mandated by 42 Pa. C.S. § 9711(h)(3)(iii) and State and Federal Constitutional law.

VII.  Counsel was ineffective for failing to raise the issues presented in this petition at trial, in post-trial motions and for failing properly to litigate these issues on direct appeal to the Pennsylvania Supreme Court.

VIII.  Petitioner is entitled to relief from his conviction and sentence because of the cumulative effect of the errors described in this petition.

(*Id.*)  The trial court, now serving as the PCRA court, held hearings in late 1997 and early 1998.  In addition, during the PCRA hearings, Abdul-Salaam filed a supplement to his amended PCRA petition on March 3, 1998, asserting the following additional claim:

Petitioner was denied due process of law secured by the Eighth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Pennsylvania Constitution when the Commonwealth and its agents suppressed material and exculpatory evidence in violation of *Brady v. Maryland* and made false evidentiary presentations and argument which were contradicted by the suppressed evidence.

(Doc. 197, Vol. 1, Ex. 6.)  Following the hearing, the PCRA court denied all of

9

Abdul-Salaam's claims for relief on November 12, 1998. *Commonwealth v.*

*Abdul-Salaam*, 94-1499 Crim. Term, *In re* Post-Conviction Relief Hearing (filed

Nov. 12, 1998) (Hess, J.) (Doc. 19-2 at 8-23) ("PCRA Op."). The Pennsylvania

Supreme Court affirmed that decision on December 31, 2001. *Commonwealth v.*

*Abdul-Salaam*, 808 A.2d 558 (Pa. 2001) ("*Abdul-Salaam-II*"). On January 10,

2002, Abdul-Salaam filed an application for reconsideration of Pennsylvania

Supreme Court's December 31, 2001, decision.

While this application was pending, Abdul-Salaam filed a second state post-

conviction petition ("Second PCRA Petition") in the trial court on February 28,

2002. In this petition, Petitioner presented the following claims:

> I. The Pennsylvania Supreme Court's failure to review the merits of
> the bulk of Petitioner's substantive claims on appeal violated due
> process. In order to vindicate Petitioner's right to due process, this
> court must permit renewed post-conviction proceedings and
> subsequently, restore Petitioner's appellate rights which were denied
> to him by the Pennsylvania Supreme Court's retroactive application of
> new rules.
>
> II. Petitioner's death sentence violates due process of law under the
> State and Federal Constitutions because the jury was not instructed to
> find that the aggravating circumstances outweighed the mitigating
> circumstances beyond a reasonable doubt as required by *Apprendi v.*
> *New Jersey*. The Pennsylvania death penalty statute permitting the
> imposition of a death sentence upon a finding of less than beyond a
> reasonable doubt also violates due process.
>
> III. Petitioner's conviction resulted from the unavailability at the time
> of trial of exculpatory evidence regarding the scientific unreliability of

fingerprint evidence.  Moreover, since this evidence was in the possession of the prosecutor's expert witness, failure to disclose it violated due process.

IV.  New scientific evidence reveals brain abnormalities in victims of childhood abuse, neglect and dysfunction.  This new evidence must be considered in mitigation of the offense.

(Doc. 198, Vol. 2, Ex. 9.)

On July 10, 2002, the PCRA court issued a notice of its intention to dismiss the Second PCRA Petition, and, on July 18, 2002, it entered an order giving Abdul-Salaam twenty (20) days within which to show cause why his Second PCRA Petition should not be dismissed without a hearing.  In response to that order, Abdul-Salaam asserted, *inter alia*, that any dismissal of his Second PCRA Petition while his request for re-argument was pending on his First PCRA Petition would be premature.  The PCRA court agreed and withheld judgment in the case pending disposition of the First PCRA Petition.  Subsequently, on September 20, 2002, the Pennsylvania Supreme Court denied Abdul-Salaam's application for reconsideration of his First PCRA Petition.  *See Abdul-Salaam-II*, 808 A.2d 558 (Pa. 2001).

On October 22, 2002, then-Governor Mark Schweiker signed Abdul-Salaam's third death warrant, scheduling his execution for December 12, 2002. Because the PCRA court had not yet acted on the Second PCRA Petition and given

11

the imminent execution date, on November 8, 2002, Abdul-Salaam filed an

emergency motion for a stay of execution in the Pennsylvania Supreme Court.  On

that same day, the PCRA court filed its opinion pursuant to Pa. R. App. P. 1925 in

support of its denial of the Second PCRA Petition.  *Commonwealth v. Abdul-*

*Salaam*, 94-1499 Crim. Term, *In re* Opinion Pursuant to Rule 1925 (filed Nov. 8,

2002) (Hess, J.).  After hearing oral argument on one of Abdul-Salaam's claims

presented in his Second PCRA Petition, on December 4, 2002, the Pennsylvania

Supreme Court issued an order denying Abdul-Salaam's November 8, 2002

request for a stay of execution.  An opinion followed on December 12, 2002.

*Commonwealth v. Abdul-Salaam*, 812 A.2d 497 (Pa. 2002) ("*Abdul-Salaam-III*").

        In the meantime, on November 25, 2002, Abdul-Salaam filed in this Court a

motion for a stay of execution, as well as for appointment of counsel and leave to

proceed *in forma pauperis*.  (Doc. 1.)  The Court granted the motion by Order

dated December 9, 2002, staying Abdul-Salaam's execution pending disposition of

the forthcoming habeas petition.  (Doc. 6.)

        On March 25, 2003, Abdul-Salaam filed the instant petition for writ of

habeas corpus, in which he alleges twelve (12) claims for relief.  (Doc.  8.)

Specifically, those claims are set forth as follows:

> I.  Petitioner was denied due process of law in violation of the
> Fourteenth Amendment to the United States Constitution, when the

prosecution suppressed exculpatory evidence;

II. Petitioner was denied due process of law when unreliable identification testimony was admitted against him at trial, when the identifications were made under highly suggestive circumstances and where the identifying witness did not possess an independent source;

III. Petitioner received ineffective assistance of counsel when trial counsel failed to make a sufficient, specific proffer to support his request for the appointment of an eyewitness identification expert, where eyewitness identification was crucial to the case;

IV. Petitioner's right to due process of law was violated when the Commonwealth consumed an entire blood sample that would have exculpated him. Due process was further violated by the Commonwealth's manipulation of a photo of the co-defendant so as to falsely eliminate him as the source of the blood evidence in question;

V. Petitioner's conviction resulted from the unavailability at the time of trial of exculpatory evidence regarding the scientific unreliability of fingerprint evidence. Moreover, since this evidence was in the possession of the prosecution's expert witness, failure to disclose it violated due process;

VI. The jury's finding of the (d)(9) aggravating circumstance, that Petitioner had a "significant history of felony convictions involving the use or threat of violence to the person" violated Petitioner's rights in multiple respects;

VII. Petitioner's death sentence must be vacated because the arbitrary "proportionality review" performed by the Pennsylvania Supreme Court violated his right to due process and denied him the meaningful appellate review of death penalty cases constitutionally mandated by the Eighth Amendment;

VIII. Pennsylvania's capital sentencing scheme, and therefore Petitioner's death sentence violate the notice and jury trial guarantees of the Sixth Amendment and the due process clause of the Fifth

Amendment in failing to require either that aggravating circumstances be pled in a charging mechanism or that a finding that aggravating circumstances outweigh mitigating circumstances be made beyond a reasonable doubt;

IX.  Petitioner received constitutionally ineffective assistance of counsel at capital sentencing;

X.  The prosecution also withheld from defense counsel documents in its possession that would have mitigated punishment in violation of the due process clause;

XI.  Trial counsel was also ineffective when he failed to request instructions that the jury could consider evidence of Petitioner's abusive and dysfunctional upbringing under 42 Pa. C.S. § 9711(e)(2) &(3) and the trial court erred when it failed to provide such instructions; and,

XII.  The jury improperly found the existence of the (d)(6) aggravating circumstance in violation of due process of law and the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

(Doc. 8.)  Respondents, represented by the Cumberland County District Attorney, filed a response to the petition on August 11, 2003.  (Doc. 19.)  On October 27, 2003, Abdul-Salaam filed his reply memorandum.  (Doc. 23.)

On that same day, Abdul-Salaam filed a motion for omnibus intermediate relief in habeas corpus proceedings, requesting various forms of relief, including the right to conduct additional discovery and to have the Court conduct an evidentiary hearing on a number of his claims.  (Doc. 22.)  Following responsive and reply briefing, the Court granted in part and denied in part the motion on July

26, 2004.  (Doc. 33.)  Specifically, among other things, the Court denied Abdul-Salaam's request for an evidentiary hearing, but permitted Abdul-Salaam to conduct limited discovery.

In permitting limited discovery, the Court allowed Abdul-Salaam to: (1) propound an interrogatory regarding whether the Commonwealth had provided the so-called Harlacker Report (which contains information about one Tony Clifton) to trial or appellate defense counsel; (2) inspect certain biological evidence; and (3) take limited depositions.  (*See* Doc. 33 at 8-10.)  Subsequent to the Court's determination, the parties reached a stipulation, filed August 11, 2004, in lieu of the interrogatory regarding the Harlacker Report.  (Doc. 35.)  The stipulation stated, in relevant part:

> [T]he parties agree that based upon the state of the full record before this Court that there is no evidence that the Harlacker Report was provided to Petitioner's counsel at any time prior to April 16, 1998, and Respondents do not contend to the contrary.

(*Id.*)

The Court also permitted Abdul-Salaam to inspect all remaining biological evidence in order to determine whether additional discovery and/or scientific testing of such would be appropriate.  (Doc. 33 at 9-10.)  Following that inspection, Abdul-Salaam filed a second motion for discovery on March 1, 2005, seeking the Court's permission to conduct DNA testing of apparent blood found on

the steering wheel of the Suzuki sport utility vehicle, presented by the Commonwealth as the getaway vehicle.  (Doc. 43.)

Following additional briefing on the motion, oral argument, and an evidentiary hearing, on August 11, 2005, the Court granted in part Abdul-Salaam's motion and allowed his expert to gather the apparent blood evidence from the steering wheel and to conduct DNA testing.  (*See* Doc. 77.)  Respondents took an interlocutory appeal of that Order to the United States Court of Appeals for the Third Circuit.  (*See* Doc. 78.)  On October 6, 2005, the Third Circuit dismissed the appeal for lack of appellate jurisdiction.  (*See* Doc. 83.)  Respondents then filed in this Court a motion for a stay of the Court's August 11, 2005 Order, (Doc. 85), which the Court granted on January 2, 2006, (Doc. 87).  The Court also stayed the August 11, 2005 Order, pending Respondents' appeal to the United States Supreme Court.  (*Id.*)  Respondents' petition for writ of certiorari was denied on May 22, 2006.  *Beard v. Abdul-Salaam*, 126 S. Ct. 2295 (May 22, 2006).

Following these interlocutory appellate proceedings, biological evidence from the steering wheel was gathered and DNA testing was conducted.  The results of testing established that the blood gathered from the steering wheel was not Abdul-Salaam's; rather, the blood on the steering wheel was that of the co-defendant, Scott Anderson.  Respondents did not contest the results of this DNA

16

testing.

On January 16, 2007, while the instant action remained pending, Abdul-Salaam protectively filed a third state post-conviction petition ("Third PCRA Petition") in the Cumberland County court.  (*See* Doc. 109.)  In that petition, Abdul-Salaam presented the results of his expert Dr. Blake's testing of the steering wheel.  Additionally, Abdul-Salaam requested that the court hold the petition in abeyance pending this Court's disposition of the instant motion.

On April 6, 2007, Abdul-Salaam filed in this Court a motion for relief on the merits, seeking relief on the merits of two of his claims presented in his habeas petition.  (Doc. 118.)  Specifically, Abdul-Salaam asked the Court to review the following claims: (1) the Commonwealth withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose the existence of blood remaining on the steering wheel that, after subsequent DNA testing, proved to be that of Scott Anderson and not Abdul-Salaam; and (2) the Commonwealth withheld exculpatory evidence in violation of *Brady* when it failed to provide to defense counsel the Harlacker Report containing information from Tony Clifton, which suggested that Abdul-Salaam was not the man discussing a robbery with Scott Anderson in a vehicle the night before the robbery and killing of Officer Cole.  After reviewing the submissions of the parties and hearing oral

argument on November 14, 2007 (*see* Doc. 131), on July 7, 2008, this Court denied the motion for relief on the merits without prejudice, but stayed litigation in this matter pending exhaustion of state court remedies of unexhausted claims, (Doc. 155, Order).

Thereafter, Abdul-Salaam filed supplements to his Third PCRA Petition in the Cumberland County court on August 27, 2008, and April 21, 2009, respectively.  (Doc. 200, Vol. 4, Exs. 14 & 15.)  After holding an evidentiary hearing on October 28, 2010, the Cumberland County court denied the Third PCRA Petition on April 1, 2011.  (*See* Doc. 172-1.)  On April 5, 2012, the Pennsylvania Supreme Court affirmed the denial of relief on the Third PCRA Petition.  *Commonwealth v. Abdul-Salaam*, 42 A.3d 983 (Pa. 2012) ("*Abdul-Salaam-IV*").  Further, Abdul-Salaam's motion for reconsideration was denied by the Pennsylvania Supreme Court on September 13, 2012.  (*See* Doc. 178.)

On September 17, 2012, Abdul-Salaam filed a notice of exhaustion of state remedies and motion to reactivate habeas corpus proceedings.  (Doc. 178.)  By Order dated September 18, 2012, the Court granted Abdul-Salaam's motion to reactivate his habeas proceedings and scheduled a status conference.  (Doc. 182.)  As a result of the conference, on October 1, 2012, the Court issued an Order directing supplemental briefing to address the Pennsylvania Supreme Court's

18

disposition of the claims that were presented to the state court for exhaustion, and updating the case law on other claims contained in Abdul-Salaam's habeas petition.  (Doc. 185.)  That supplemental briefing has been submitted.  (*See* Docs. 188-190.)  Thus, Abdul-Salaam's petition for writ of habeas corpus (Doc. 8) is now ripe for disposition.

## II.    STANDARDS OF REVIEW

On April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), went into effect and amended the standards for reviewing state court judgments in federal habeas petitions filed under 28 U.S.C. § 2254.  A habeas corpus petition pursuant to § 2254 is the proper mechanism for a prisoner to challenge the "fact or duration" of his confinement.  *Preiser v. Rodriguez*, 411 U.S. 475, 498-99 (1973).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Rather, federal habeas review is restricted to claims based "on the ground that [petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 68.

### A.    <u>Exhaustion and Procedural Default</u>

Habeas corpus relief cannot be granted unless all available state remedies

19

have been exhausted, or there is an absence of available state corrective process, or

circumstances exist that render such process ineffective to protect the rights of the

applicant.  *See* 28 U.S.C. § 2254(b)(1).  The exhaustion requirement is grounded

on principles of comity in order to ensure that state courts have the initial

opportunity to review federal constitutional challenges to state convictions.  *See*

*Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000).

    A state prisoner exhausts state remedies by giving the "state courts one full

opportunity to resolve any constitutional issues by invoking one complete round of

the State's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S.

838, 845 (1999).  Respect for the state court system requires that the petitioner

demonstrate that the claims in question have been "fairly presented to the state

courts."[2]  *Castille v. Peoples*, 489 U.S. 346, 351 (1989).  To "fairly present" a

claim, a petitioner must present its "factual and legal substance to the state courts

in a manner that puts them on notice that a federal claim is being asserted."

*McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999); *see also Nara v. Frank*,

---

[2] A petitioner bears the burden of demonstrating that he has "fairly presented" his claims to the state's highest court, either on direct appeal or in a state post conviction proceeding. *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997).  Further, pursuant to Pennsylvania Supreme Court Order 218, effective May 9, 2000, issues presented to the Pennsylvania Superior Court are considered exhausted for the purpose of federal habeas corpus relief under section 2254.  *See In re: Exhaustion of States Remedies in Criminal and Post-Conviction Relief Cases*, No. 218, Judicial Administration Docket No. 1 (May 5, 2000) (per curiam).

488 F.3d 187, 197-98 (3d Cir. 2007) (recognizing that a claim is fairly presented

when a petitioner presents the same factual and legal basis for the claim to the state

courts). While the petitioner need not cite "book and verse" of the federal

Constitution, *Picard v. Connor*, 404 U.S. 270, 278 (1971), he must "give the State

'the opportunity to pass upon and correct' alleged violations of its prisoners'

federal rights" before presenting those claims here, *Duncan v. Henry*, 513 U.S.

364, 365 (1995) (quoting *Picard*, 404 U.S. at 275).

In this case, the Court will address exhaustion and procedural default in its

discussion of each issue herein.

**B.     Merits Standard**

Once a court has determined that the exhaustion requirement is met and,

therefore, that review on the merits of the issues presented in a habeas petition is

warranted, the scope of that review is set forth in 28 U.S.C. § 2254(d). That

section states, in relevant part, that exhausted claims that have been adjudicated on

the merits by the state courts are subject to review under the standard of whether

they are "contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States,"

28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the

21

State court proceeding," § 2254(d)(2).  AEDPA places the burden on the petitioner

to make this showing.  *Williams v. Taylor*, 529 U.S. 362 (2000).

The "contrary to" and "unreasonable application of" clauses of Section 2254

have independent meanings.  *Bell v. Cone*, 535 U.S. 685, 694 (2002).  A state court

judgment is "contrary to" federal law when it is "diametrically different, opposite

in character or nature, or mutually opposed" to "clearly established" decisions of

the United States Supreme Court.  *Williams*, 529 U.S. at 405.  This may occur if

"the state court ignores or misapprehends clear precedent or it 'confronts a set of

facts that are materially indistinguishable from a decision of [the Supreme] Court

and nevertheless arrives at a result different from [Supreme Court] precedent.'"

*Wilkerson v. Klem*, 412 F.3d 449, 452 (3d Cir. 2005) (quoting *Williams*, 529 U.S.

at 406).  Alternatively, "[a]n 'unreasonable application' occurs when a state court

'identifies the correct governing legal principle from [the Supreme] Court's

decisions but unreasonably applies that principle to the facts[] of petitioner's case."

*Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Wiggins v. Smith*, 539 U.S.

510, 519, 520 (2003)).  For the purposes of Section 2254(d)(1), "[i]t is not enough

that a federal habeas court, in its independent review of the legal question, is left

with a firm conviction that the state court was erroneous."  *Lockyer v. Andrade*,

538 U.S. 63, 75 (2003) (internal citations omitted).  "Under § 2254(d)(1)'s

'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 75-76, 123 S. Ct. 1166 (quoting *Williams*, 529 U.S. at 411). Rather, "[t]he state court's application of clearly established law must be objectively unreasonable" before a federal court may grant the writ. *Andrade*, 538 U.S. at 75, 123 S. Ct. 1166.

By its terms, Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). Thus, § 2254(d)(1)'s "clearly established Federal law" signifies the holdings, not the dicta, of Supreme Court decisions. *Howes v. Fields*, ___ U.S. ___, ___, 132 S. Ct. 1181, 1187 (2012). Specifically, only Supreme Court law established at the time of the state court's decision can be a basis for habeas relief under AEDPA. *See Green v. Fisher*, ___ U.S. ___, ___, 132 S. Ct. 38, 44 (2011) ("§ 2254(d)(1) requires federal courts to 'focu[s] on what a state court knew and did,' and to measure state-court decisions 'against this Court's precedents *as of* '*the time the state court renders its decision*.'") (quoting *Cullen v. Pinholster*, ___ U.S. ___, ___, 131 S. Ct. 1388, 1399 (2011) (emphasis added)). Therefore, federal

23

habeas review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, ___ U.S. at ___, 131 S. Ct. at 1398. Finally, "under the AEDPA standard, the '[s]tate court[s'] relevant factual determinations are presumed to be correct unless the petitioner rebuts [that] presumption by clear and convincing evidence.'" *McBride v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 101 (3d Cir. 2012) (quoting *Han Tak Lee v. Glunt*, 667 F.3d 397, 403 (3d Cir. 2012)) (citing 28 U.S.C. § 2254(e)(1)).

Turning to Section 2254(d)(2), the test for the "unreasonable determination of facts" clause is whether the petitioner has demonstrated by "clear and convincing evidence," 28 U.S.C. § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record. *Rountree v. Balicki*, 640 F.3d 530, 537 (3d Cir. 2011) (citing *Rice v. Collins*, 546 U.S. 333, 338-39, 126 S. Ct. 969, 163 L.Ed. 2d 824 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *see also Simmons v. Beard*, 590 F.3d 223, 231 (3d Cir. 2009) ("Under the § 2254 standard, a district court is bound to presume that the state court's factual findings are correct, with the burden on the petitioner to rebut those findings by clear and convincing evidence."). Further, as with Section 2254(d)(1), the evidence against which a federal court measures the

reasonableness of the state court's factual findings is the record evidence at the time of the state court's adjudication.  *Rountree*, 640 F.3d at 538 (citing *Cullen*, ___ U.S. at ___, 131 S. Ct. at 1401-03).

Further, the United States Supreme Court has clarified the test a district court must apply before granting relief where the court finds constitutional error:

> [I]n § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California*, 386 U.S. 18 (1967).

*Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).  Thus, even if the Court concludes that constitutional error occurred in the state court, the Court may not grant relief unless the error "had a substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 631; *Bond v. Beard*, 539 F.3d 256, 276 (3d Cir. 2008); *see also O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) ("When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless."  (quotations omitted)).

In addition, the Supreme Court has stated, "If this standard is difficult to meet, that is because it was meant to be."  *Harrington v. Richter*, ___ U.S. ___,

___, 131 S. Ct. 770, 786 (2011).  Section 2254(d) "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents.  It goes no farther."  *Id*.  Further, it was designed to be difficult "to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism."  *Martinez v. Ryan*, ___ U.S. ___, ___, 132 S. Ct. 1309, 1316 (2012).

Finally, AEDPA scrutiny is applicable only if the state court adjudicated the petitioner's claims "on the merits."  28 U.S.C. § 2254(d); *see Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).  "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground."  *Rompilla v. Horn*, 355 F.3d 233, 247 (3d Cir. 2004), *rev'd on other grounds*, *Rompilla v. Beard*, 545 U.S. 374 (2005) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001)).  Further, an "adjudication on the merits" can occur at any level of state court.  *Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009).  However, "to qualify as an 'adjudication on the merits,' the state court decision must finally resolve the claim.  This means that the state court's resolution of the claim must have preclusive effect."  *Id*. (citing *Rompilla*, 355 F.3d

at 247 (quoting *Sellan*, 261 F.3d at 311)).  Where a state court has not reached the

merits of a claim thereafter presented to a federal habeas court, the deferential

AEDPA standards do not apply, and the federal court must exercise *de novo* review

over pure legal questions and mixed questions of law and fact.  *Simmons v. Beard*,

581 F.3d 158, 165 (3d Cir. 2009) (citing *Appel*, 250 F.3d at 210).  However, the

state court's factual determinations are still presumed to be correct, rebuttable upon

a showing of clear and convincing evidence.[3]  *Simmons*, 581 F.3d at 165 (citing

*Appel*, 150 F.3d at 210).

## C.   Ineffective Assistance of Counsel Standard

Because several of Abdul-Salaam's habeas claims presented herein raise the

issue of whether his counsel was effective, we will set forth the applicable standard

here.  A claim for ineffective assistance of counsel is governed by the two-pronged

test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail on an

ineffective assistance claim, a petitioner must show that: (1) counsel's

representation fell below an objective standard of reasonableness; and (2) the

deficient representation was prejudicial to the petitioner.  *Id*. at 688; *see also*

*Albrecht v. Horn*, 485 F.3d 103, 127 (3d Cir. 2007).  In determining whether

---

[3] In fact, "the § 2254(e)(1) presumption of correctness applies regardless of whether there
has been an 'adjudication on the merits' for purposes of § 2254(d)."  *Thomas*, 570 F.3d at 116
(quoting *Nara v. Frank*, 488 F.3d 187, 200-01 (3d Cir. 2007)).

counsel has met the objective standard of reasonableness, courts must be highly deferential towards trial counsel's conduct. *See Strickland*, 466 U.S. at 686. "In assessing counsel's performance, 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. There is a 'strong presumption' that counsel's performance was reasonable." *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001) (alteration in original) (citations and quotations omitted). Counsel cannot be deemed ineffective for failing to raise a meritless claim. *See United States v. Saunders*, 165 F.3d 248, 253 (3d Cir. 1999). To satisfy the prejudice prong, a petitioner must show a reasonable probability that, but for the errors of his or her counsel, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

The two-prong test for ineffective assistance of counsel established in *Strickland* "qualifies as 'clearly established Federal law'" for purposes of AEDPA. *Rainey v. Varner*, 603 F.3d 189, 197 (3d Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 391 (2000)).[4] Thus, under § 2254(d)(1)-(2), the relevant inquiry in

---

[4]   Pennsylvania applies the same test for ineffective assistance of counsel as the federal courts. *Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000). In Pennsylvania, the ineffective assistance of counsel standard requires the petitioner to "rebut the presumption of professional competence" by demonstrating: "(1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interest; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the

28

assessing ineffectiveness claims that have been adjudicated on the merits is

whether the state court's decision involved an unreasonable application of

*Strickland* or is based on an unreasonable determination of the facts. *Jacobs v.*

*Horn*, 395 F.3d 92, 107 n.9 (3d Cir. 2005); *Werts v. Vaughn*, 228 F.3d 178, 204

(3d Cir. 2000). In conducting this analysis, the Court is cognizant that:

> Establishing that a state court's application of *Strickland* was
> unreasonable under § 2254(d) is all the more difficult. The standards
> created by *Strickland* and § 2254(d) are both "highly deferential,"
> [*Strickland*, 466 U.S.] at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n.
> 7 (1997), and when the two apply in tandem, review is "doubly" so,
> [*Knowles v. Mirzayance*, 556 U.S. 111 (2009) ]. The *Strickland*
> standard is a general one, so the range of reasonable applications is
> substantial. 556 U.S. at 123-25.

*Harrington*, 131 S. Ct. at 788; *see also Knowles*, 556 U.S. at 123 ("[B]ecause the

*Strickland* standard is a general standard, a state court has even more latitude to

reasonably determine that a defendant has not satisfied that standard." (citing

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Finally, the reviewing court must evaluate counsel's performance in light of

the totality of the evidence. *Strickland*, 466 U.S. at 695-96; *see also Jacobs*, 395

F.3d at 106-07. It is the petitioner's burden to establish both deficient performance

and resulting prejudice in order to state an ineffective assistance of counsel claim.

_____

outcome of the proceedings would have been different." *Commonwealth v. Sneed*, 899 A.2d
1067, 1076 (Pa. 2006) (citing *Commonwealth v. Pierce*, 786 A.2d 203, 213 (Pa. 2001)). If the
petitioner fails to satisfy any of the standard's prongs, the claim will be rejected. *Id*.

*Strickland*, 466 U.S. at 697; *see also Jacobs*, 395 F.3d at 102.

## III.  DISCUSSION

Abdul-Salaam's habeas petition contains twelve claims for relief and involves both the guilt phase and the penalty phase of Abdul's Salaam's trial.  The Court will address his claims in turn.  For purposes of discussion, the Court will address Claims I and IV together because both allege suppression of exculpatory evidence that could have been used during the guilt phase of trial.  As stated by Petitioner, those claims are as follows.

> **A.**  **Claim I - Petitioner was denied due process of law in violation of the Fourteenth Amendment to the United States Constitution, when the prosecution suppressed exculpatory evidence; and,**
>
> **Claim IV - Petitioner's right to due process of law was violated when the Commonwealth consumed an entire blood sample that would have exculpated him.  Due process was further violated by the Commonwealth's manipulation of a photo of the co-defendant so as to falsely eliminate him as the source of the blood evidence in question.[5]**

---

[5] In his original petition and in connection with this claim, Abdul-Salaam argues that the Commonwealth destroyed all the blood evidence on the steering wheel and that the "bad faith destruction was exacerbated by the Commonwealth's manipulation of its Exhibit 41, depicting the co-defendant, Scott Anderson." (Doc. 8-2 at 44.)  According to Abdul-Salaam, the manipulation of the photograph consisted of covering up Anderson's hands in the picture so as to hide the fact that he had fresh cuts on his hands. (*Id.*)  He contends that the Commonwealth was attempting to eliminate Anderson as the source of the blood that was subject to the Commonwealth's testing by misleading the jury as to whose blood was on the wheel. (*Id.* at 44-45.)  In a footnote, Abdul-Salaam baldly asserts, in one sentence, that trial counsel was ineffective for failing to object to the manipulation of the photograph. (*Id.* at 44 n.42.)  Because this claim relating to the blood evidence has evolved from one under *Youngblood* to one under *Brady, see infra*, and it appearing that Abdul-Salaam is not making a connection between the

In Claim I, Abdul-Salaam claims that the Commonwealth withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963),[6] when it failed to provide to defense counsel the Harlacker Report containing information from Tony Clifton, which suggested that Abdul-Salaam was not the man discussing a robbery with Scott Anderson in a vehicle the night before the robbery and killing of Officer Cole.  In Claim IV, Abdul-Salaam claims that the Commonwealth withheld exculpatory evidence in violation of *Brady* when it failed to disclose the existence of blood remaining on the steering wheel which, after subsequent DNA testing, proved to be that of Scott Anderson and not Abdul-Salaam.  Upon careful review, habeas relief on both claims will be denied.

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."  *Brady*, 373 U.S. at 87.  To establish a *Brady* violation, a petitioner must demonstrate that: (1) evidence was suppressed by the state, either willfully or inadvertently; (2) the evidence is

_____

*Brady* blood claim and the alleged manipulation of the photograph, the Court will not address this sub-issue regarding the photograph, nor will we entertain the one-sentence "argument" related to trial counsel ineffectiveness.

   [6] Briefly, in *Brady* the United States Supreme Court established the principle that a defendant has a due process right to request and receive evidence in the government's possession that is material to his guilt or punishment, and that failure to adhere to this principle constitutes a violation irrespective of the good faith or bad faith of the prosecution.  *Brady*, 373 U.S. at 86-88.

favorable to the accused, either because it is exculpatory or impeaching; and (3)

that the evidence was material to the outcome of the case.  *Strickler v. Greene*, 527

U.S. 263, 281-82 (1999).  The materiality standard is satisfied when the evidence

places the "whole case in such a different light as to undermine confidence in the

verdict."  *Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995).  Further, this standard is

satisfied "if there is a reasonable probability that, had the evidence been disclosed,

the result of the proceeding would be different."  *Strickler*, 527 U.S. at 281-82.  In

order for evidence to be material, it is not necessary that the evidence establish by a

preponderance that disclosure of the evidence would have resulted in an acquittal.

*Kyles*, 514 U.S. at 434-35.  However, in making a determination of materiality, the

assessment of the omitted evidence's impact must take account of the cumulative

effect of the suppressed evidence in light of the other evidence, not merely the

probative value of the suppressed evidence standing alone.  *Id*. at 436-37.

 In this case, Abdul-Salaam argues that the Commonwealth suppressed two

items of favorable evidence that are material.  With respect to this evidence, the

Court notes the following factual background in addition to the procedural history

that has already been discussed, *see supra*, Section I, at 15-19.

   **1.**  **Clifton Evidence**

Approximately four months after the killing of Officer Cole, New

Cumberland Police Officer Brian Nailor prepared a report dated December 29, 1994, which described his attempts to investigate a tip that a previously unidentified man may have information on the robbery and killing of Officer Cole. (*See* Petitioner's Appendix, Ex. 1, Doc. 11) ("Nailor Report").  Through information provided by several persons, Officer Nailor tracked down Viola Troyan, a woman who had an individual named Tony Clifton in her employ around the time of Officer Cole's killing.  According to Ms. Troyan,

> Tony would talk about being involved with the two (2) guys that were in prison for shooting a Police Officer in New Cumberland. . . . [H]e was with them in a vehicle and that they had talked about robbing a jewelry store in New Cumberland and when he found out what they were going to do, he didn't want any part of it, they dropped him off at a gas station and he walked back across the bridge into Harrisburg.

(Nailor Report at 2.)

Officer Nailor then spoke with Mr. Clifton's ex-girlfriend, Terri Garret, and her daughter, Tasha, by telephone.  Both women recalled, "Tony saying something about being with some guys and that they were talking about doing something stupid at a coin store and when Tony found out what was going to happen, he got out of the vehicle and walked back."  (*Id.* at 3-4.)

Finally, Officer Nailor attempted to find Tony Clifton, but was unsuccessful. He did note, however, Mr. Clifton's ties to both Pennsylvania (through his employer and acquaintances) and Virginia (through relatives and a criminal history

33

in that state).  (*Id.* at 4.)

Officer Nailor's report of December 29, 1994, was provided to Abdul-Salaam's defense counsel prior to the trial.  (Doc. 8 at 26.)  Mr. Clifton was not called as a witness at trial, and in fact the record indicates that he was located by Abdul-Salaam's appellate counsel in February 1998, approximately three years after Abdul-Salaam was convicted and sentenced.  (*Id.*)

As stated above, Abdul-Salaam filed his counseled First PCRA Petition on September 23, 1997.  Hearings on the petition took place in late 1997 and early 1998.  After Abdul-Salaam's PCRA counsel located Mr. Clifton, he signed a declaration on February 12, 1998, describing his knowledge of the robbery and killing of Officer Cole.  (*See* Petitioner's Appendix, Ex. 2, Doc. 11) ("Clifton Declaration").  Specifically, he stated the following:

> On the night of August 18th 1994, I approached Gary [Miller, manager of the Midnight Special,] inside the Midnight Special [bar in Harrisburg] and asked whether he knew anyone at the bar that could give me a ride home.  Gary indicated he might be able to find someone that could provide me with a ride home and he approached another man inside the bar whom I now know was Scott Anderson.  I was able to hear Gary ask Scott whether Scott could give me a ride and overheard Scott ask Gary whether I was "cool."  I understood Scott's question of Gary as an attempt to determine whether I could be trusted.  Gary indicated he knew me and that I could be trusted.
>
> Very early in the morning, I along with Scott Anderson, and another black man that I had not previously met left the Midnight Special and got into a car driven by Scott Anderson.  As we pulled out of the

34

parking lot and Scott Anderson began speaking with the other man and pretty soon it became clear to me that they were discussing plans to commit a robbery. Although I did not hear what the specific target of the robbery was, I did understand that the robbery was of a jewelry or coin store across the river from Harrisburg. It was clear that the robbery was Scott Anderson's plan and he was the one in charge. It was also clear that the other man agreed to do the robbery as Anderson had planed [sic] it. When I realized what was going on I became frightened and asked them to drop me off at the next intersection which they did.

I managed to get home by myself and as I didn't have to go to work the next day, I slept in and woke up in the afternoon. Later that same day I was watching TV when the show I was watching was interrupted for a special news report about a shooting of a police officer that had taken place in New Cumberland. The report indicated that the officer had been shot during a robbery and immediately, I began to think about the conversation that I overheard the night before. The TV report said that the police had captured two suspects in the shooting and showed pictures of the two men that had been taken into custody.

I immediately recognized one of those men as Scott Anderson, the same man planing [sic] the robbery as he was driving me home. However, the pictures of the other man in custody I did not recognize and had never seen before. This man was most definitely not the man that was in the front seat with Scott Anderson as Scott discussed his plans for a robbery.

* * *

A couple months later I was approached by a Detective from Cumberland County. Apparently, some of my friends had told the police about what I had told them about how I had been given a ride by one of the men arrested for the shooting of the officer. I do not recall the name of the Detective from Cumberland County that interviewed me. All I can remember was that he was a large white man in plain clothes that showed me law enforcement identification from Cumberland County.

This Detective began to ask me about the events of August 18th

35

and August 19th and I proceeded to tell him what I have stated in this Affidavit/Declaration. I recall that as I was talking to him he was taking notes and asked me several times to slow down so he could catch up with what I was telling him. I also recall that he asked me specifically if the other individual in the car with Scott Anderson on the night of August 18th was Seifullah Abdul-Salaam. I told him that the other man in the car was most definitely not the other man shown on TV on August 19, 1994 when Scott Anderson was arrested.

I have since been shown a single photograph of a man that has been identified to me as Seifullah Abdul-Salaam. This was the same man that I saw on TV who was identified as one of the robbers. As I told the detective from Cumberland County in 1995, I am positive that Seifullah Abdul-Salaam was not the other man in the car with Scott Anderson and myself on the night of August 18, 1994.

(Clifton Declaration at 1-3.)

In light of Clifton's Declaration, Abdul-Salaam filed a supplement to the amended First PCRA Petition, in which he argued, *inter alia*, that the Commonwealth had failed to provide defense counsel with information on the identity of the officer who had interviewed Mr. Clifton after submission of the Nailor Report and before trial, as well as information on Mr. Clifton's whereabouts. (*See* Petitioner's Appendix, Ex. 3, Doc. 11) ("Petitioner's PCRA Supplement"). Abdul-Salaam requested, *inter alia*, that the PCRA court conduct an evidentiary hearing on the Clifton issue; that the Commonwealth identify the officer who interviewed Mr. Clifton; and that the Commonwealth produce a copy of the notes and police report of that officer. (*Id.* at 13-14.) The Commonwealth

filed an answer to Petitioner's PCRA Supplement, but did not at the time provide the requested information.

Instead of conducting a separate evidentiary hearing, the PCRA Court continued to hear evidence in early 1998 in proceedings on the First PCRA Petition.  In particular, on April 16, 1998, Abdul-Salaam called as a witness Officer Nailor.  During his testimony Officer Nailor identified Detective John Harlacker of the Dauphin County Criminal Investigation Division ("CID") as the "person that actually spoke to Mr. Clifton."  (PCRA Hearing, Notes of Testimony ("PCRA NT") 4/16/1998, at 11, Doc. 125.)  Mr. Nailor also provided a copy of the report which detailed Detective Harlacker's efforts to gather information on Mr. Clifton in January 1995.  (*See* Petitioner's Appendix, Ex. 5, Doc. 11) ("Harlacker Report").  Further, Mr. Nailor provided a transmittal sheet showing that Detective Harlacker faxed his report to New Cumberland Police Chief Oren Kauffman and the Cumberland County CID on January 17, 1995, approximately two months prior to the commencement of jury selection in Abdul-Salaam's case.  (*See id.*)  Officer Nailor also expressed his opinion that the Cumberland County District Attorney's ("D.A.") Office received the Harlacker Report at that time as well.  (PCRA NT 4/16/1998, at 21.)  Detective Norman Chronister of the Cumberland County D.A.'s Office also testified at the PCRA hearings that the Commonwealth's prosecuting

attorneys[7] were provided with the Harlacker Report prior to commencement of jury selection.  (PCRA NT 4/22/1998, at 16-17, Doc. 126-2.)

As a result of the foregoing, Detective Harlacker was called and testified about his investigation and interview of Tony Clifton.  Detective Harlacker testified that he interviewed Mr. Clifton in January 1995 in Harrisburg, Pennsylvania.  (*Id.* at 37-38.)  As recounted by Detective Harlacker, Mr. Clifton explained to Harlacker that he had been with Scott Anderson in a vehicle driven by another unknown individual in the early morning hours of August 19, 1994.  (*Id.* at 38.)  Mr. Anderson and the unknown individual were discussing a plan to rob a coin shop the next day.  (*Id.*)  The day after the robbery of the coin shop and killing of Officer Cole, Mr. Clifton saw Mr. Anderson on the local news covering the incident, but was not sure that the other man identified as a suspect in the killing (Abdul-Salaam) was the same man who had been in the vehicle with Mr. Anderson and Mr. Clifton.  (*Id.* at 39.)  Mr. Clifton did tell Detective Harlacker, however, that he was willing to look at a photographic array or a lineup in order to identify the man from the vehicle.  (*Id.* at 39-40.)  Detective Harlacker testified that neither he nor, to his knowledge, any other detective followed up with Mr. Clifton about

_____

[7] Prosecuting the case for the Commonwealth were then-District Attorney, and now Pennsylvania Supreme Court Justice, Michael J. Eakin, and Assistant District Attorney Allison Taylor.

such an identification. (*Id.* at 40.) He simply "gathered the information and forwarded it." (*Id.*)

Detective Harlacker transmitted his report to Chief Kauffman of the New Cumberland Police Department within a few days of interviewing Mr. Clifton, but received no further requests from that Department, Cumberland County CID, or the Cumberland County D.A.'s Office. (PCRA NT 4/22/1998, at 37.) Detective Harlacker did indicate, however, that he would have performed further investigation after the report was transmitted, had it been requested of him. (*Id.*)

Tony Clifton also testified at the PCRA hearing.[8] Mr. Clifton testified that he had been drinking the night he got in the vehicle with Mr. Anderson and the unidentified man, but was still able to remember what he saw and heard in the vehicle. (PCRA NT 4/23/1998, at 101-02.) When Mr. Clifton saw the television news coverage, he focused mainly on the photograph of Mr. Anderson because he remembered him from the vehicle. (*Id.* at 105.) When asked about the unidentified individual in the vehicle, Mr. Clifton provided the following testimony:

> Q:   Mr. Clifton, the other individual that was in the car along with
>       Mr. Anderson, did you have an opportunity to see that

---

[8] While Mr. Clifton did make some corrections to his affidavit during his testimony, (PCRA NT 4/23/1998, at 91-92, 110, 119-20), generally his testimony reflected the declarations made in the affidavit.

individual?

A:    Yeah, I saw him.

Q:    You saw him approach the vehicle and get into the front of the vehicle with Mr. Anderson?

A:    No, I didn't see him get in, but when I looked up he was like I told you.  You know, I was like leaning out the window.  When he got in the car and started the car, I looked up to see who was getting in and who was driving, right, okay?

Q:    Okay.

A:    I looked up and I seen the dude, the other guy.

* * *

Q:    You did see the other gentleman in the car; is that correct?

A:    Yeah.

Q:    Okay.  Were you able to see the other gentleman's profile, the side of his face?

A:    Yeah.

Q:    Okay.  Were you able to see the back of his head?

A:    Yeah.

Q:    Were you able to get an idea of his approximate size?

A:    Yeah.

* * *

Mr. Nickerson:    Mr. Abdul-Salaam, please stand up.

40

Q:      Mr. Clifton, I would ask you to look at the gentleman that's
        standing next to me right now, is this the gentleman that was in
        the car with Scott Anderson on the early morning hours of
        August the 19th, 1994?

A:      Not when I was in the car.

(*Id.* at 106-08.)

Finally, at the PCRA hearing, Abdul-Salaam's trial counsel, Speros Lappas,

Esquire, testified about both Mr. Clifton and the Harlacker Report.  Attorney

Lappas indicated that he did have knowledge of Mr. Clifton's existence prior to

trial through Detective Nailor's report, but he did not "recall making an issue out

of Mr. Clifton's existence."  (PCRA NT 4/23/1998, at 157.)  Further, he did not

recall receiving the Harlacker Report prior to trial.  (*Id.* at 126.)

## 2.    New Blood Evidence

At Abdul-Salaam's original 1995 trial in the Cumberland County court,

Donald P. Bloser, Jr., a forensic scientist with the Pennsylvania State Police Crime

Laboratory, testified on behalf of the Commonwealth that, when he tested the

Suzuki steering wheel for the presence of blood, he found Type B blood, which

matched Abdul-Salaam's blood type to within ten percent (10%) of the

population.[9]  (Trial, Notes of Testimony ("Trial NT") 3/14/1995, at 125, Doc. 144.)

---

[9] Mr. Bloser also tested for blood type a pair of blue jeans and two pairs of boxer shorts
belonging to Abdul-Salaam and found Type B blood on all of the items.  (Trial NT 3/14/1995, at
118-19.)

41

Mr. Bloser, however, performed this testing without using DNA testing modalities. (*Id.* at 118.)  Rather, he separated the Type B blood to identify enzymes which would further narrow the results.  (*Id.* at 120-21.)  When the Commonwealth asked why he did not get results on two enzymes he had tested, Mr. Bloser stated,

> A:    I did not get a result.  There was not enough blood there to do those two.
>
> Q:    Not enough blood on the steering wheel?
>
> A:    Yes.

(*Id.* at 121.)  On cross examination, Mr. Bloser further testified:

> Q:    Now, can you recognize on that photograph [of the steering wheel] discolored areas on the steering wheel consistent with the blood which you found when it was delivered to you for testing?
>
> A:    Yes.
>
> Q:    And your testimony is that even with this quantity of discoloration that we see, there was insufficient blood for the purposes of doing the Isoenzyme tests?
>
> A:    On some I got three of the five enzymes.  So I used most of it for the three.  And I did not have enough - - what I used for the last two did not give me results.

* * *

> Q:    And I guess you tried to remove all of the blood from the wheel?
>
> A:    As much as I could.

42

(*Id.* at 124, 128.)

In light of Mr. Bloser's trial testimony, before the PCRA court Abdul-Salaam asserted that the Commonwealth violated his due process rights in violation of *Arizona v. Youngblood*, 488 U.S. 51 (1988),[10] when it consumed the entire blood sample for testing.  In relying on *Youngblood*, Abdul-Salaam contended that the police had destroyed the entire blood sample in bad faith.  The PCRA court disagreed, however, finding that Abdul-Salaam had failed to offer evidence that the blood sample was in fact destroyed in bad faith.  (Doc. 19-2 at 16, PCRA Op.)  Noting that "[t]he presence or absence of bad faith by the police must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed," *Youngblood*, 488 U.S. at 56 n.1, the PCRA court denied Abdul-Salaam's claim that his due process rights were violated when the entire blood sample was used.  (Doc. 19-2 at 16, PCRA Op.)

In his habeas petition filed in this Court, Abdul-Salaam originally raised this same claim regarding the blood evidence pursuant to *Youngblood*.  (*See* Doc. 8-2 at 84-88.)  In support of that claim, at the hearing on Abdul-Salaam's second motion

---

[10] Briefly, in *Youngblood* the Supreme Court held that when considering evidence lost by the government, "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," a defendant must show that the government acted in bad faith in order to demonstrate a due process violation.  *Youngblood*, 488 U.S. at 57-58.

for discovery, the Court heard testimony from Mr. Bloser.  Specifically, Mr. Bloser

read from his laboratory notes which had been generated contemporaneously with

his work on the case.  His notes read, in pertinent part,

>    Inside [an evidence box] is one dark green steering wheel with
>    suspected blood.  Lots of blood, but on different areas.

(Discovery Hearing, Notes of Testimony ("Discovery NT") 8/2/2005, at 36-37,

Doc. 107.)  He also testified as follows:

Q:    Do I understand your testimony to be, sir, that when you
      handed off the wheel to the fingerprint folks, that in your view
      there was blood remaining on the wheel?

A:    I could not say it was blood, I did not test it, but it looked like it
      was possible blood.

                              * * *

Q:    Are you suggesting, after having read that [his own trial
      testimony], that you meant to say that there was still remaining
      blood on the steering wheel?

A:    The question was, was there - - the results mean there was not
      enough blood on the steering wheel, not enough - - and I said
      not enough - - they said not enough blood on the steering
      wheel, I said yes, for - -

Q:    But you meant - -

A:    - - the enzymes.  I did not - - of the sample I collected.  Of the
      sample - - of the sample I collected there was not enough blood.

Q:    That's what you're saying now.  My question is, your answer at
      the time was that there was not enough - - you responded yes to

the question that there's no remaining blood - -

A:      I answered the question yes.

(Discovery NT 8/5/2005, at 51-52.)

By Memorandum and Order dated August 11, 2005, the Court found that

Abdul-Salaam had demonstrated good cause for his discovery request, and that

state exhaustion of the request in the context of this case was not required.  (*See*

Doc. 77.)  As a result, the Court crafted a protocol for examination of remaining

biological evidence on the steering wheel, removal of a sample, and for DNA

testing of the same.  (*See id.* at 12-14.)

Pursuant to the Court's directives, Abdul-Salaam's DNA expert, Dr. Edward

T. Blake of the Forensic Science Associates in Richmond, California, conducted

the DNA testing of the biological evidence remaining on the steering wheel in

cooperation with Respondents.  Dr. Blake subsequently authored three reports,

which were provided to Respondents and the Court.  (*See* Docs. 99, 101, 116.)

These reports, read together, establish that the blood recovered from the steering

wheel according to our protocol was that of the co-defendant, Scott Anderson,

rather than Abdul-Salaam's.  Respondents did not contest the results of this DNA

testing.

On April 6, 2007, Abdul-Salaam filed a motion for relief on the merits,

asking the Court to consider these *Brady* claims related to the Clifton evidence and new blood evidence.  (Doc. 118.)  By Order dated July 7, 2008, the Court denied the motion, but stayed litigation pending exhaustion of these claims before the state courts.  (Doc. 155.)  Thereafter, Abdul-Salaam filed supplements to his Third PCRA Petition in the Cumberland County court on August 27, 2008, and April 21, 2009, respectively.  (Doc. 200, Vol. 4, Exs. 14 & 15.)  After holding an evidentiary hearing on October 28, 2010, the Cumberland County court denied the Third PCRA Petition on April 1, 2011.  (*See* Doc. 172-1.)

### 3.    Pennsylvania Supreme Court Decision

Thereafter, on April 5, 2012, the Pennsylvania Supreme Court affirmed the denial of relief on the Third PCRA Petition containing both the Clifton and blood claims.  *See Abdul-Salaam-IV*, 42 A.3d 983.  In so ruling, the court specifically addressed the *Brady* cumulation analysis for materiality.  Addressing the Clifton evidence first, the court found:

> Respecting the Clifton evidence, it appears that the Harlacker report was not turned over to the defense before trial.  The interview with Clifton occurred on or about January 10, 1995 (2 months before trial).[1]  Detective John Harlacker testified to the contents of the report during the first PCRA proceeding.  Specifically, his testimony outlined that Clifton had stated that he was with appellant's co-conspirator, Scott Anderson, and another individual six hours prior to the robbery during which appellant murdered New Cumberland Police Officer Willis Cole.  At that time, Clifton overheard the two men discussing a robbery.  Clifton also told Detective Harlacker that he

was intoxicated when he was with the two men.  Furthermore, Clifton told Detective Harlacker that he was able to identify Anderson, but was unable to identify the man who was with him.  Clifton also testified at the first PCRA proceeding and claimed that the man he saw with the co-conspirator six hours prior to the robbery and murder was not appellant.

* * *

For purposes of the *Kyles / Brady* cumulation analysis now of concern to Judge Jones, even if it is assumed that this information in the possession of governmental authorities was subject to *Brady* disclosure under U.S. Supreme Court precedent governing in March of 1995, we agree with the initial PCRA court's determination that the Clifton interview was neither material nor exculpatory.  Clifton's account may have been relevant to further inculpate Anderson, indicating his intention to commit a robbery, but it did nothing to exculpate appellant.  Detective Harlacker's testimony indicated that Clifton claimed that he was able to identify Anderson, but was unable to identify the individual who was with Anderson.  Clifton's inability to identify the other individual to Detective Harlacker does not exculpate appellant, it just fails to inculpate him in an association many hours before the robbery and murder.  By the same token, Clifton's account to police that he had overheard Anderson and another individual discussing a robbery six hours before it occurred does nothing to exculpate appellant for his conduct, attested to by numerous eyewitnesses, and corroborated by, among other things, the gunshot wound he suffered in his exchange of lethal gunfire with Officer Cole.  Therefore, it is not apparent that this evidence should even be considered in a cumulative effect of "suppressed" evidence analysis under *Kyles* and *Brady*.

*Abdul-Salaam-IV*, 42 A.3d at 985-86.

The court found the following with respect to the blood evidence:

For purposes of a *Kyles / Brady* cumulation inquiry, there is a similar difficulty with appellant's new claim deriving from

47

blood/DNA evidence uncovered through federal habeas supplemental discovery. This evidence showed that DNA testing of another sample of blood on the steering wheel of the getaway car, which testimonial and other evidence at trial had shown had been driven by Anderson, was consistent with Anderson's DNA profile. Evidence that would further incriminate Anderson, and corroborate the Commonwealth's evidence that he was the driver of the getaway vehicle, does not tend to exculpate appellant.

*Id.*, 42 A.3d at 986. The court also noted:

Appellant's briefing to this Court does not accurately account for the actual trial and PCRA evidence. Both appellant and Anderson were injured during the criminal episode: the evidence suggested that appellant was shot by Officer Cole, and Anderson's hand was injured during a skirmish with the store owner. At trial, the Commonwealth presented evidence that blood taken from the steering wheel of the getaway car, when tested, matched the blood type and blood enzymes of appellant and did not match the blood type and enzymes of Anderson. The Commonwealth used this evidence to help establish appellant's presence in the getaway car. The Commonwealth also presented evidence that blood taken from the driver's side door of the getaway car when tested, was determined to match the blood type of Anderson and did not match appellant's blood type. The new blood evidence, deriving from the habeas proceedings and relating to different blood samples taken from the steering wheel than that tested by the Commonwealth before trial, corroborated Anderson's role, but did not disprove or negate the evidence of appellant's presence. Nor does the new evidence prove appellant's federal counsel's unsupported accusation that the Commonwealth "fabricated" the trial evidence. It is unsurprising that two confederates, on the run after having just murdered a police officer, and both having been injured, would both leave blood on the steering wheel of the vehicle.

*Id.*, 42 A.3d at 986 n.4.

In addressing both pieces of evidence together for purposes of the

48

cumulation analysis, the court concluded the following:

> In any event, assuming that both the Clifton evidence and the new blood evidence should be considered in a *Kyles* cumulation analysis, the cumulative effect of these allegedly suppressed items of evidence does not warrant relief.  In the *Brady* context, materiality includes an assessment of whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  *Kyles*, 514 U.S. at 433-34, 115 S. Ct. 1555; *see also Strickler v. Greene*, 527 U.S. 263, 280, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999); *Commonwealth v. Lambert*, 584 Pa. 461, 884 A.2d 848, 854 (2005).  Notably, in his argument on *Brady* materiality, appellant fails to address the breadth of the trial evidence. That evidence makes clear that whatever marginal use may have been made of Clifton's account and the blood evidence, its collective effect does not establish a reasonable probability that the result of the trial would have been different, *i.e.*, that appellant would have been acquitted.

> The trial evidence included the following.  The robbery and murder here occurred on a Friday morning during business hours on a commercial street.  No less than four eyewitnesses identified appellant as Officer Cole's shooter at trial. The getaway car, driven by Anderson, was followed by an off-duty police officer.  When appellant and Anderson abandoned the car and fled on foot, the off-duty police officer observed them and identified appellant as the individual exiting the passenger side of the car.  In addition, trial evidence showed that the shooter was injured at the scene of the crime by Officer Cole; notably, when appellant was apprehended mere hours after the crime, he was transported to a hospital for a bullet wound to his leg.  After appellant was apprehended, police conducted a consensual search of his girlfriend's residence where they found bloody clothing and a briefcase containing ammunition.  Finally, appellant told the police officer who transported him to the hospital that he would tell his lawyer that "'Scotty Love'[1] did it," further implicating himself by revealing his knowledge of the fresh crime and Anderson's involvement.  Given this overwhelming evidence, and considering the minimal, if any, effect of the Harlacker report and the

blood/DNA evidence in exculpating appellant, he has not established
a reasonable probability that the outcome of the trial would have been
different.

*Id.*, 42 A.3d at 986-87.

### 4.   Analysis

#### a.   Exhaustion; Standard of Review

Both the Clifton and blood claims have taken a decidedly winding path to

exhaustion in order for us to finally reach their merits.  However, Abdul-Salaam

nevertheless now makes two arguments in support of his position that no AEDPA

deference is due to our review of the Pennsylvania Supreme Court decision.  First,

Abdul-Salaam suggests that the state courts have "prejudged the [Clifton-*Brady*]

claim as a frivolous delay tactic and in doing so demonstrated a bias against

Petitioner and counsel."  (Doc. 188 at 32.)  Because of this bias, he argues, this

Court is free to abandon the state court's analysis and decision on these issues and

apply *de novo* review rather than a more narrow review under AEDPA.  To

demonstrate bias, Abdul-Salaam points to the *Abdul-Salaam-II* decision in which

the Pennsylvania Supreme Court found that his claim that the Commonwealth

suppressed the exculpatory Clifton evidence was waived because it was not raised

at either trial or on direct appeal.  *See Abdul-Salaam-II*, 808 A.2d at 560-61.  This

finding of waiver, Abdul-Salaam argues, made "little sense," and thus suggests that

it was linked to Justice Michael Eakin's taking his seat on the court less than one week after the court issued its opinion. (Doc. 188 at 27.) Abdul-Salaam seemingly bolsters this argument by reminding us of the subsequent procedural history in the state court in which his attempts to raise a conflict of interest were thwarted, despite conceding in a footnote that Justice Eakin has recused himself from decisions regarding Abdul-Salaam. (*See id*. at 27-29.) He also contends that in subsequent opinions, the state court made statements against counsel and Abdul-Salaam suggesting a "less than an unbiased view of the issues in this case." (*Id*. at 28-29.) All of these speculative assertions relative to bias are meritless. Abdul-Salaam and his counsel's suggestion that the Pennsylvania Supreme Court was anything but professional and unbiased in its review and disposition of the issues is without foundation and in no way a justification for bypassing AEDPA review of the state court decision at hand.

Second, Abdul-Salaam suggests that because the Pennsylvania Supreme Court stated in its review of these claims that "[w]e write in elaboration primarily to address concerns of the federal district court . . . Out of respect for the concerns of Judge Jones . . . we will address *Brady* cumulation," the court somehow did not resolve the claims in a manner that would enable us to employ AEDPA deference in our review. Rather, Abdul-Salaam contends, the state court simply "answered"

our opinion regarding exhaustion, and did so by engaging in a "superficial and distorted review of the facts and baldly declared the due process violation was not material." (Doc. 188 at 32.) What Abdul-Salaam fails to point out is that, in introducing its *Brady* cumulation analysis, the court's *entire* statement is as follows: "Out of respect for the concerns of Judge Jones, and cognizant that appellant adverts to the cumulation theory in his brief, albeit he does not separately argue the point, we will address *Brady* cumulation." *Abdul-Salaam-IV*, 42 A.3d at 985. In light of this complete statement, we easily conclude that the Pennsylvania Supreme Court's opinion is a thorough analysis addressing the issues and concerns of all parties, rather than the superficial treatment posited by Petitioner.

In sum, Abdul-Salaam has not persuaded the Court to bypass AEDPA review of the Pennsylvania Supreme Court decision on these claims. Rather, upon review under AEDPA, and for the reasons set forth below, the Court concludes that the state court's determination regarding this issue is consistent with federal law and is based on a reasonable determination of the relevant facts. *See* 28 U.S.C. § 2254(d)(1)-(2).

### b.   *Brady / Kyles* Analysis

In its decision, the Pennsylvania Supreme Court determined that Abdul-Salaam failed to prove *Brady* violations occurred because he did not prove that the

Clifton evidence or new blood evidence would be both favorable, *i.e.*, exculpatory, and material.  *See Abdul-Salaam-IV*, 42 A.3d at 985-87.  Upon review, the Court fully agrees with the state court's decision in this regard.[11]

Turning first to whether the Clifton evidence was favorable to Abdul-Salaam, even assuming as true Clifton's later statement that the man in the vehicle with Anderson on the night before the incident was someone other than Abdul-Salaam, we agree with the state court that this information does nothing to exculpate Abdul-Salaam.  *See id.*, 42 A.3d at 986.  Rather, it simply further inculpates Anderson by providing further information on *his* whereabouts the day before he robbed the coin shop with Abdul-Salaam.  As the state court found, Abdul-Salaam's involvement was corroborated by numerous eyewitnesses and the gunshot wound he suffered in the exchange of fire with Officer Cole.  *Id*.  We agree with the state court that the Clifton evidence indicating that Anderson was in a vehicle the night before the incident planning a robbery with a man Clifton could

_____

[11] In his supplemental memorandum of law in support of his habeas petition, Abdul-Salaam asks the Court not to consider the trial fingerprint evidence in assessing the materiality of the due process violations related to these claims.  (*See* Doc. 188 at 63-68.)  In doing so, he cites to a 2009 analysis of the state of forensic science in the United States by the National Academy of Sciences which addressed the unreliability of forensic evidence generally.  (*See id.* at 63) (citing NATIONAL ACADEMY OF SCIENCES, STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD (Feb. 2009) ("NAS Report")).  Because the Pennsylvania Supreme Court did not rely on fingerprint evidence in its analysis of materiality with respect to these claims, *see infra*, we need not consider it here in our review of the state court decision.

not readily identify as Abdul-Salaam is not exculpatory.[12]  *See* 28 U.S.C. § 2254(d)(2), (e).

Next, in determining whether the new blood evidence was favorable to Abdul-Salaam,[13] the Pennsylvania Supreme Court found that the DNA testing on the new sample of blood from the steering wheel served to further incriminate Anderson and identify him as the driver of the getaway vehicle rather than exculpate Abdul-Salaam from the murder of Officer Cole.  *Abdul-Salaam-IV*, 42 F.3d at 986.  Here, Abdul-Salaam requests the Court to find that the state court's decision was objectively unreasonable under § 2254(d)(2) because it allegedly presumes a previous state court finding that both Anderson's and Abdul-Salaam's blood were on the steering wheel.  Specifically, in *Abdul-Salaam-IV*, the state court provides in a footnote that the new blood evidence taken from samples on the steering wheel were different than those tested by the Commonwealth before trial,

---

[12] We cannot gainsay that the Clifton evidence would have arguably been relevant if offered at Petitioner's trial.  But relevant testimony in the context of a trial does not equate to that which is exculpatory for purposes of our analysis.

[13] In light of the procedural posture of this issue, the Court will not address whether the new blood evidence was actually "suppressed" by the Commonwealth.  Therefore, the Court will not entertain Abdul-Salaam's argument that the original report by Donald Bloser on blood taken from the steering wheel was falsified.  Instead, because during oral argument held before this Court on November 14, 2007, we stated, "We now know, apparently, in an unequivocal way, that Mr. Abdul-Salaam's blood was not on the wheel," (Notes of Testimony, Oral Argument 11/14/2007, at 27), we will determine whether the new blood evidence is favorable to Abdul-Salaam and material so as to warrant habeas relief.

and which matched only Anderson's DNA, does not "disprove or negate the evidence of [Abdul-Salaam]'s presence," presumably in the getaway vehicle. *Id.*, 42 F.3d at 986 n.4.  Abdul-Salaam argues the erroneous presumption, that he was in the getaway vehicle, should be deemed unreasonable under Section 2254(d)(2), and this Court should, therefore, apply *de novo* review.  (*See* Doc. 188 at 34.) However, while the language with respect to the blood evidence expressed in a footnote by the state court invokes, in part, the matter of Abdul-Salaam's presence in the getaway vehicle, the state court's ultimate conclusion does not turn on that point.  Rather, the state court relied on the findings of the *new* blood evidence, which proved only that Anderson was present in the getaway vehicle.  *See Abdul-Salaam-IV*, 42 A.3d at 986 ("This [blood/DNA evidence uncovered through federal habeas supplemental discovery] showed that DNA testing of another sample of blood on the steering wheel of the getaway car, which testimonial and other evidence at trial had shown had been driven by Anderson, was consistent with Anderson's DNA profile. Evidence that would further incriminate Anderson, and corroborate the Commonwealth's evidence that he was the driver of the getaway vehicle, does not tend to exculpate appellant.").  We agree with the state court that the *new* blood evidence only proves to be further inculpatory to Mr. Anderson rather than exculpatory to Abdul-Salaam.  *See* 28 U.S.C. § 2254(d)(2),

(e).

Despite finding that both the Clifton and new blood evidence were not favorable to Abdul-Salaam, the Pennsylvania Supreme Court went further in its analysis of these claims.  Notably, the state court expressly concluded "[A]ssuming that both the Clifton evidence and the *new* blood evidence should be considered in a *Kyles* cumulation analysis, the cumulative effect of these allegedly suppressed items of evidence does not warrant relief."  *Abdul-Salaam-IV*, 42 F.3d at 986-87 (emphasis added).  In doing so, the state court looked to the "collective effect" of the Clifton evidence and the new blood evidence with the "overwhelming evidence" of guilt presented at trial to determine that Abdul-Salaam had not established a reasonable probability that the outcome of the trial would have been different.  *Id*. at 987.  Specifically, the court relied on '[n]o less than four eyewitnesses" who identified Abdul-Salaam as the shooter of Officer Cole.  *Id*., 42 F.3d at 987.  Also, an off-duty police officer, Rodney Smith, observed the getaway vehicle and identified Abdul-Salaam as the individual exiting the passenger side in flight.[14]  *Id*.  The court also noted that trial evidence demonstrated that the shooter

---

[14] Officer Smith, who pursued the getaway vehicle from New Cumberland to Harrisburg, testified that Abdul-Salaam was the individual who exited the passenger side of the vehicle, (Trial NT 3/11/1995, at 202), describing the encounter as follows:

As the passenger got out of the vehicle, when he got out he kind of - - he got out backwards.  And he stepped out.  It was kind of like a backwards step-out, so that

had been injured at the scene by Officer Cole,[15] and when Abdul-Salaam was

apprehended just hours after the shooting, he was transported to hospital with a

bullet wound in his leg.[16]  *Id.*  In connection, a consensual search of Abdul-

Salaam's girlfriend's residence revealed bloody clothing and a briefcase containing

ammunition.  *Id.*  Finally, the court noted that Abdul-Salaam told the police officer

who transported him to hospital mere hours after the shooting that he would tell his

attorney that "'Scotty Love' [(a nickname of Anderson)] did it."  *Id.*  In light of this

evidence of guilt relied upon by the state court, this Court concludes that Abdul-

Salaam has not established that the Clifton material or new blood evidence was

material and would have changed the outcome of the trial.  *See Kyles*, 514 U.S. at

420 (the defendant must show "the favorable evidence [withheld] could reasonably

---

he had to turn around.  He had to turn around and face me to get turned back
around. . . . At that time I was roughly thirty feet [from the getaway vehicle]. . . .
As he turned around we made eye contact.  I saw him looking at me.  And I knew
that he was looking back.  And I was looking back at him.  As he turned around,
in his left hand, I believe I saw what I believed to be a firearm in his left hand.  As
he made that turn and began to run up the hill I was looking a little more.

(*Id*. at 160-61.)

[15] By way of example, Wendy Gerberich, an individual who witnessed the incident in
New Cumberland that morning, testified that Officer Cole "was shooting back at the black male
that was doing the shooting."  (Trial NT 3/10/1995, at 165.)

[16] The director of the emergency department at the time of Polyclinic Hospital in
Harrisburg, Pennsylvania, Edward Hildrew, M.D., testified that he evaluated Abdul-Salaam for a
gunshot wound on his right thigh on the day of the shooting of Officer Cole.  (Trial NT
3/13/1995, at 152-53.)  The doctor estimated that, given the aging of the wound, it was "certainly
less than a day old."  (*Id*. at 155.)

be taken to put the whole case in such a different light as to undermine confidence in the verdict").  In evaluating the cumulative effect of the Clifton and new blood evidence in light of the evidence of guilt found at trial, the state court's decision on these matters that Abdul-Salaam has not established materiality because there is no reasonable probability that the outcome of the trial would have been different, *see Strickler*, 527 U.S. at 281-82, is not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(1)-(2).

Abdul-Salaam also argues that the materiality prong of *Brady* is met with both the Clifton and new blood evidence because both pieces of evidence were material for impeachment purposes, not just as exculpatory evidence.  Even if we were to find the Clifton and new blood evidence favorable to Abdul-Salaam for impeachment purposes, we cannot escape our finding that this evidence is not material or that its inclusion would not have produced a different result.  The Court does recognize that additional, non-cumulative impeachment evidence may have the potential to be material under *Brady*.  *See Lambert v. Beard*, 633 F.3d 126, 134-35 (3d Cir. 2011), *rev'd on other grounds*.  As the Third Circuit Court has recognized, "'[c]onfidence in the outcome is particularly doubtful when the withheld evidence impeaches a witness whose testimony is uncorroborated and

58

essential to the conviction.'" *Id.* at 134 n.3 (quoting *Norton v. Spencer*, 251 F.3d

1, 9 (1st Cir. 2003)).  However, even where withheld evidence is found to be

favorable for impeachment purposes, unless the evidence is also found to be

material, the prosecution's failure to disclose the evidence does not constitute a

*Brady* violation.  Again, "evidence is material only if there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the

proceeding would have been different." *United States v. Bagley*, 473 U.S. 667,

682 (1985).

Here, as to the Clifton evidence, Mr. Clifton's account to Detective

Harlacker of being unable to identify Abdul-Salaam as the passenger in the vehicle

the night before the robbery and shooting, and his testimony at the PCRA hearing

that Abdul-Salaam was not the passenger, could not have been used to cast doubt

on the testimony of the eyewitnesses on the scene because Mr. Clifton's encounter

with Mr. Anderson and the unknown passenger in the vehicle occurred many hours

before the robbery and shooting.  Nothing Mr. Clifton stated to either Detective

Harlacker in January 1995 or during the PCRA hearing about the presence of

another individual in the vehicle brings into serious question Abdul-Salaam's

presence that morning in New Cumberland at the coin shop or on the street

encountering Officer Cole, as overwhelming evidence of his presence was

demonstrated.  Thus, the Court rejects Abdul-Salaam's contention that the Clifton evidence could have been used to discredit testimony of the eyewitnesses on the scene and therefore his evidence is exculpatory under *Brady*.

As to the new blood evidence, even if the new evidence was used in an attempt to impeach the credibility of Mr. Bloser or to call into question whether Abdul-Salaam was in the getaway vehicle, in light of the other evidence of Abdul-Salaam's guilt, we do not believe a jury would have been reasonably troubled by the lack of blood evidence linking Abdul-Salaam to the getaway vehicle. Importantly, there was other significant testimony from Officer Smith, as aforestated, placing Abdul-Salaam in the getaway vehicle such that the jury had an independent basis upon which to rely that was fully separate from Mr. Bloser's testimony.  Thus, the Court is not persuaded that this blood evidence was favorable as impeachment or exculpatory evidence under *Brady*.

In sum, in light of the overwhelming evidence of Abdul-Salaam's guilt, the Court finds that even if the Commonwealth had produced the Clifton and new blood evidence, it cannot be said that a reasonable probability exists that the outcome of the trial would have been different.  Therefore, the Pennsylvania Supreme Court's decision on these issues is not contrary to, or an unreasonable application of, clearly established federal law, nor is it an unreasonable

determination of the facts.  *See* 28 U.S.C. § 2254(d)(1)-(2).  Habeas relief on

Claims I and IV will be denied.

**B.    Claim II - Petitioner was denied due process of law when unreliable identification testimony was admitted against him at trial, when the identifications were made under highly suggestive circumstances and where the identifying witness did not possess an independent source.**

Abdul-Salaam argues that his right to due process was violated when various

identification testimony was admitted at trial, despite that testimony being a

product of impermissibly suggestive influences and identification procedures that

created a significant risk of misidentification.  In support, he claims that "[a]

review of the totality of the circumstances surrounding the identifications reveals

that the identifying witnesses who were subjected to these suggestive influences

had no reliable independent basis upon which to ground their identifications of

Petitioner."  (Doc. 8-2 at 21.)

The federal standard for evaluating the reliability of identification evidence

was articulated by the United States Supreme Court in *Neil v. Biggers*, 409 U.S.

188 (1972).  In *Neil*, the Court held that "convictions based on eye-witness

identification at trial following a pretrial identification by photograph will be set

aside on that ground only if the photographic identification procedure was so

impermissibly suggestive as to give rise to a very substantial likelihood of

irreparable misidentification." *Id*. at 196-97 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).  The Court observed that the central question in this analysis is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive" and specified that the factors to be considered are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id*. at 199-200.

In considering the instant identification claim, the Pennsylvania Supreme Court articulated a standard which is clearly in line with prevailing federal law, as it recited the *Biggers* factors as the guideposts it would use in assessing the propriety of the witness identifications:

> We recently held that in-court identifications, despite impermissibly suggestive pre-trial procedures, are admissible if there exists an independent basis for the identifications.  In *Commonwealth v. Carter*, 537 Pa. 233, 643 A.2d 61 (1994), we set forth the analysis to be used when considering the issue of an impermissibly suggestive identification.  To allow an in-court identification following a suggestive pre-trial identification, the Commonwealth must establish, by clear and convincing evidence, that the identification was not a product of the events occurring between the time of the crime and the in-court identification.  *Carter*, 537 Pa. at 253, 643 A.2d at 71.  Therefore, an in-court identification will be permitted if, considering the totality of the circumstances, the in-court identification "had an

origin sufficiently distinguishable to be purged of the primary taint."
*Id*.

In determining whether an independent basis exists for the
identification, the factors to be considered in this determination are:
"(1) the opportunity of the witness to view the criminal at the time of
the crime; (2) the witness' degree of attention; (3) the accuracy of the
witness' prior description of the criminal; (4) the level of certainty
demonstrated by the witness at the confrontation; and (5) the length of
time between the crime and the confrontation." *Id.*, at 253-54, 643
A.2d at 71.

*Abdul-Salaam-I*, 678 A.2d at 349.

In the instant petition, Abdul-Salaam points out that, although trial counsel

challenged the identifications of each of the five witnesses (Rishel, Michaels, Tran,

Gerberich, and Howie), both the trial court and the Pennsylvania Supreme Court

found suggestivity as to all witnesses, but only made independent source findings

with regard to Rishel and Michaels. (Doc. 8-2 at 29.) As a result, Abdul-Salaam

argues that: (1) this Court must credit the state court's finding of suggestivity as to

all witnesses; (2) this Court must conduct a *de novo* review of whether an

independent basis exists for the identifications made by witnesses Tran, Gerberich,

and Howie; and (3) the state court's independent source findings as to witnesses

Rishel and Michaels were contrary to clearly established federal law and involved

an unreasonable application of the facts in light of available evidence. (*Id*. at 29-

30.)

Initially, the Court agrees with Abdul-Salaam as to the state court's treatment of the suggestivity as to all witnesses.  Specifically, the Pennsylvania Supreme Court stated, "the trial court noted that the one-on-one confrontation at the preliminary hearing as well as certain pre-trial publicity may have been suggestive. . . .   Our review of the record confirms the trial court's findings." *Abdul-Salaam-I*, 678 A.2d at 349-350.  The Court will credit the state court's decision on that issue.  *See* 28 U.S.C. § 2254(e).

In crediting the state court's finding on suggestivity, we are left with a consideration of whether an independent basis exists for the five witness identifications.  The Pennsylvania Supreme Court addressed this issue at length as follows:

> Mindful that our scope of review is limited to a determination of whether sufficient evidence has been offered to establish an independent basis for the in-court identification, we believe that the trial court's determination concerning the in-court identifications was supported by sufficient evidence.  [*Commonwealth v. Carter*], 537 Pa. 233, 254, 643 A.2d 61, 71 (Pa. 1994)].

> In the case *sub judice*, the trial court noted that the one-on-one confrontation at the preliminary hearing as well as certain pre-trial publicity may have been suggestive.  However, the trial court reviewed the testimony of various eyewitnesses to the crime.  The court determined that each of the witnesses viewed the Appellant in extremely favorable circumstances.  Further, the trial court credited the testimony of their ability to identify Appellant and that their identification had an independent basis, separate from any taint.  Our review of the record confirms the trial court's findings.

64

Appellant specifically objects to the identifications made by Mr.
Rishel and Mr. Michaels, both of whom testified at the preliminary
hearing. The testimony at trial by Mr. Rishel, the owner of the coin
shop, established that he had more than sufficient opportunity to
observe Appellant. Mr. Rishel observed Appellant as he entered the
coin shop. Mr. Rishel engaged in conversation with Appellant,
watched him draw a revolver and ultimately knock Mr. Rishel to the
ground. Mr. Rishel testified that his view of Appellant was
unimpeded and that he viewed Appellant on a sunny day in a well lit
room at close range. (N.T. 3/9/95 p. 96.) Mr. Rishel was unwavering
in his identification of Appellant. The period of time between the
crime and the initial confrontation at the preliminary hearing was only
ten days, although the period of time between the crime and the trial
was seven months. Although the description of Appellant given to
police was somewhat general (N.T. 3/3/95 p. 132), and the encounter
somewhat brief, we find that there was sufficient evidence to support
the trial court's determination that Mr. Rishel's in-court identification
of Appellant had a basis independent of any suggestive encounter
between the crime and the in-court identification.

Mr. Michaels, the owner of a barber shop on Fourth Avenue, testified
at trial that on August 19, 1994, he watched Anderson emerge from
Maple Alley. He observed Officer Cole's arrival, Officer Cole's
attempt to arrest Anderson, Appellant's later emergence from Maple
Alley firing at Officer Cole, and Anderson and Appellant's escape.
(N.T. 3/10/95 pp. 86-87, 89. 94-96, 104-05, and 106). Later that day,
Mr. Michaels immediately announced to a friend when watching a
newscast showing Appellant, "That is the shooter." (N.T. 3/10/95 p.
112). Mr. Michael[s] gave a detailed description of Appellant. (N.T.
3/10/95 pp. 101, 112). As to the level of certainty exhibited by Mr.
Michael[s], he identified Appellant and testified that his in-court
identification was based solely on his observations at the scene of the
crime. (N.T. 3/10/95 p. 113). Again, we believe that there was
sufficient evidence that Mr. Michaels' in-court identification of
Appellant was distinguishable from any taint.

Although Appellant does not specifically object to other eyewitnesses'
identification of Appellant, he argues generally that the circumstances

under which the eyewitnesses observed the perpetrators of the crime
were such as to make the identifications unreliable.  Our review of the
record confirms the trial court's determination that the
Commonwealth established that the other witnesses who testified
were not induced by events occurring between the time of the crime
and the in-court identification.  Appellant was given the opportunity
to, and did cross-examine each of the witnesses as to the accuracy of
their identification.  Therefore, we find Appellant's first issue on
appeal to be without merit.

*Abdul-Salaam-I*, 678 A.2d at 349-50.

As stated above, Abdul-Salaam contends that we should conduct a *de novo*

review of whether an independent basis exists for the identifications made by

witnesses Tran, Gerberich, and Howie because neither the trial court nor the

Pennsylvania Supreme Court made any such findings in their opinions.  Upon

review of the record, the Court disagrees that we should conduct a *de novo* review

with respect to these eyewitnesses.  In the trial court's February 10, 1995 opinion

and order addressing Abdul-Salaam's omnibus pretrial motions, the trial court

stated:

We agree with the defendant that the one-on-one confrontation
between the defendants and the witnesses, as well as the fact that
certain of the witnesses saw the defendant(s) on an evening newscast,
might prove to be suggestive. Thus, it is incumbent upon the
Commonwealth to establish, by clear and convincing evidence, that
the identification was not induced by events occurring between the
time of the crime and the in-court identification.

(Trial Ct. Op. re. Ominbus Pretrial Motions 2/10/1995, Doc. 197-1 at 29) (citation

omitted).  After setting forth the factors for determining whether an independent

basis for identification existed, the trial court provided this factual analysis:

> Here, the witnesses included Dale Rishel.  He was the coin store
> operator who observed the defendants for a number of minutes at
> close range.  Mr. David Michaels and Mr. Vinh Tran were outside the
> coin shop on the street and watched the entire event unfold from
> beginning to end.  They observed the incident in broad daylight.  The
> witnesses testified credibly that they were unwavering in their ability
> to identify the perpetrator.  There was no evidence of any impediment
> in either their sight line or their vision.  We are satisfied that the
> Commonwealth has more than established an independent basis for in-
> court identification as far as these witnesses are concerned.

(*Id*. at 29-30.)  Further, in his brief on direct appeal, Abdul-Salaam argued as

follows with respect to the eyewitness identifications:

> All of the "eyewitnesses" testified that they had never seen the
> perpetrator before or since the date of the crime.  (NT Preliminary
> Hearing, 20, 95.)  However, after the inherently prejudicial
> circumstances of the preliminary hearing "show up," they claimed that
> they could recognize and identify the Defendant.  (NT Preliminary
> Hearing, 9, 62.)  The prejudice inherent in that in-court "show up"
> was the direct result of the fact that the Defendant was forced to attend
> a preliminary hearing without a prior determination of probable cause
> to arrest.
>
> *With respect to Rishel and Michaels*, the alleged eyewitnesses
> made an identification of this Defendant at the preliminary hearing in
> this case.  (NT Preliminary Hearing, 9, 62.)  The occurrence of that
> one on one identification was itself unduly and impermissibly
> suggestive, it compounded the taint which already existed by virtue of
> the circumstances described above, and it was itself unreliable based
> on these same circumstances and facts.  Where there exists an
> impermissible risk that a witness would be identifying the person
> whom they saw at a pre-trial prejudicial "show up" procedure, and not

making an identification based upon their alleged recollection of the date and time of the crime, the testimony should be excluded.  The pre-trial identification procedure was so infected by suggestiveness as to give rise to a substantial likelihood of irreparable misidentification.  *See, Commonwealth v. Sample*, 468 A.2d 799 (Pa. Super. Ct. 1983).

Furthermore, where the circumstances under which the alleged eyewitnesses observed the perpetrator of these crimes - - including duration of observation, surrounding circumstances, and other factors - - are such as to make any testimony about the identity of the perpetrator fundamentally unreliable, the in court testimony should be suppressed.  The factors which apply in this case include the following: prior to the day in question the alleged eyewitnesses had never seen and did not know the alleged perpetrator; the alleged eyewitnesses' statements to the police which have included descriptions of the perpetrator may have been inconsistent in material respects with respect to those descriptions; the poor opportunity of the witness to view the criminal at the time of the crime; the witness's degree of attention; the accuracy of this prior description of the criminal; the level of certainty demonstrated at the confrontation; and the time between the crime and the confrontation.  *See, e.g.*, *Commonwealth v. Thompkins*, 457 A.2d 925, 928 (Pa. Super. Ct. 1983); *Manson v. Brathwait*, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253 (1977).  The "totality of the circumstances analysis" militates against the admission of this alleged eyewitness identification.  *Commonwealth v. Spiegal*, 457 A.2d 531, 536 (Pa. Super. Ct. 1983).

(App. Direct Appeal Br., Doc. 197 at 19-21) (emphasis added).  In light of the trial

court's decision on Abdul-Salaam's Omnibus Pretrial Motions, as well as Abdul-

Salaam's subsequent argument on direct appeal, both of which make specific

references to witnesses Rishel and Michaels,[17] but also refer to "all" eyewitnesses,

---

[17] While the trial court does reference witness Tran, Abdul-Salaam's direct appeal brief makes no such reference.  Applying a plain reading of the direct appeal brief, the Court finds that Abdul-Salaam makes general assertions with respect to all eyewitnesses other than witnesses

this Court will not set aside the Pennsylvania Supreme Court's analysis with

respect to the other witnesses raised here by Abdul-Salaam.  Again, that court

noted that "[a]lthough Appellant does not specifically object to other eyewitnesses'

identification of Appellant, he argues generally that the circumstances under which

the eyewitnesses observed the perpetrators of the crime were such as to make the

identifications unreliable." *Abdul-Salaam-I*, 678 A.2d at 350.  Therefore, because

the Pennsylvania Supreme Court addressed this issue with respect to witnesses

Rishel, Michaels, Tran, Gerberich, and Howie, the Court will employ AEDPA's

deferential standard of review in addressing Abdul-Salaam's claim as to all these

witnesses.

Applying that deferential standard, the Court first recognizes that the

Pennsylvania Supreme Court determined that the identification procedure as to all

the eyewitnesses was unduly suggestive, but, based on the totality of the

circumstances, there was sufficient evidence to establish an independent basis for

the in-court identifications.  After careful review of the record, the Court finds that

the Pennsylvania court's determination was not contrary to or an unreasonable

application of federal law.  28 U.S.C. § 2254(d)(1).  In particular, the court's

determination that the identifications possessed sufficient aspects of reliability was

---

Rishel and Michaels.

not contrary to or an unreasonable application of *Biggers*. *See Biggers*, 409 U.S. at

199.  As to witness Rishel, the state court evaluated Mr. Rishel's testimony and

found that he had more than sufficient opportunity to observe Abdul-Salaam, and

that his view of Abdul-Salaam was unimpeded.  The court also found that although

Mr. Rishel's description of Abdul-Salaam to the police was somewhat general, and

that his encounter with Abdul-Salaam was somewhat brief, Mr. Rishel's

identification of Abdul-Salaam was unwavering.  In addition, the court noted that

the period of time between the crime and the trial was seven months, but the period

of time between the crime and the initial confrontation at the preliminary hearing

was only ten days.  Turning to witness Michaels, the state court evaluated his

testimony and found that he actually witnessed Abdul-Salaam emerge from Maple

Alley and fire his weapon at Officer Cole, and later gave a detailed description of

him.  The court found significant that when Mr. Michaels saw a newscast later that

day showing Abdul-Salaam, he immediately announced to a friend that Abdul-

Salaam was the shooter.  Further, the court noted that Mr. Michaels clearly stated

that his in-court identification was based entirely on his observations of Abdul-

Salaam at the time of the crime.  Finally, turning to the remaining witnesses, the

court reviewed their testimony and found that the identifications made were not

induced by events occurring between the time of the crime and the in-court

identifications.  The court also noted that Abdul-Salaam cross-examined each of the witnesses as to the accuracy of their identifications.

Consequently, under these circumstances, and recognizing that the state court's analysis clearly reflects its consideration of the *Biggers* factors, the Court concludes that the state courts' adjudication of this identification claim was not contrary to, or an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d).  Further, Abdul-Salaam has not demonstrated by clear and convincing evidence that the state court's factual findings pertaining to any witness' testimony were incorrect, as required by 28 U.S.C. § 2254(e)(1).  Therefore, Abdul-Salaam is not entitled to habeas relief on this claim.

> **C.   Claim III - Petitioner received ineffective assistance of counsel when trial counsel failed to make a sufficient, specific proffer to support his request for the appointment of an eyewitness identification expert, where eyewitness identification was crucial to the case.**

Abdul-Salaam argues that trial counsel was ineffective for failing to make a sufficient and specific proffer to support his request for the appointment of an eyewitness identification expert.  Upon review, the Court will deny this claim as it was not exhausted in the state courts prior to filing the instant federal petition.

The background of this claim is as follows.  Prior to trial, Abdul-Salaam's trial counsel, Attorney Lappas, filed a pretrial motion in which he requested, *inter*

*alia*, the payment of expert witness fees for an expert in the "psychology of eyewitness testimony." (Defendant's Brief in Support of Pre-Trial Motions, Doc. 11, Ex. 15.)  In support, trial counsel offered the following reasoning for the request:

> Psychology of eyewitness testimony - - to testify as to the unreliability of any eyewitness testimony which the court does not suppress.  On this point defense counsel notes that he does not believe that a vigorous and exhaustive cross-examination will by itself suffice.

(*Id.*)  In a January 20, 1995 order, the trial court denied trial counsel's request for the appointment of a psychologist to testify as to the unreliability of eyewitness testimony.  (In re: Motion for Payment of Expert Witness Expenses Order (Jan. 20, 1995), Doc. 11, Ex. 18.)  On direct appeal, Abdul-Salaam, still represented by Attorney Lappas, argued that the trial court erred in denying his motion for the funding for an expert on eyewitness identification.  The Pennsylvania Supreme Court affirmed the trial court's ruling, finding that an "expert on the psychology of eyewitness identification was not necessary for the preparation of a defense." *Abdul-Salaam-I*, 678 A.2d at 352.

Abdul-Salaam did not raise the instant ineffective assistance of counsel claim in the state courts.  In his habeas petition, he contends that he did not raise the claim in his PCRA petition because the substantive and underlying claim of trial court error was denied by the Pennsylvania Supreme Court on direct appeal,

72

and therefore the related ineffectiveness claim "*would have been* deemed 'previously litigated'" by the PCRA court.  (Doc. 8-2 at 42) (emphasis added).  In opposition, the Commonwealth argues that this claim is unexhausted because Abdul-Salaam failed to present it in his PCRA petition.

A review of this issue as presented in the habeas petition reveals that Abdul-Salaam has not presented the federal ineffective assistance of counsel claim raised here to any state court for review.  Pursuant to § 2254(b)(1), exhaustion of state court remedies is excused if there is "an absence of available State corrective process[,] or . . . circumstances exist that render such process ineffective to protect the rights of the applicant."  Courts use the term "futile" or "futility" in referring to these exceptions to exhaustion.  *See, e.g.*, *Lines v. Larkin*, 208 F.3d 153, 162-63 (3d Cir. 2001).  In *Lines*, the Third Circuit Court of Appeals identified one such situation as "where a state's highest court has ruled unfavorably on a claim involving facts and issues materially identical to those undergirding a federal habeas petition and there is no plausible reason to believe that a reply will persuade that court to reverse its field."  *Id*. at 162 (quoting *Allen v. Attorney Gen. of Me.*, 80 F.3d 569, 573 (1st Cir. 1996)).

In the instant petition, Abdul-Salaam argues in favor of this exception, that is, that exhaustion of this claim would be futile "because the Pennsylvania

Supreme Court has already decided factually and procedurally indistinguishable

claims." (Doc. 8 at 83 ¶ 162.) He adds:

> Here, the state courts have clearly spoken to circumstances identical to
> those at hand - that Petitioner has raised the predicate claim below,
> and now, in light of subsequently appointed counsel, raises counsel's
> ineffectiveness with regard to his presentation of that claim. For this
> reason, it would be futile to require the technical exhaustion of
> returning to state court to have the claim rejected as barred by
> Pennsylvania law. Accordingly, this issue is exhausted for federal
> habeas purposes.

(*Id*. at 83 ¶ 163.)

The problem with Abdul-Salaam's argument is that he is essentially asking

the Court to extend the futility doctrine to this ineffectiveness claim not presented

to the state courts on the speculative basis that there appears to be no possibility of

success on the merits of his claim in state court. However, as the Third Circuit

Court of Appeals has established, "likely futility on the merits does not excuse a

failure to exhaust a claim in state court." *Parker v. Kelchner*, 429 F.3d 58, 63 (3d

Cir. 2005). Here, Abdul-Salaam has not even afforded the state courts the

opportunity to consider his ineffectiveness claim "previously litigated" based on

the Pennsylvania Supreme Court's disposition of the substantive and underlying

claim in *Abdul-Salaam-I*. To emphasize, this is *not* a case where the PCRA court

already denied a claim of ineffectiveness as "previously litigated" based on

disposition of the underlying claim. If that were the case, it is possible that we

74

could excuse exhaustion based on futility.  *See Hughes v. Beard*, Civ. No. 06-250, 2012 WL 1569567, at *21 n.19 (E.D. Pa. Apr. 30, 2012) (finding PCRA court's denial of an ineffectiveness claim as "previously litigated" not to be a bar to consideration of the claim).  Rather, the Court must follow the Third Circuit Court's precedential statement in *Parker*, namely "that the exhaustion requirement is not excused merely because a petitioner's claim will likely be denied on the merits in state court." *Parker*, 429 F.3d at 63.  To do otherwise is to turn the exhaustion requirement on its head.  As such, Abdul-Salaam's ineffectiveness claim here is unexhausted because the state courts have not yet had the opportunity to review it, and therefore the Court cannot review this claim on the merits.

Notwithstanding the foregoing analysis, Petitioner would not be entitled to relief, even if the Court were to consider the merits of Abdul-Salaam's ineffectiveness claim.  In *Abdul-Salaam-I*, the Pennsylvania Supreme Court resolved that underlying claim as follows:

> Appellant argues that the trial court improperly denied his motions for the payment of expert witness expenses with respect to an expert on eyewitness identification.  Appellant contends that as eyewitness testimony was critical to the Commonwealth's case, an expert in the field of psychology of eyewitness testimony was necessary.
>
> The decision to appoint an expert witness is within the sound discretion of the trial court.  The trial court's determination will not be disturbed except for a clear abuse of that discretion. [*Commonwealth v. Carter*, 537 Pa. 233, 257, 643 A.2d 61, 73 (1994)].  However, in a

capital case such as this, a defendant is entitled to the assistance of experts necessary to prepare a defense. *Id.*

Here, the trial court granted Appellant's request for funding for experts in the fields of ballistics, fingerprints, serology, and hair and fiber analysis. However, the trial court denied Appellants request for funds for experts in the fields of forensic pathology and the psychology of eyewitness testimony, thereby finding such experts to be unnecessary.

In the capital case of *Commonwealth v. Simmons*, 541 Pa. 211, 230, 662 A.2d 621, 630-31 (1995)[,] we recently addressed the issue of whether the trial court's exclusion of an expert in the field of eyewitness identification was proper. As we stated in *Simmons*, testimony concerning the reliability of eyewitness identification by appellant's expert "would have given an unwarranted appearance of authority as to the subject of credibility, a subject which an ordinary juror can assess. Moreover, appellant was free to and did attack the witnesses' credibility and point out inconsistencies of all the eyewitnesses at trial through cross-examination and in his closing argument." *Simmons*, 541 Pa. at 230, 662 A.2d at 631.

Our analysis in *Simmons* is instructive for our determination of the necessity of an expert in eyewitness testimony. For the reasons offered in *Simmons*, we find that the trial court properly determined that an expert on the psychology of eyewitness identification was not necessary for the preparation of a defense, and that therefore, the trial court properly denied Appellant's request for expert witness fees.

*Abdul-Salaam-I*, 678 A.2d at 352. Here, the Pennsylvania Supreme Court

reasoned that, while a defendant is entitled to the assistance of experts "necessary

to prepare a defense" in a capital case, expert testimony on the reliability of

eyewitness identification in this capital case is not such "necessary" testimony.

*Abdul-Salaam-I*, 678 A.2d at 352. *See also Washington v. Beard*, Civ. No. 07-

3462, 2012 WL 1033526, at *2 n.3 (E.D. Pa. Mar. 28, 2012) ("Expert testimony

that eye-witness identification is not reliable is not admissible in Pennsylvania state

court.") (citing *Abdul-Salaam-I*, 678 A.2d at 352); *Commonwealth v. Selenski*, 18

A.3d 1229, 1232-33 (Pa. Super. Ct. 2011) (acknowledging Pennsylvania's "long-

standing principle guarding the jury's function of deciding credibility by

prohibiting expert testimony on the reliability of eyewitness identifications");

*Commonwealth v. Bormack*, 827 A.2d 503, 512 (Pa. Super. Ct. 2003) ("Courts of

this Commonwealth have deemed [expert testimony on the unreliability of

eyewitness identification] inadmissible because it intrudes upon the jury's

credibility determination."); *Commonwealth v. Simmons*, 662 A.2d 621, 631 (Pa.

1995) (affirming exclusion of expert on reliability of eyewitness identification as

"[s]uch testimony would have given an unwarranted appearance of authority as to

the subject of credibility, a subject which an ordinary juror can assess");

*Commonwealth v. Spence*, 627 A.2d 1176, 1182 (Pa. 1993) ("Expert opinion may

not be allowed to intrude upon the jury's basic function of deciding credibility.").

Clearly, then, trial counsel cannot be found ineffective for failing to secure the

appointment of an expert on the reliability of eyewitness testimony, if such

testimony would not have been admissible.  *See Strickland*, 466 U.S. at 691

(reasoning that counsel's performance cannot be deficient based on a failure to

advance meritless claims).

Based on the foregoing discussion, Abdul-Salaam is not entitled to relief on this claim.  Further, Petitioner's request for an evidentiary hearing on this issue is denied.

> **D.   Claim V - Petitioner's conviction resulted from the unavailability at the time of trial of exculpatory evidence regarding the scientific unreliability of fingerprint evidence.  Moreover, since this evidence was in the possession of the prosecution's expert witness, failure to disclose it violated due process.**

Abdul-Salaam argues that his conviction was based on what new scientific evidence has proven to be unreliable fingerprint evidence introduced at trial by the Commonwealth, and the failure of the prosecution to disclose the infirmities in such evidence violated due process of law.[18]  (Doc. 8-2 at 48-50; Doc. 8-3 at 1-2.) Upon review, the Court will deny relief on this claim.

The background of this claim is as follows.  At trial, Pennsylvania State Police Sergeant Dennis Loose testified that the latent print recovered from an extension cord wrapper found at the crime scene matched the ink impressions

---

[18] In his petition, Abdul-Salaam does not make this argument relating to failure to disclose beyond simply stating it in a caption.  Insofar as he argues that the fingerprint evidence should not be considered in assessing the materiality of the due process violations related to Claims I and IV, we have already addressed that argument.  *See supra* Section III.A.4.b, at 54 n.11.

taken from Abdul-Salaam.[19]  (Trial NT, 3/14/1995, at 152-53.)  Also at trial,

Federal Bureau of Investigation Specialist Michael Wieners opined that Abdul-

Salaam's inked impression matched two latent impressions recovered from the

cord wrapper.[20]  (Trial NT, 3/15/1995, at 26.)  Abdul-Salaam now claims that this

testimony on fingerprint evidence was unreliable based on three reports published

after Abdul-Salaam's trial: (1) a National Institute of Justice Report - FORENSIC

SCIENCES: REVIEW OF STATUS AND NEEDS (1999); (2) a Department of Justice,

National Institute of Justice Solicitation: FORENSIC FRICTION RIDGE (FINGERPRINT)

EXAMINATION VALIDATION STUDIES (2000); and (3) a National Academy of

Sciences report - STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A

PATH FORWARD (2009).

 Abdul-Salaam presented this claim in the state courts.  The Pennsylvania

Supreme Court addressed it on the merits in its disposition of Abdul-Salaam's

Second PCRA petition.  The state supreme court concluded as follows:

 Appellant raises a claim challenging the adequacy of the

---

[19] Sergeant Loose was questioned on direct examination on his qualifications and did state that he has previously testified as an expert in fingerprint identification, but was neither formally offered by the Commonwealth nor accepted by the court as an expert in fingerprint identification.  (*See* Trial NT 3/14/1995, at 144-47.)

[20] Mr. Weiners was questioned on direct and cross-examination on his qualifications, and ultimately offered by the Commonwealth and accepted by the court as an expert in fingerprint identification.  (Trial NT 3/15/1995, at 18.)

fingerprint evidence. According to Appellant, recent scientific disclosures undermine the reliability and admissibility of fingerprint evidence. Thus, Appellant is attempting to craft an after-discovered evidence claim that fits within an exception to the jurisdictional time bar. *See* 42 Pa.C.S. § 9545(b)(1)(ii).

Appellant's argument conveniently overlooks that even in the absence of such fingerprint evidence, there was overwhelming eyewitness testimony placing Appellant at the scene of the crime. At least four persons who were at the scene of the crime testified that Appellant shot the police officer. *See Commonwealth v. Abdul-Salaam*, 544 Pa. 514, 678 A.2d 342, 346 (1996). Thus, even if we were to accept Appellant's argument regarding the fingerprint evidence, Appellant is simply unable to show that the evidence would have altered the outcome of the trial. 42 Pa.C.S. § 9543(a)(2)(vi).

*Abdul-Salaam-III*, 812 A.2d at 503. Further, when the Pennsylvania Supreme

Court affirmed the denial of Abdul-Salaam's Third PCRA petition, it noted

towards the conclusion of its opinion:

Appellant raises a second claim on appeal, unrelated to the *Brady* claim Judge Jones directed him to exhaust. This claim alleges that a "new" National Academy of Science Report demonstrated the unreliability of the fingerprint evidence introduced at his trial. Appellant attacked the same fingerprint evidence, albeit premised upon different "new" evidence, in the appeal from the denial of his first serial PCRA petiton in *Abdul-Salaam III*. This Court rejected the serial claim as follows: "Appellant's argument conveniently overlooks that even in the absence of such fingerprint evidence, there was overwhelming eyewitness testimony placing Appellant at the scene of the crime. At least four persons who were at the scene of the crime testified that Appellant shot the police officer. Thus, even if we were to accept Appellant's argument regarding the fingerprint evidence, Appellant is simply unable to show that the evidence would have altered the outcome of the trial." *Abdul-Salaam III*, 812 A.2d at 503. Since our disposition in *Abdul-Salaam III* turned on appellant's failure

> to demonstrate prejudice, his present claim, alleging a new basis for
> the same theory, does not remotely affect the prejudice assessment
> finally litigated during his second collateral proceedings and is plainly
> frivolous. *Cf. Commonwealth v. Williams*, 597 Pa. 109, 950 A.2d
> 294, 320 (2008) (conclusion on direct appeal that error was harmless
> because of overwhelming evidence of guilt undermined and ultimately
> defeated appellant's claim of ineffectiveness on collateral review
> because appellant could not demonstrate prejudice); *Commonwealth v.
> Collins*, 585 Pa. 45, 888 A.2d 564, 574-75 (2005).

*Abdul-Salaam-IV*, 42 A.3d at 987 n.7.  Because the state courts addressed this

claim on the merits, we will review it under the AEDPA standard of review.

To succeed in this claim, Abdul-Salaam must show that the admission of the

testimony on the fingerprint evidence "undermined the fundamental fairness of the

entire trial," *Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001), because "the

probative value of the [fingerprint] evidence, though relevant, is greatly

outweighed by the prejudice to the accused from its admission." *Han Tak Lee v.

Glunt*, 667 F.3d 397, 403 (3d Cir. 2012) (quoting *Bisaccia v. Attorney Gen.*, 623

F.2d 307, 313 (3d Cir. 1980)).  Here, the Pennsylvania Supreme Court denied this

claim on the basis that Abdul-Salaam failed to demonstrate prejudice.  *Abdul-

Salaam-III*, 812 A.2d at 503.  Specifically, the court determined that, in light of the

overwhelming evidence placing Abdul-Salaam at the scene of the crime, even if

the fingerprint evidence at issue was to be excluded, the outcome of the trial would

not have been altered.  *Id.*  Upon review, we agree with the Pennsylvania Supreme

Court.  28 U.S.C. § 2254(d)(2).  As the state court found, in light of the

overwhelming evidence of Abdul-Salaam's involvement in the crimes, the Court

finds that even had the fingerprint evidence been excluded as unreliable, it cannot

be said that a reasonable probability exists that the outcome of the trial would have

been different due to the overwhelming evidence placing Abdul-Salaam at the

scene.  Thus, Abdul-Salaam has not shown that the fingerprint evidence's inclusion

undermined the fundamental fairness of the entire trial on the basis that the

probative value of the fingerprint evidence is greatly outweighed by the prejudice

to Abdul-Salaam from its admission.  *See Han Tak Lee*, 667 F.3d at 403.

Therefore, the Pennsylvania Supreme Court's decision on this issue is not contrary

to, or an unreasonable application of, clearly established federal law, nor is it an

unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(1)-(2).  Habeas

relief on this claim will be denied.

> **E.    Claim VI - The jury's finding of the (d)(9) aggravating
> circumstance, that Petitioner had a "significant history of felony
> convictions involving the use or threat of violence to the person"
> violated Petitioner's rights in multiple respects.**

Abdul-Salaam argues that the jury's finding of the (d)(9) "significant

history" aggravating circumstance violated his constitutional rights in that the

aggravating circumstance is facially vague and, in this case, was impermissibly

found based upon juvenile "adjudications" rather than "convictions."  In addition,

82

he claims that his trial and appellate counsel were ineffective for failing to litigate this claim.  Upon review, the Court will deny relief on this claim.

The background of this claim is as follows.  Among the four aggravating circumstances found by the jury in the sentencing phase was that Abdul-Salaam had a "significant history of felony convictions involving the use or threat of violence to the person" pursuant to 42 Pa. Cons. Stat. § 9711(d)(9).[21]  During the sentencing phase, the Commonwealth had offered the following evidence in support of the "significant history" aggravating circumstance: (1) a juvenile delinquency adjudication dated March 31, 1986, from Northampton County, Pennsylvania, relating to charges of robbery and conspiracy when Petitioner was age 15; (2) a juvenile delinquency adjudication dated January 23, 1987, from Lehigh County, Pennsylvania, relating to charges of robbery, assault, and theft when Petitioner was age 16; (3) a juvenile delinquency adjudication dated February 20, 1987, from Lehigh County, Pennsylvania, relating to a charge of

_____

[21] The full text of this aggravating circumstance is:

(d) Aggravating circumstances.  Aggravating circumstances shall be limited to the following:

* * *

(9) The defendant has a significant history of felony convictions involving the use or threat of violence to the person.

42 Pa. Cons. Stat. § 9711(d)(9).

assault when Petitioner was age 16; and (4) a criminal conviction dated February 1,

1989, from Cumberland County, Pennsylvania, on a charge of robbery when

Petitioner was age 18. (Sentencing NT 3/16/1995, at 53.) At a sidebar discussion

before the jury heard testimony, defense counsel objected to the use of the juvenile

adjudications in support of the "significant history" aggravator. (*Id*. at 5-11.)

However, counsel acknowledged that under *Commonwealth v. Baker*, 614 A.2d

663 (Pa. 1992), the law in Pennsylvania is settled that juvenile acts are admissible

for sentencing purposes in a capital proceeding, and the trial court overruled his

objection. (Sentencing NT 3/16/1995, at 11.) As a result, the jury heard evidence

of the previous juvenile adjudications, and in its charge to the jury the trial court

instructed the jury to consider, *inter alia*, whether the Commonwealth had proven

the aggravating circumstance "that the defendant has a significant history of felony

convictions involving the use or threat of violence to the person" beyond a

reasonable doubt. (*Id*. at 113.) The trial court added:

> Now, in this regard the Commonwealth did make argument to you
> concerning undertaking the career in armed robbery. And I make the
> observation to you that there is no evidence that the prior robberies
> involved any particular kind of weapon, though I add that in this case
> and in the matter that you heard and as to which you rendered a
> verdict yesterday there was a firearm that was used.

(*Id*. at 114.) After deliberation, the jury found all four (4) aggravating factors,

including the "significant history" aggravator, and one (1) mitigating circumstance,

and thus handed down the penalty of death.  (*Id*. at 121-22.)

Abdul-Salaam raised this claim in his PCRA petition and on appeal to the Pennsylvania Supreme Court.  However, the Pennsylvania Supreme Court deemed this claim waived because Petitioner could have raised it in his direct appeal but failed to do so.  *Abdul-Salaam-II*, 808 A.2d at 560.  Thus, we will review this claim *de novo*.

## 1.    <u>"Significant History" Aggravator as Vague</u>

As stated above, Abdul-Salaam first contends that the § 9711(d)(9) aggravating circumstance is unconstitutionally vague on its face in violation of the Eighth Amendment.  An aggravating circumstance is unconstitutionally vague when "the challenged provision fails adequately to inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman*."[22] *Maynard v. Cartwright*, 486 U.S. 356, 362 (1988).

In support of his contention that § 9711(d)(9) is unconstitutionally vague, Abdul-Salaam cites three state supreme court cases from outside Pennsylvania. *See State v. David*, 468 So. 2d 1126, 1129-30 (La. 1984) (invalidating an

---

[22] Briefly, in *Furman v. Georgia*, 408 U.S. 238 (1972), the United States Supreme Court held that Georgia's then-standardless capital punishment statute was being applied in an arbitrary and capricious manner, as there was no principled means provided to distinguish those that received the penalty from those that did not.  *Id*., 408 U.S. at 310, 311.

aggravating circumstance based on the defendant's "significant prior history" of criminal activity); *Gall v. Commonwealth*, 607 S.W.2d 97, 111 n.8 (Ky. 1980) (invalidating an aggravating circumstance based on the defendant's "substantial history" of serious assaultive criminal convictions); *Arnold v. State*, 224 S.E.2d 534 (Ga. 1976) (same).  In addition, Abdul-Salaam attempts to distinguish *Proffitt v. Florida*, 428 U.S. 242 (1976), in which the United States Supreme Court rejected a vagueness challenge to a *mitigating* circumstance in Florida's death penalty statute that permitted a sentencing jury to consider that a defendant had "no significant history of prior criminal activity."  Petitioner posits that because mitigating circumstances do not perform the narrowing function of determining who is eligible for the death penalty unlike aggravating circumstances, the Court's decision in *Proffitt* is "simply inapposite" to this claim and cannot be binding on our determination of the constitutionality of Pennsylvania's aggravating circumstance at issue here.  However, we do not read the *Proffitt* Court's analysis on this matter as making the distinction as argued by Abdul-Salaam.  *See Holland v. Horn*, 150 F. Supp. 2d 706, 776 (E.D. Pa. 2001) (rejecting the petitioner's interpretation of *Proffitt* as inapposite to vagueness challenge to § 9711(d)(9) aggravator).  In explaining its decision to uphold Florida's mitigating circumstance statutory provision, the *Proffitt* Court stated:

> While the various factors to be considered by the sentencing
> authorities do not have numerical weights assigned to them, the
> requirements of *Furman* are satisfied when the sentencing authority's
> discretion is guided and channeled by requiring examination of
> specific factors that argue in favor of or [against] imposition of the
> death penalty, thus eliminating total arbitrariness and capriciousness
> in its imposition. The directions given to judge and jury by the
> Florida statute are sufficiently clear and precise to enable the various
> aggravating circumstances to be weighed against the mitigating ones.
> As a result, the trial court's sentencing discretion is guided and
> channeled by a system that focuses on the circumstances of each
> individual homicide and individual defendant in decided whether the
> death penalty is to be imposed.

*Proffitt*, 428 U.S. at 258.  Further, the Pennsylvania Supreme Court has repeatedly

applied *Proffitt* in finding that the § 9711(d)(9) is constitutional.  *See, e.g.*,

*Commonwealth v. Fahy*, 516 A.2d 689, 698 (Pa. 1986) ("We find no basis . . . to

ignore the holding[ ] of *Proffitt* . . . .  Appellant's contention that 42 Pa. C.S. §

9711(d) is vague and overbroad is dismissed as being meritless."); *Commonwealth*

*v. Holcomb*, 498 A.2d 833, 854 (Pa. 1985) ("[Section 9711(d)(9)] as here

interpreted and applied does sufficiently channel jury consideration of the factors

which warrant the imposition of the death penalty.").  Abdul-Salaam has cited to

no Supreme Court cases that would require a different outcome.  As a result, and in

light of the federal and state court precedent, Abdul-Salaam has failed to establish

that the § 9711(d)(9) aggravator is unconstitutionally vague and thus violates the

Eighth Amendment.  *See Holland*, 150 F. Supp. 2d at 775-76 (finding

Pennsylvania Supreme Court's denial of petitioner's vagueness claim regarding

§ 9711(d)(9) is not contrary to, or an unreasonable application of, clearly

established federal law).  Abdul-Salaam is not entitled to relief on this subclaim.

### 2. "Significant History" Aggravator Based on Juvenile Adjudications Rather Than Convictions

Abdul-Salaam also argues that the § 9711(d)(9) aggravator was

unconstitutionally applied in his case because the jury was permitted to consider

not only his one previous conviction, but also three previous juvenile

adjudications.  It is Abdul-Salaam's position that, at the time of his trial in 1995,

Pennsylvania law was "inconsistent" on the question of whether juvenile

adjudications could be used as part of the significant history aggravator.

Contrary to Abdul-Salaam's assertion, at the time of his trial, Pennsylvania

law was clear on the subject of whether to include juvenile adjudications in a

capital sentencing proceeding.  In *Commonwealth v. Baker*, 614 A.2d 663 (Pa.

1992), the Pennsylvania Supreme Court held that, for evidentiary purposes during

a capital sentencing proceeding, juvenile adjudications are admissible to establish a

defendant's "sgnificant history of felony convictions involving the use or threat of

violence to the person."  42 Pa. Cons. Stat. § 9711(d)(9).  The court reasoned that:

> Pennsylvania adheres to a system of individualized sentencing which
> must explore the defendant's prior behavior and dangerousness before
> sanctions are imposed.  For the care of capital sentencing, indeed, is

> "a function of character analysis . . . and the central idea of the present
> sentencing status is to allow a jury to take into account such relevant
> information, bearing on a defendant's character and record, as is
> applicable to the task of considering the enumerated aggravating
> circumstances."

*Baker*, 614 A.2d at 676 (quoting *Commonwealth v. Beasley*, 479 A.2d 460, 465

(Pa. 1984)).  The court also recognized the limitations of its holding:

> [W]hile the delinquent record could not be used as "evidence . . . in
> another court," to "deprive the Courts of the right to be informed of
> and to consider the history and background of the person subject to
> sentence may result in sentences which are unjust and unfair to both
> society and defendants."

*Baker*, 614 A.2d at 676 (quoting *Commonwealth ex rel. Hendrickson v. Myers*, 144

A.2d 367, 371 (1958)).  The holding of *Baker* has subsequently been upheld in

Pennsylvania.  *See Commonwealth v. Birdsong*, 24 A.3d 319, 348-49 (Pa. 2011);

*Commonwealth v. Moore*, 937 A.2d 1062, 1068 (Pa. 2007); *Commonwealth v.

Carson*, 913 A.2d 220, 274 (Pa. 2006).[23]  Therefore, in light of the law established

at the time of Abdul-Salaam's trial, it is clear that the trial court's decision to

follow precedent and overrule defense counsel's objection to the introduction of

Abdul-Salaam's juvenile adjudications was not in error.  There is no violation of

the Eighth Amendment here, and thus habeas relief on this subclaim will be denied.

---

[23] Following the state court's decision in *Baker*, and before *Myers*, *Birdsong*, *Moore*, and
*Carson*, the Pennsylvania General Assembly amended the Juvenile Act to expressly authorize
the admission of juvenile adjudications into evidence if the commission of the delinquent act
would be admissible if committed by an adult.  *See* 42 Pa. Cons. Stat. § 6354(b)(4).

### 3. <u>"Notice" of Use of Juvenile Adjudications for Capital Sentencing</u>'

Abdul-Salaam also argues that his sentence violated due process when he did not receive "notice" that his juvenile adjudications could be used in the "significant history" aggravator because at the time he received those adjudications (in 1987 and 1989), the law was clear that juvenile adjudications could not be used to establish the § 9711(d)(9) aggravator.  The Court again turns for guidance to the Pennsylvania Supreme Court's decision in *Baker*.

In *Baker*, the Pennsylvania Supreme Court set forth the state of the law prior to its decision as follows:

> The Commonwealth established a separate court with exclusive jurisdiction over accused minors in 1933.  Up to that time, youthful offenders were tried equally with adults in the Quarter Sessions Courts.  Act of June 2, 1933, P.L. 1933, 11 P.S. § 261.  Section 19 provided:

>> No order made by any juvenile court shall operate to impose any of the civil disabilities ordinarily imposed by the criminal law of the Commonwealth, nor shall any child be deemed to be a criminal by reason of any such order or be deemed to have been convicted of crime.  The disposition of a child or any evidence given in a juvenile court shall not be admissible as evidence against the child in any case or proceeding in any other court.  (Footnote omitted).

> The contemporary counterpart appears in 42 Pa. C.S. 6354:[ ]

> Section 6354.  Effect of adjudication

(a) General rule. – An order of disposition or other adjudication in a proceeding under this chapter is not a conviction of crime and does not impose any civil disability ordinarily resulting from a conviction or operate to disqualify the child in any civil service application or appointment.

(b) Effect in subsequent judicial matters. – The disposition of a child under this chapter may not be used against him in any proceeding in any court other than a subsequent juvenile hearing, whether before or after reaching majority, except:

(1) in dispositional proceedings after conviction of a felony for the purposes of a presentence investigation and report.

Both this Court and the Superior Court found occasion to rule on the issue of whether a record of delinquency could be employed for the determination of sentence of an adult under the Act of 1933, and in each instance of review, these tribunals determined that the juvenile acts indeed were admissible for that purpose.  Our seminal case on point is *Commonwealth ex rel. Hendrickson v. Myers*, 393 Pa. 224, 144 A.2d 367 (1958), where the majority held (Justice Musmanno dissenting on the grounds that the juvenile record was unclear), specifically addressing Section 19, that while the delinquent record could not be used as "evidence . . . in another court," to "deprive the Court of the right to be informed of and to consider the history and background of the person subject to sentence may result in sentences which are unjust and unfair to both society and defendants." *Myers*, 393 Pa. at 231, 144 A.2d at 371 (affirming the Superior Court's holding that the "judge was entitled to all of the material facts to inform him as to what kind of offender he was dealing with to assist him in determining the appropriate penalty."  182 Pa. Superior Ct. 169, 173-74, 126 A.2d 485, 486-87 [1956]).  The Superior Court in *Myers*, in fact, baldly concluded that the statute was not applicable to prevent the sentencing judge from considering the defendant's juvenile court record.  182 Pa. Superior Ct. at 174, 126 A.2d at 487.

The rationale behind both decisions in *Myers* derived from our

91

previous ruling in *Commonwealth v. Petrillo*, 340 Pa. 33, 16 A.2d 50 (1940), where we settled on the broader principle that sentencing judges have wide latitude in considering facts, "regardless of whether such facts are produced by witnesses whom the court sees and hears." *Petrillo* was a death case. *Petrillo*'s principle was applied in the same manner in *Commonwealth v. Johnson*, 348 Pa. 349, 354, 35 A.2d 312, 314 (1944). Moreover, the Superior Court applied *Petrillo* to the 1933 Act and approved the use of juvenile records as sentencing considerations. *See, Commonwealth ex rel. Miller v. Maroney*, 179 Pa. Superior Ct. 305, 116 A.2d 755 (1955); *Commonwealth ex rel. Yeschenko v. Keenan*, 179 Pa. Superior Ct. 145, 115 A.2d 386 (1955); and *Commonwealth ex rel. Czarnecki v. Stitzel*, 179 Pa. Superior Ct. 80, 115 A.2d 805 (1955).

More recent decisions by the Superior Court have affirmed uniformly this rule. *Commonwealth v. Woodward*, 368 Pa. Superior Ct. 363, 534 A.2d 478 (1987); allocatur denied, 520 Pa. 575, 549 A.2d 135 (1988); *Commonwealth v. Krum*, 367 Pa. Superior Ct. 511, 533 A.2d 134 (1987); *Commonwealth v. Morio*, 302 Pa. Superior Ct. 407, 448 A.2d 1106 (1982); and *Commonwealth v. Allen*, 287 Pa. Superior Ct. 88, 429 A.2d 1113 (1981) (citing *Myers*).

*Baker*, 614 A.2d at 675-76. Given this state of the law with respect to the use of

juvenile adjudications in criminal sentencing matters prior to *Baker*, the Court

rejects Abdul-Salaam's argument related to the inconsistent application of the

§ 9711(d)(9) aggravator to juvenile adjudications. Nor is the Court convinced that

the *Baker* decision and its progeny have expanded the § 9711(d)(9) aggravator to

the point that Abdul-Salaam was subjected to an *ex post facto* and therefore

unconstitutional change in the law. Therefore, Abdul-Salaam's right to due

process with respect to notice has not been violated here, and habeas relief on this

subclaim will be denied.

Moreover, as the Court has determined that all three subclaims with respect to the § 9711(d)(9) aggravator are meritless, the ineffective assistance of counsel claim also fails.  *See Strickland*, 466 U.S. at 691 (reasoning counsel's performance cannot be deficient based on a failure to advance meritless claims).  Again, as found *supra*, Abdul-Salaam's entire claim here will be denied.

**F.    Claim VII - Petitioner's death sentence must be vacated because the arbitrary "proportionality review" performed by the Pennsylvania Supreme Court violated his right to due process and denied him the meaningful appellate review of death penalty cases constitutionally mandated by the Eighth Amendment.**

At the time of Abdul-Salaam's direct appeal of his death sentence in 1995, the Pennsylvania Supreme Court was statutorily required to determine whether his sentence was "excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant."  42 Pa. Cons. Stat. § 9711(h)(3)(iii) (1992).  Abdul-Salaam argues that the Pennsylvania Supreme Court failed to provide him with a meaningful proportionality review because the database relied upon by the court was fundamentally flawed and inaccurate, and that he had no notice or opportunity to meaningfully participate in the Pennsylvania Supreme Court's review, thereby violating his right to due process.

Abdul-Salaam raised this claim in his PCRA petition, (Doc. 197, Vol. 1, Ex. 4), and the PCRA court denied it.  Further, the Pennsylvania Supreme Court refused to consider the merits of this claim upon appeal from the PCRA court decision, finding that it was waived because counsel failed to raise it on direct appeal.  *Abdul-Salaam-II*, 808 A.2d at 560.  Therefore, this Court will review this claim *de novo*.

The United States Constitution does not require state appellate courts to engage in proportionality review in capital cases, *Pulley v. Hicks*, 465 U.S. 37, 50–51 (1984), and it is not the "province of a federal habeas court to reexamine state-court determinations on state court questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).  Further, it is "unclear whether, under Third Circuit law, a state proportionality-review statute creates any cognizable liberty interest for due process purposes." *Riley v. Taylor*, 277 F.3d 261, 311-12 (3d Cir.2001); *see also Frey v. Fulcomer*, 132 F.3d 916, 925 n.7 (3d Cir.1997).  Even assuming such a liberty interest exists, a federal court's review of state proportionality review is generally limited.  If a federal court finds that the state court performed its proportionality review in good faith, "it cannot 'look behind' the state court's conclusion of proportionality to consider whether the state court misapplied state proportionality law." *Id*. (quoting *Walton v. Arizona*, 497 U.S. 639, 656 (1990),

94

*rev'd on other grounds Ring v. Arizona*, 536 U.S. 584 (2002)); *see also Bannister*

*v. Delo*, 100 F.3d 610, 627 (8th Cir.1996).

In this case, in light of the directive set forth in 42 Pa. Cons. Stat. §

9711(h)(3)(iii), the Pennsylvania Supreme Court, relying upon "sentencing data

compiled by the Administrative Office of the Pennsylvania Courts[,]" determined

that "the sentence was not an improper product of passion, prejudice, or any other

arbitrary factor, but, rather, was based upon the overwhelming evidence that

[Abdul-Salaam] murdered Officer Willis Cole." *Abdul- Salaam-I*, 678 A.2d at 355

n.16.  Specifically with respect to the court's reliance on the AOPC database, the

court stated,

> [W]ith respect to the final consideration, and in accordance with
> *Commonwealth v. Zettlemoyer*, 500 Pa. At 63, 454 A.2d at 961, this
> court has performed an independent review of the cases involving the
> sentence of death to determine whether [Abdul-Salaam]'s sentence of
> death was proportional to the sentences imposed in similar cases
> taking into consideration both the circumstances of the offense and the
> character and record of [Abdul-Salaam].

*Id.*, 678 A.2d at 355.

Abdul-Salaam now contends that the Pennsylvania Supreme Court's

proportionality review was not meaningful because the database of cases that it

relied upon included flaws and methodological infirmities.  Further, he claims that

when he raised this proportionality challenge in his state post-conviction

95

proceedings, the PCRA court would not permit him to develop an evidentiary

record in support of the claim.  Even so, the Pennsylvania Supreme Court has

repeatedly rejected claims challenging its proportionality review process, including

claims based upon the alleged errors Abdul-Salaam relies upon here.  In

*Commonwealth v.  Gribble*, 703 A.2d 426, 440 (Pa. 1997), the Pennsylvania

Supreme Court held that "we believe that our proportionality review comports with

the General Assembly's desire to afford capital defendants an additional check

against the arbitrary imposition of the death penalty."  *Id*.  In *Commonwealth v.*

*Harris*, 703 A.2d 441, 451-52 (Pa. 1997), the Pennsylvania Supreme Court

rejected a claim that the "data base maintained by the Administrative Office of

Pennsylvania Courts (AOPC) is substantially flawed and the procedures which

produce the results are inherently defective."  *Id*.; *see also Commonwealth v. Laird*,

726 A.2d 346, 361 (Pa.1999); *Commonwealth v. Albrecht*, 720 A.2d 693, 708-09

(Pa. 1998) (rejecting challenge to proportionality review because "litigants are

afforded no access to the data upon which it is based and because that data, by

virtue of underinclusiveness, is fundamentally flawed").  Given the Supreme

Court's pronouncement on this issue, there is no indication that the court

performed its proportionality review of Abdul-Salaam's claim in bad faith.

Therefore, we will not "look behind" the Pennsylvania Supreme Court's

conclusion to consider whether it properly applied state proportionality law.  *See*

*Riley*, 277 F.3d at 311–12; *Stevens v. Beard*, 701 F. Supp.2d 671, 706-07 (W.D.

Pa. 2010).

Abdul-Salaam further asserts that he was unable to challenge the integrity of

the database, since he "had no notice or opportunity to meaningfully participate in

what amounted to appellate factfinding done by the Pennsylvania Supreme Court

regarding what constituted 'similar' cases and whether the sentence imposed in this

case was disproportionate."  (Doc. 8-3 at 33.)  However, it is well-settled that the

information that the Pennsylvania Supreme Court relied upon in performing its

review "is made available by ... [the Administrative Office of Pennsylvania Courts]

free of charge."  *Commonwealth v. DeHart*, 516 A.2d 656, 260–61 (Pa.1986).  In

addition, the proportionality review process was "an appellate process, statutory

mandated, to ensure that sentences of death are not imposed by Pennsylvania juries

and/or jurists, in a disproportionate manner."  *Laird*, 726 A.2d at 361.  Under state

law, it was not an "adversarial part of the trial or the sentencing procedures in a

death penalty case."  *Commonwealth v. Banks*, 656 A.2d 467, 474 (Pa. 1995).

In denying Abdul-Salaam federal relief on this basis, our decision is in

accordance with decisions in our district, as well as those in other district courts

rejecting challenges to the Pennsylvania Supreme Court's proportionality review

process. *Marinelli v. Beard*, Civ. No. 4:CV-07-0173, 2012 WL 5928367, at \*98-100 (M.D. Pa. Nov. 26, 2012) (rejecting the petitioner's claim that the Pennsylvania Supreme Court failed to provide meaningful proportionality review on the basis that the state court's review of petitioner's case under its stated procedures was not "arbitrary or capricious"); *Stevens v. Beard*, 701 F. Supp.2d 671, 706-07 (W.D. Pa. 2010); *Lambert v. Beard*, Docket No. 02-9034, 2007 WL 2173390, \*51-52 (E.D. Pa. July 24, 2007) (rejecting claims that petitioner was denied a meaningful proportionality review because he was not given an opportunity to review and challenge the information relied on by the Pennsylvania Supreme Court, and because the database, data collection instruments, and methodology employed in the review process allegedly were "egregiously" flawed; petitioner presented no evidence that the Pennsylvania Supreme Court conducted its proportionality review in bad faith; and denying certificate of appealability); *Rollins v. Horn*, Docket No. 00-1288, 2005 WL 1806504, \*39-40 (E.D. Pa. July 26, 2005) (denying petitioner's challenges to the procedure by which the Pennsylvania Supreme Court conducted its proportionality review because that court had examined the procedures in *Commonwealth v. Gribble*, 703 A.2d 426(1997), and had found nothing arbitrary or capricious about them, and denying certificate of appealability); *Kindler v. Horn*, 291 F. Supp.2d 323, 351-53 (E.D. Pa.

98

2003) (denying petitioner's claims that the Pennsylvania Supreme Court's proportionality review did not provide him with the meaningful appellate review in violation of the Eighth and Fourteenth Amendments, and denying certificate of appealability); *Laird v. Horn*, 159 F. Supp. 2d 58, 124 (E.D. Pa. 2001) (denying petitioner's challenge to proportionality review because there was no evidence that the Pennsylvania Supreme Court had undertaken its review in bad faith); *Jermyn v. Horn*, Docket No. 97-634, 1998 WL 754567 *52-54 (M.D. Pa. Oct. 27, 1998) (rejecting petitioner's due process and Eighth Amendment challenges to his proportionality review), *aff'd* 266 F.3d 257 (3d Cir. 2001) (affirming summarily district court's denial of certain claims, including the petitioner's challenge to proportionality review).

Here, because the state court reviewed Abdul-Salaam's case under procedures found not to be "arbitrary or capricious," the Court finds that there is no basis for federal review of this claim.

**G.    Claim VIII - Pennsylvania's capital sentencing scheme, and therefore, Petitioner's death sentence violate the notice and jury trial guarantees of the Sixth Amendment and the due process clause of the Fifth Amendment in failing to require either that aggravating circumstances be pled in a charging mechanism or that a finding that aggravating circumstances outweigh mitigating circumstances be made beyond a reasonable doubt.**

Abdul-Salaam argues that his sentence was impermissibly enhanced to a

death sentence because the aggravating factors were neither pled in a charging document nor proven to outweigh the mitigating circumstances beyond a reasonable doubt, in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002).  In *Apprendi*, the United States Supreme Court held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Apprendi*, 530 U.S. at 490.  Thereafter, in *Ring*, the Supreme Court applied the rule of *Apprendi* to capital sentencing schemes, holding that under the Sixth Amendment, the facts that render a defendant eligible for the death sentence, including the requisite state of mind and at least one statutory aggravating factor, are the functional equivalent of elements of the offense and must be found by a jury beyond a reasonable doubt rather than by a judge.  *Ring*, 536 U.S. at 607-09.  Abdul-Salaam argues that, because the Pennsylvania statutes related to aggravating factors do not require that the factors be pled in a charging document or be proven to outweigh the mitigating circumstances beyond a reasonable doubt, his death sentence violates the Sixth Amendment and habeas relief on sentencing should be granted.  Upon review, the

Court finds that neither *Apprendi* nor *Ring* is applicable to Abdul-Salaam's claim,[24]

and therefore habeas relief here will be denied.

Generally, a federal habeas petitioner may not rely on new rules of criminal

procedure if they were announced after his conviction became final.  *Schriro v.*

*Summerlin*, 542 U.S. 348, 352 (2004); *Teague v. Lane*, 489 U.S. 288, 306 (1989)

(stating that "new constitutional rules of criminal procedure will not be applicable

to those cases which become final before the new rules are announced").  In this

case, Abdul-Salaam's conviction became final before the decisions in *Apprendi*

and *Ring*, or on March 31, 1997, when the United States Supreme Court denied

certiorari review.  *See Abdul-Salaam v. Pennsylvania*, 520 U.S. 1157 (1997).

Under the Supreme Court's retroactivity analysis set forth in *Teague*, a

federal habeas petitioner may not avail themselves of a new rule of criminal

procedure unless that rule meets one of two narrow exceptions: (1) "it places

certain kinds of primary, private individual conduct beyond the power of the

criminal-law making authority to proscribe," or (2) it requires the observance of

those procedures that are implicit in the concept of ordinary liberty.  *Teague*, 489

---

[24] Abdul-Salaam raised this claim in his second PCRA petition. In *Abdul-Salaam-III*, the Pennsylvania Supreme Court held that the claim was not cognizable because it was raised in a second petition and Abdul-Salaam did not meet the jurisdictional requirements for the presentation of such a successor petition. *See Abdul-Salaam-III*, 812 A.2d at 499-502.  Because the Pennsylvania Supreme Court did not address this claim on the merits, we will review the claim here *de novo*.

U.S. at 311.  The first *Teague* exception applies to the type of rule characterized as "substantive" rather than "procedural."  *See Banks v. Beard*, 542 U.S. 406, 411 n.3 (2004) (citing *Schriro*, 542 U.S. at 352 n.4).  The second *Teague* exception is reserved for "watershed rules of criminal procedure that not only improve the accuracy of trial, but also 'alter our understanding of the *bedrock procedural elements*' essential to the fairness of a proceeding."  *United States v. Swinton*, 333 F.3d 481, 487 (3d Cir. 2003) (quoting *Sawyer v. Smith*, 497 U.S. 227, 242 (1990) (emphasis in original) (citations omitted)).

Neither the Third Circuit nor the Supreme Court has held that the rule announced in *Apprendi* or *Ring* meets either *Teague* exception.  First, as to *Apprendi*, in *United States v. Swinton*, 333 F.3d 481, 489-90 (3d Cir. 2003), the Third Circuit Court initially concluded that *Apprendi* itself announced a new rule of criminal procedure,[25] and therefore analyzed whether the second *Teague* exception applied to permit a retroactive application of *Apprendi* on collateral review.  In holding that *Apprendi* does not satisfy *Teague*'s second exception to non-retroactivity, the Third Circuit joined the Courts of Appeals from several other Circuits in finding that the rule in *Apprendi* is not a "watershed" rule that improved

---

[25] In *Schriro v. Summerlin*, the United States Supreme Court unequivocally stated that the *Apprendi* line of cases, of which *Ring* is certainly one, announced a new rule of criminal procedure.  542 U.S. 348, 352-54 (2004).

the accuracy of determining the guilt or innocence of a defendant, or that an

*Apprendi* violation does not necessarily undermine the fairness of judicial

proceedings.  *Swinton*, 333 F.3d at 490 (citing *Coleman v. United States*, 329 F.3d

77 (2d Cir. 2003); *United States v. Brown*, 305 F.3d 304, 309 (5th Cir. 2002);

*Curtis v. United States*, 294 F.3d 841, 843-44 (7th Cir. 2002); *United States v.*

*Sanchez-Cervantes*, 282 F.3d 664, 670 (9th Cir. 2002); *United States v. Mora*, 293

F.3d 1213, 1219 (10th Cir. 2002); *McCoy v. United States*, 266 F.3d 1245, 1258

(11th Cir. 2001); *United States v. Sanders*, 247 F.3d 139, 151 (4th Cir. 2001);

*United States v. Moss*, 252 F.3d 993, 998-99 (8th Cir. 2001)).  As a result, the

Court in *Swinton* expressly held that *Apprendi* itself does not apply retroactively.

*Swinton*, 333 F.3d 481 at 491 ("[W]e hold that *Apprendi* does not apply

retroactively to cases on collateral review.").

As to *Ring*, in *Schriro*, the Supreme Court held that the *Ring* rule "does not

apply retroactively to cases already final on direct review."  *Schriro*, 542 U.S. at

358; *see also Bell v. Cone*, 543 U.S. 447, 454 n.6 (2005) (confirming that *Ring*

does not apply retroactively) (citing *Schriro*, 542 U.S. at 358).  The defendant in

*Schriro* was convicted of first-degree murder and related charges in an Arizona

state court.  *Schriro*, 542 U.S. at 350.  Pursuant to Arizona's capital sentencing

scheme, the trial court judge found two aggravating factors and no mitigating

103

circumstances, and consequently sentenced the defendant to death. *Id*. The

Arizona Supreme Court affirmed the sentence on direct review, and the defendant

subsequently filed a post-conviction petition seeking habeas review of his

conviction. *Id*. While review was pending in the Ninth Circuit, the Supreme Court

decided *Ring*, which, again, required that aggravating factors be found by a jury

rather than a judge. *Id*. at 351 (citing *Ring*, 536 U.S. at 603-09). Relying on *Ring*,

the Ninth Circuit Court reversed the defendant's death sentence. *Schriro*, 542 U.S.

at 351; *see Summerlin v. Stewart*, 341 F.3d 1082, 1121 (9th Cir. 2003). Thereafter,

the Supreme Court reversed the Ninth Circuit, holding that "*Ring* announced a new

procedural rule that does not apply retroactively to cases already final on direct

review." *Schriro*, 542 U.S. at 358. To hold otherwise would invite "criminal

defendant[s] [who already] had a full trial and one round of appeals . . . [to]

nevertheless continue to litigate [their] claims indefinitely in hopes that we will one

day have a change of heart." *Id*.

Considering that *Ring* is simply the application of the principles of *Apprendi*

to a particular subject, namely capital sentencing schemes, and that the Supreme

Court and Third Circuit have expressly held that neither holding applies

retroactively to cases on collateral review, *see Schriro*, 542 U.S. at 358; *Swinton*,

333 F.3d 481 at 491, it is clear that the rule established in these cases is not

104

applicable to Abdul-Salaam's case.  Because both *Apprendi* and *Ring* were decided after Abdul-Salaam's case was already final on direct review, we cannot apply the rules announced therein to his case.  Therefore, habeas relief on this claim will be denied.

### H.    Claim IX - Petitioner received constitutionally ineffective assistance of counsel at capital sentencing.

Abdul-Salaam contends that he is entitled to a new sentencing hearing because trial counsel was ineffective for failing to investigate and present mitigating evidence relating to Abdul-Salaam's mental health and family history. More specifically, he argues that trial counsel was ineffective during the sentencing phase for: (1) failing to present additional testimony from family members to demonstrate the ongoing and steady dysfunction that marked Abdul-Salaam's life, (Doc. 8-4 at 16); (2) failing to seek or obtain records relating to Abdul-Salaam's school, prior criminal history, and childhood mental health evaluations that all support identifying him as "troubled, disturbed, physically and sexually abused, brain damaged and mentally ill child and young man," (*Id.* at 8); and (3) failing to present testimony of a mental health expert who "could have drawn the critical link between Petitioner's early childhood illness, deprivations and abuse, and his adult behavior," (*Id.* at 9).  For the reasons that follow, habeas relief on this claim will be denied.

1.   **Background**

a.   **Penalty Phase**

During the penalty phase, the Commonwealth presented eight witnesses, seven who presented testimony regarding Abdul-Salaam's juvenile adjudications relating to, *inter alia*, robbery and aggravated assault.  (Sentencing Hearing, Notes of Testimony ("Sentencing NT") 3/16/1995, at 24-46, Doc. 146.)  The Commonwealth's final witness, then New Cumberland Police Chief Oren Kauffman, testified as to the position of various downtown buildings in relation to the coin shop where the shooting of Officer Cole occurred.  (*Id*. at 46-53.)  Abdul-Salaam's attorney, Speros Lappas, presented three witnesses, Abdul-Salaam's mother and his two sisters, each of whom testified about Abdul-Salaam's abusive upbringing at the hands of his father and how that abuse affected other aspects of Abdul-Salaam's life, such as schooling and socialization.  (*Id*. at 54-82.)

Abdul-Salaam's mother, Dovetta, testified that his father was abusive towards her and her five children, including Abdul-Salaam.  (*Id*. at 55-56.)  Most of the abuse was mental, and the father was "very angry all the time."  (*Id*. at 56, 62.)  The physical abuse involved "struggles . . . , fights and arguments," (*Id*. at 58), between the father and mother and the three sons.  Abdul-Salaam's mother believed Abdul-Salaam was twelve when he began recognizing his father's abuse

towards his mother.  (*Id*. at 59.)  Further, his father would discipline or punish

Abdul-Salaam on most occasions by punching him in the chest.  (*Id*. at 64-65.)  His

mother testified that many of the problems the family had with Abdul-Salaam's

father were due to his drug use.  (*Id*. at 61-63.)

     Abdul-Salaam's mother also testified about his problems with school and

socializing.  She stated that when he was young, she had him tested because of the

problems he was having in school.  (*Id*. at 57.)  The school initially thought Abdul-

Salaam had a learning disorder, but, after testing, it was discovered that he had a

"deficient disorder," based on his inability to concentrate.  (*Id*.)  Because he could

not pay attention, Abdul-Salaam was placed in a special school.  (*Id*.)  In addition,

when he was approximately sixteen or seventeen, as a result of one of his juvenile

adjudications he was placed in an Alternative Rehabilitation Communities, Inc.

("ARC") program, where he met a positive male role model.  (*Id*. at 71-72.)

Abdul-Salaam also had close relationships with both of his sisters.  (*Id*. at 61.)


     Abdul-Salaam's sister Karima, a college student raised in the same home,

testified that her father was verbally abusive towards her mother and all the

children, mainly degrading them by telling them they were "nothing."  (*Id*. at 75.)

However, she called herself "daddy's little girl," testifying that she would sit on

her father's lap and was hurt when he left the home.  (*Id*. at 80.)  Nevertheless, when the family was living in Allentown, she witnessed her father hit Abdul-Salaam with a baseball bat.  (*Id*. at 76.)  She also testified that her mother tried to shelter and clothe the children, but at times they only had cans of beans for food. (*Id*. at 78.)  Finally, she stated that she has a good relationship with Abdul-Salaam, had some good times with him, but recognized that he needed a positive male role model while growing up.  (*Id*. at 79-80.)

Abdul-Salaam's other sister, Safryah, also testified at the sentencing hearing. (*Id*. at 80-82.)  She remembered her father arguing and yelling at her mom, and throwing lamps, plates, glasses, and "anything that was in his sight."  (*Id*. at 81.) She also "heard behind doors" her father punching and yelling at Abdul-Salaam. (*Id*.)  She testified that she loves her brother and would continue to visit him in prison should he be given a life sentence.  (*Id*. at 82.)

During his obviously passionate closing argument to the jury, Attorney Lappas addressed the jury's role in weighing of the aggravating factors and mitigating circumstances for purposes of sentencing, but with rather abstract references to the mitigation evidence he had presented.  His relevant statement to the jury was as follows:

> You have convicted this man.  You have concluded he is guilty. And based upon that conclusion I am not telling you that the fact that

he had a bad, a horrible, hellish upbringing excuses the crime for
which you have convicted him.  It is not a defense.  But you
remember that we told you in the *voir dire*, and the judge will tell you
again, that mitigating evidence is not designed to excuse the crime.  It
goes to the question of penalty.

* * *

[F]rom the history of civilization the decisions in any kind of criminal
case, the sentencing decisions, have been based upon the upbringing,
the record, the influences on the defendant.  Not because it excuses
the crime, not even because it always explains it, but often it does
mitigate it.

* * *

Now, Mr. Eakin said many people grow up in bad and abusive
homes.  I took offense to what he called being beaten with a baseball
bat by your own father vague abuse, but he said many people do grow
up in those situations.  I don't know if many do, but some do.  And
they surmount it.  And they overcome it.  And they turn out okay.

And perhaps that's true, but we are not here to judge the whole
world.  We are not here to determine if it would have been possible to
grow up in an environment where your father never says a decent
word to you.  Where not only does he not support the family, but he
takes what meager money he gets with a once every five year job he
holds down and puts it up his nose with cocaine.

We are not here to determine whether anybody could have
surmounted that.  We are not here to determine whether my client
could have surmounted that if he had been someone else.  We are not
here to judge the whole world.  And we are not here to say you are
excused.  It is okay.  We are just here to say that that is mitigating.  I
am not asking you to go back to the jury room and come back out and
say now that we have heard this we find him not guilty.  But that life
goes on the scale.  That life goes on the scale in your own heart.

109

People think different things about the effect of a life like that. Some people think, I guess this is what Mr. Eakin was driving at, that everybody in the world has freedom of choice. That you make your bed and then you lie in it. Well, did he make his bed? His bed was made for him before August the 19th. Who knows, I wish quite honestly and sincerely that I had been there to take the baseball bat away. Maybe none of us would then need to be here. But who knows, who knows.

\* \* \*

What is the mitigation? What is the weight of mitigation as mitigation? Of growing up thinking because your own father tells you this that you are no good, that you are worthless. What is the effect in mitigation of living in a house where you have to tiptoe around so that somebody doesn't beat you until you can't breathe. What is the weight and mitigation of having it droned into you from youth that you are trouble? The schools can't help you. Your mother can't help you. And when you reach a certain age, and you are in a bedroom with your little brother, and your father comes in and takes a ball bat to the both of you, and you can't help him because you are little. Does that mean that he is not guilty. By your verdict he is guilty. That's not vague abuse.

(*Id*. at 102; 104-106; 107.)

At the end of testimony and closing arguments, the trial court charged four

aggravating factors, as offered by the Commonwealth: (1) Abdul-Salaam

committed a killing while in the perpetration of a felony; (2) in the commission of

the offense, Abdul-Salaam knowingly created a grave risk of death to another

person in addition to the victim of the offense; (3) Abdul-Salaam has a significant

history of felony convictions involving the use or threat of violence; and (4) the

victim was a peace officer killed in the performance of duty.  (Sentencing NT

3/16/1995, at 113.)  The trial court also charged the jury with the catch-all

mitigating factor, namely any evidence of mitigation concerning the character and

record of Abdul-Salaam and the circumstances of his offense.  (*Id.* at 114.)  After

deliberating for approximately one hour, the jury returned a verdict of death,

finding all four aggravating factors and one mitigating circumstance, but that those

aggravating factors outweighed the one mitigating factor.  (*Id.* at 121.)

Specifically, the jury stated the mitigating circumstance as: "The background that

includes both physical and mental abuse does have a negative impact on a person's

development and therefore his future behavior."  (*Id.*)

### b.    PCRA Proceedings

At the PCRA proceedings, Abdul-Salaam, represented by new counsel,

presented the testimony of his trial counsel, as well as additional family witness

testimony, extensive background records, and mental health expert testimony.  The

Commonwealth countered with its own mental health expert testimony.  That

evidence is as follows, in relevant part.

### i.    Testimony of Trial Counsel

Attorney Lappas represented Abdul-Salaam at trial and through direct

appeal.  At the PCRA hearing, Attorney Lappas recollected presenting testimony

from members of Abdul-Salaam's family concerning his abuse and upbringing as

mitigation evidence despite arguing during his closing at the guilt phase that

"although [Abdul-Salaam] had been convicted of first degree murder, there was a

residual doubt concerning whether he had been the one firing the fatal shot."[26]

(PCRA NT 4/23/1998, at 159, Doc. 126-36.)

With respect to the presentation of background witnesses who testified

regarding Abdul-Salaam's childhood abuse, Attorney Lappas stated that he

presented only the three family members as witnesses "concerning [Abdul-

Salaam's] upbringing" at the penalty phase, "to try to get the jury to feel some

level of sympathy for Mr. Abdul-Salaam and the goal to induce them to be

merciful."  (*Id*. at 159; 179.)

As to presentation of background records, Attorney Lappas testified that,

prior to the penalty phase, he did not obtain any records relating to Abdul-Salaam's

background, schooling, prior mental health evaluations, or anything regarding his

social history, other than getting some records from the Lehigh County juvenile

probation office and the Pennsylvania Department of Corrections relating to

Abdul-Salaam's previous convictions.  (*Id*. at 163; 169-71.)  He added that he had

---

[26] During his closing argument to the jury in the guilt phase, Attorney Lappas argued, in part, that the Commonwealth had not proven beyond a reasonable doubt that Abdul-Salaam fired the fatal shot at Officer Cole by relying mainly on eyewitness testimony.  (Trial NT 3/15/1995, at 71-105.)

no strategic or tactical reason for not obtaining such records.[27]  (*Id*. at 169.)

Finally, with respect to calling a mental health expert or presenting any other relevant evidence regarding to mental health issues, Attorney Lappas testified that, prior to trial, he "hadn't specifically identified any issues of that sort," and thus, he did no preparation or investigation of Abdul-Salaam's background beyond hiring a psychiatrist to evaluate Abdul-Salaam prior to the penalty phase.  (*Id*. at 160; 161-62.)  In fact, Attorney Lappas stated that he "never concluded that there were or that there were not" mental health issues in this case, adding that "there was nothing about [his] interactions with Mr. Salaam which suggested to [him] specifically that [Abdul-Salaam] had a psychiatric diagnosis."  (*Id*. at 164, 165.)  When asked whether he would have explored the potential presence of organic brain damage in Abdul-Salaam, such as minimal cerebral dysfunction, had he had such information, Attorney Lappas stated: "Well, I don't think I can say that I would not have explored it.  I don't think that that fact alone in the context especially of this case would have been one that I thought was of critical importance."  (*Id*. at 175.)  On cross-examination, Attorney Lappas further stated,

---

[27] When asked specifically why he did not obtain any records of mental health evaluations addressing Abdul-Salaam's social history, Attorney Lappas answered, "[T]he only reason I would have obtained them would be to determine whether I would introduce them.  So it may be that I had a tactical and strategic reason for not presenting that as a mitigating factor." (PCRA NT 4/23/1998, at 172.)

> In a case like this, in this case in particular, the emotional impact of
> the testimony throughout the trial was such that I would have thought
> it unlikely that a jury would accept psychiatric mitigation as a factor,
> especially one that would outweigh the really very devastating
> emotional impact of the several days of testimony that they just heard.

(*Id*. at 180.)  Specifically regarding his reason for cancelling the evaluation of

Abdul-Salaam by the mental health expert, Attorney Lappas stated:

> I was also concerned that Dr. Crutchley's value to me as Mr. Salaam's
> defense attorney would be that she would - - if she developed some
> favorable information, she would then be called upon to testify in
> court, and certainly if she testified statements made to her during the
> evaluation process would be fair game for either direct or cross
> examination.

(*Id*. at 190.)  He further clarified: "I told her I did not want her to explore the

events, any events relating to the charge that was on trial, and as I recall, she

expressed her view that she either could not or would not conduct an evaluation

under those conditions, and as a result of it we canceled her evaluation."  (*Id*. at

192.)  He added later, "one of the things that was important to [Dr. Crutchley] was

whether there were or were not going to be expressions of remorse."  (*Id*. at 209-

10.)

## ii.    Family Witnesses

In addition to Mr. Lappas' testimony, counsel for Abdul-Salaam presented

ten family witnesses.  These witnesses provided further information on Abdul-

Salaam's childhood experiences, especially those involving his father, Abdul-

Salaam, Sr.  Specifically, Raymond Harris, Abdul-Salaam's older half-brother,

testified that, during his childhood in the early 1970's, Abdul-Salaam's father had

an angry temper, drank excessively and used drugs, and was frequently in trouble

with the police.  (PCRA NT 10/3/1997, at 40-42; 48-49, Doc. 125-2.)  During that

time and after Abdul-Salaam, Sr. joined the Nation of Islam in the early 1970's,

Abdul-Salaam, Sr. verbally and physically abused his wife and children, including

Abdul-Salaam.[28]  (*Id*. at 42-44, 46, 77.)  The father also had trouble keeping a job,

and infrequently provided food for the children.  (*Id*. at 50-51.)  He sent his

children to a Muslim school that taught students to dislike white people, and he

tried to prevent his family from socializing with certain relatives and friends.  (*Id*.

at 52-55.)

Mr. Harris testified that he was contacted by Abdul-Salaam's trial counsel to

testify at the sentencing hearing on the morning he was asked to testify, but he had

no way of getting to Carlisle from Harrisburg.  (*Id*. at 60-61.)  On cross-

---

[28] Mr. Harris described this verbal abuse as follows:

> Like what he would say to us to lower our self-esteem, to me, you know, he
> would call me a mommy's boy, a punk, a silly, you know, you ain't going to be
> nothing.  And you are not my child.  You don't need to be living here, you know,
> go somewhere else.  You know, a lot of stuff like that.

(PCRA NT 10/3/1997, at 49.) Mr. Harris also testified that Abdul-Salaam, Sr. hit Abdul-Salaam
with an aluminum baseball bat, but on cross-examination stated that he was not present at that
incident.  (*Id*. at 89.)

examination, he admitted that he was told of Abdul-Salaam's arrest at the time by

family members who had his contact information in Harrisburg, but that he did not

attend the trial or any related hearings.  (*Id*. at 92-93.)

Florita Goodman, Abdul-Salaam's paternal aunt, testified that when Abdul-

Salaam, Sr. was a child, he was "crazy," stating that he heard voices telling him to

"do crazy things" like "harm people that were his enemies."  (*Id*. at 98-99.)   Ms.

Goodman also recalled that after Abdul-Salaam, Sr. joined the Nation of Islam, he

became fanatical about its teachings, and gave his family's money to the Nation

rather than provide food or clothing for his family.  (*Id*. at 106-07.)  She also

observed Abdul-Salaam, Sr. beat and verbally abuse his wife when they all lived

together after the Abdul-Salaam's married.  (*Id*. at 108-09.)  There is no mention of

whether Abdul-Salaam observed any of this behavior.  After the family moved out

of the house when Abdul-Salaam was approximately four-years old, Ms. Goodman

rarely had contact with Abdul-Salaam's family.  (*Id*. at 110, 140.)  However, when

Abdul-Salaam was seventeen, he briefly lived with her "because he wanted to get

away from his father," but was soon joined by Abdul-Salaam, Sr. in the home.  (*Id*.

at 110, 143-44.)  Ms. Goodman observed no incidents of abuse between father and

son during that time.  (*Id*. at 144.)

Ms. Goodman indicated that she had no previous knowledge of Abdul-

Salaam's arrest, trial, or death sentence in this case.  (*Id*. at 114.)  However, had she been contacted, she would have testified.  (*Id*.)

Abey Abdul-Salaam, Abdul-Salaam's younger brother, testified that most of the time, living with his parents was peaceful and quiet, with trips to the park and cookouts. (*Id*. at 116, 119.)  He recalled that approximately three times a week, his parents would argue, mainly due to his father's unpredictable and moody temper. (*Id*. at 116.)  Also, the family was poor, with no food in the house, no toys or television, and limited clothing.  (*Id*. at 116-17.)  Abdul-Salaam, Sr. would discipline the children by whipping them or putting them in the corner facing the wall for hours at a time.  (*Id*. at 117-18.)  Abey testified that he was present when Abdul-Salaam, Sr. hit Abdul-Salaam with an aluminum baseball bat, as Raymond Harris had earlier testified.  (*Id*. at 118.)

Josephine Hall, Abdul-Salaam's maternal grandmother, testified that she witnessed Abdul-Salaam, Sr. arguing with her daughter, Dovetta, and saw her at times with black eyes.[29]  (*Id*. at 155-56.)  However, Ms. Hall testified that she never saw bruising or signs of physical abuse on Abdul-Salaam.  (*Id*. at 170.) When Ms. Hall did see Dovetta and the grandchildren, she sensed that they were

---

[29] Ms. Hall never witnessed Abdul-Salaam Sr. hit her daughter, Dovetta.  (PCRA NT, 10/3/1997, at 166.)

afraid of Abdul-Salaam, Sr.  (*Id*. at 157.)  The children were fairly clean, but Ms. Hall and her other daughter would assist the family by purchasing clothing and food for them.  (*Id*. at 157, 159.)

Ms. Hall knew that Abdul-Salaam was on trial "for something," but no one contacted her about the trial or asked her to testify.  (*Id*. at 175.)  However, she maintained that she has regular telephone contact with her daughter, Dovetta.  (*Id*. at 174.)

Eddie Washington, Jr., Abdul-Salaam's first cousin on his mother's side, testified that at the occasional family gathering, Abdul-Salaam, Sr. was irrational, unreasonable, non-communicative and non-cordial, and, in his opinion, "obnoxious" and a "lunatic."  (*Id*. at 180, 182.)  He recalled an instance when he was riding in a car with Abdul-Salaam, Sr. when Abdul-Salaam was seven or eight-years old, when Abdul-Salaam, Sr. suddenly turned around to the children as they spoke to each other and snapped, "be quiet or I will kill you."  (*Id*. at 181, 183.)  Further, when Dovetta did bring her children to Mr. Washington's house, they looked scruffy, had torn clothing, and were hungry.  (*Id*. at 184.)  When Mr. Washington played with Abdul-Salaam during these visits, he appeared "slow" and did not communicate well.  (*Id*. at 186-87.)  Also, Mr. Washington stated that he understood that Dovetta was using drugs and alcohol during this time.  (*Id*. at 187.)

Mr. Washington was never contacted by Abdul-Salaam's trial counsel to testify at trial. (*Id*. at 191.)

Christine Reeves, Abdul-Salaam's girlfriend at the time of the shooting, testified as to her observations of Abdul-Salaam and what she learned about Abdul-Salaam's upbringing and family life. Ms. Reeves testified that when she met Abdul-Salaam in 1994, he was very reserved and quiet, but very active and athletic. (PCRA NT 12/11/1997, at 20, Doc. 125-3.) He could be anxious and high-strung, and when he was angry, he acted like a "spoiled kid, wanting attention and things like that." (*Id*. at 21.) Further, when he saw a police officer while they were walking or driving together, he would become very anxious and nervous, and became verbally abusive to her. (*Id*. at 25.)

Ms. Reeves testified regarding her knowledge of Abdul-Salaam's upbringing, recalling that Abdul-Salaam described himself as the protector of his family, inasmuch as he would gather his siblings in order to get them out of the house when their parents were fighting. (*Id*. at 10.) When he described the incidents of domestic violence between his parents, he appeared "distressed, upset, anxious, [and] nervous."[30] (*Id*. at 11.) Ms. Reeves also understood that the family

[30] Abdul-Salaam told her of an incident when, at age six or seven, he was kidnapped and held hostage by a group of drug dealers to whom Abdul-Salaam, Sr. was indebted. (PCRA NT 12/11/1997, at 10-11.) He was held for a number of days until his father could clear the debt. (*Id*.) During his PCRA testimony, Abdul-Salaam, Sr. denied that this incident ever took place.

financial situation was "shaky" and that the family moved often. (*Id*. at 12.)

Abdul-Salaam attended at least two alternative school programs for emotionally

impaired children, Glen Mills and ARC. (*Id*. at 13.)

Abdul-Salaam also told Ms. Reeves that, as part of his association with the

Nation of Islam, he was involved in the 1989 riots at SCI-Camp Hill while

incarcerated there, and resultantly was transferred to SCI-Huntingdon and placed

in solitary confinement for a period of three to four years. (*Id*. at 15.) While in

solitary confinement, he was called various racial slurs and was beaten. (*Id*. at 16.)

When he related these events, his eyes would well up and get teary, and he would

get angry. (*Id*.) Further, Ms. Reeves described his change in thought processes as

a result of this incarceration as follows: "there was a deep sense of paranoia and

anger and resentment towards authority figures and basically to a lot of white

people." (*Id*. at 17.) He was well-versed in the teachings of the Nation of Islam,

and was "very adept with historical facts as related to the Koran." (*Id*. at 18.)

Ms. Reeves testified at trial, but never spoke to or met with Abdul-Salaam's

trial counsel or investigator. (*Id*. at 31-32.) She stated that she would have been

willing to testify about Abdul-Salaam's upbringing and family history at trial. (*Id*.

at 32.)

---

(*Id*. at 131-32.)

Abdul-Salaam, Sr. also testified at the PCRA hearing.  At the time of his

testimony, he had been homeless for eight years and was using crack cocaine.  (*Id*.

at 75-76.)  He also used methamphetamine in the late 1960's until he joined the

Nation of Islam in the early 1970's.  (*Id*. at 76.)  He stated that Dovetta used drugs

with him, but not when she was pregnant with Abdul-Salaam.  (*Id*. at 143.)  He

admitted that he hit Abdul-Salaam when he was young "if I thought that it was

called for."  (*Id*. at 79.)  He struck Abdul-Salaam for wetting the bed at age ten or

eleven, and ridiculed him for it in front of others.  (*Id*. at 97-98, 107.)  He also

called Abdul-Salaam "stupid" or "dumb" in front of other people.  (*Id*. at 106.)  He

also admitted that he hit his wife, but stated that the physical abuse stopped when

he joined the Nation of Islam.  (*Id*. at 87-88.)  He also tried to force the Nation of

Islam teachings on his children, telling them that black people were superior to

white people.  (*Id*. at 84, 86.)  Further, when Abdul-Salaam was approximately

four-years old, Abdul-Salaam, Sr. aspired to be an executioner for the Nation of

Islam, but did not demonstrate any of his tactics to his children.  (*Id*. at 149-51.)  In

addition, Abdul-Salaam, Sr. admitted that he spent family money on drugs rather

than pay the rent or provide food for the family.  (*Id*. at 85-86.)  At some point,

Abdul-Salaam, Sr. concluded that he "had the devil in [him]," because of what he

had done to his family, including the physical and verbal abuse, as well as

spending their money on drugs.  (*Id*. at 103-04.)

Dana Goodman, Abdul-Salaam's paternal uncle, testified that his older brother, Abdul-Salaam, Sr., was violent when they were growing up and that he was scared of him.  (*Id*. at 161-62.)  He also testified that Abdul-Salaam, Sr. was more paranoid when he returned from the war in Korea.  (*Id*. at 164.)  When the Abdul-Salaam's were living with Abdul-Salaam, Sr.'s parents and sister, Mr. Goodman witnessed Abdul-Salaam, Sr. strike the five-year old Abdul-Salaam several times with a "baseball bat or pipe or whatever would be around that's available for him to pick up."  (*Id*. at 167.)  But Mr. Goodman only saw the family occasionally after they moved out of that house.  (*Id*. at 168.)  He did see Abdul-Salaam between the time he was released from prison and prior to his arrest for Officer Cole's murder, and noticed he was bitter and angry.  (*Id*. at 170.)  He recalled that Abdul-Salaam was not bitter and angry prior to that incarceration. (*Id*.)

Mr. Goodman was not contacted by Abdul-Salaam's trial counsel, but stated that he would have been willing to testify at trial.  (*Id*. at 171-72.)

Lawrence Goodman, Abdul-Salaam's other paternal uncle, described his older brother, Abdul-Salaam, Sr., when they were young as "wild" and "rambunctious," often losing his temper, getting mad and excited, punching and

hitting his siblings, teasing and calling them names, and acting like the neighborhood bully. (*Id.* at 186-88.) When they were older, Abdul-Salaam, Sr. abused alcohol, methamphetamine and crack cocaine. (*Id.* at 189-192.) As a result, his behavior became unpredictable, from drunken rages to non-reality-based conversations about "flying saucers and all that kind of stuff." (*Id.* at 191-193.) After Abdul-Salaam, Sr. and Dovetta married, Mr. Goodman visited their house "periodically." (*Id.* at 193.) He testified that both parents drank and occasionally used cocaine and other drugs. (*Id.* at 197-98.) He observed the Abdul-Salaam's arguing loudly, and, at times, saw Dovetta wearing sunglasses to hide a black eye. (*Id.* at 194.) He also observed on several occasions Abdul-Salaam, Sr. smack Abdul-Salaam on the side of the head for interrupting him while he was speaking, and hit Abdul-Salaam on the top of his head with a spoon to discipline him. (*Id.* at 194-95; 200.) Mr. Goodman stated that Abdul-Salaam acted withdrawn and introverted around his father. (*Id.* at 195.)

Prior to Abdul-Salaam's arrest, the last time Mr. Goodman saw him was approximately in 1987. (*Id.* at 206-07.) He testified that he was not contacted by Abdul-Salaam's trial counsel prior to trial, but would have testified had he been asked. (*Id.* at 199.)

Finally, Karima Abdul-Salaam, one of Abdul-Salaam's younger sisters who

testified at trial, testified that growing up in the household, she heard "a lot of abusive language" between her parents, but never saw her father strike her mother, although she heard about it from other family members.  (*Id*. at 210-11.)  She also testified on cross-examination that she witnessed her father hit Abdul-Salaam more than ten times.  (*Id*. at 225.)  She described the family's financial difficulties, which caused them to move around often because of evictions or her mother trying to get away from Abdul-Salaam, Sr., and having little food to eat on many days.  (*Id*. at 214-16.)  She testified that, when she was older, Abdul-Salaam tried to help her financially with college expenses.  (*Id*. at 217.)  At that point in the PCRA hearing, the PCRA court noted that "we have reached a point where much of this has become cumulative."  (*Id*. at 218.)

Ms. Abdul-Salaam testified that she spent about ten to fifteen minutes with Abdul-Salaam's trial counsel prior to testifying at trial.  (*Id*. at 219.)

### iii.   <u>Background Records</u>

Abdul-Salaam's counsel also introduced a number of background records on Abdul-Salaam's early childhood and young adult life at the PCRA hearing.  The Court will recount relevant portions of that extensive background history below.

Abdul-Salaam entered the Green Tree School, a school for children with

124

special needs, in 1977, at age 7, and remained there until June 1983.[31]  (Pet.

Appendix, Doc. 11, Ex. 21.)  In his discharge summary, his treatment summary

noted:

> Roman[32] entered Green Tree with extremely hyperactive, impulsive,
> aggressive behavior and a fierce temper that could quickly become
> explosive.  He also showed severe insecurity and had very little
> confidence.  His academic achievement was far below his potential
> because of these severe emotional and behavioral problems.  Goals
> have been to help him gain control of impulsive, aggressive behavior,
> to build his confidence, and to improve his interpersonal relationships.
> He has made significant progress in academic gains and much
> improvement in social/emotional goals.  However, staff did not feel
> his behavior warranted leaving our program yet.

(Green Tree Discharge Summary, Doc. 11, Ex. 21.)  It was noted that Abdul-

———————————

[31] Prior to entering the Green Tree School, Abdul-Salaam was referred to several medical professionals for psychiatric evaluation by the Kelly School.  (*See* Pet. Appendix, Doc. 11, Ex. 21.)  In December 1976, William Neussle, Ph.D, found Abdul-Salaam to be an "emotionally disturbed youngster who has extreme difficulty in relating to persons in his environment," but did not find any signs of "organic impairment" in his examination.  (*Id.*)  He also noted that Abdul-Salaam's mother "becomes quite upset with him and physically punishes him when her anger builds up too much."  (*Id.*)  In January 1977, Patricia Mildvan, M.D., evaluated Abdul-Salaam for hyperactivity and poor academic performance.  (*Id.*)  She noted that his infancy was very healthy, but hyperactivity was "always a bit of a problem."  She also noted "signs of minimal cerebral dysfunction," and prescribed Ritalin.  (*Id.*)  The Ritalin was discontinued within three to four weeks at the direction of Abdul-Salaam's mother.  (*Id.*)  In June 1977, Katherine Goddard, M.D., evaluated Abdul-Salaam and found him to be "very hyperactive, undisciplined, and paranoid in his attitudes."  (*Id.*)  She noted his I.Q. ranging about 116, "but academic skills are poor, and attention span short."  (*Id.*)  She discovered no organic or neurological impairments.  (*Id.*)  When interviewed, Abdul-Salaam "admitted to many frightening things in his life, including 'German shepherd dogs,' admitted to being frightened of father who he says 'belts' him."  (*Id.*)  Dr. Goddard recommended placement in a residential psychotherapeutic facility.  (*Id.*)

[32] In his youth, Abdul-Salaam was known as "Roman" or "Reggie" Goodman.  (*See* Pet. Appendix, Doc. 11, Exs. 21 & 22.)

Salaam's mother sought his discharge in order to attend public school because she was "adamant about 'giving Roman a chance' at mainstreaming." (*Id*.)  Further, he was referred for "intensive further psychiatric help - with Mother and Father preferably (family therapy) as well as continued counsel at school." (*Id*.)

In March 1986, as a 15-year old, Abdul-Salaam was placed on juvenile probation in March 1986 as a result of an adjudication in Northampton County, Pennsylvania.  (Doc. 8-4 at 22-23.)  Progress notes were taken in Lehigh County, where Abdul-Salaam's probation was transferred.  (*Id*.)  Specifically, in the Social Summary, the juvenile probation officer took a family history, juvenile history, and noted Abdul-Salaam's delinquency record and other social information.  (Pet. Appendix, Doc. 11, Ex. 22.)  In his evaluation, the officer concluded the following:

> Seifullah is a sixteen-year-old, black male of medium height with a slender, muscular build.  Seifullah has been moderately cooperative and does not appear to be open and honest, but rather appears superficial with this officer.  He, likewise, tends to be guarded and defensive.
>
> Seifullah has a history of displaying defiant and manipulative behaviors.  He tends to be impulsive and tries to rationalize the reasons for his seemingly unpremeditative [sic] behavior.  When confronted with these behaviors, he becomes highly defensive and has, on occasion, acted out violently.  Seifullah has a propensity to use violence as his major defense.  Seifullah can be explosive and potentially dangerous.  He has demonstrated this in a variety of settings.  He has had numerous physical confrontations with school staff members, as well as other school students.

\* \* \*

> Seifullah has been residing in an unstable home environment as his
> parents have gone through numerous separations.  Seifullah's father
> has been described as a strict and rigid disciplinarian, and as a result,
> Seifullah has had a great deal of conflict with his father.  Seifullah is
> also rebellious of his father's conversion of the family to the Black
> Muslim religion. . . .   Seifullah has a strained relationship with his
> mother.  Mrs. Abdul-Salaam is extremely frustrated with her son due
> to his irresponsible behavior and feels her son lacks realistic goals and
> is not very motivated.

(*Id*.)  Further, the Chronological Data Sheet indicates that Abdul-Salaam's juvenile

probation officer had constant contact with Abdul-Salaam and his mother.  (*Id*.)

Reports from Abdul-Salaam's placement in the Wiley House Diagnostic Center at

this time reflect much of these same observations and conclusions.[33]  (*Id*.)

In February 1987, Abdul-Salaam was referred to the ARC program by the

---

[33] In a June 1986 report from the Wiley House, an evaluator noted that:

> Seifullah was cooperative, yet somewhat guarded, in the psychiatric evaluation.
> No evidence of disturbed thinking was noted.  He admitted to the offenses that
> caused his placement in the Diagnostic Center.  While he first stated that the
> robbery was done for money, he later admitted that he was angry with his father.
> He stated that he would prefer to live with relatives in Philadelphia.  He came
> across as an angry person, venting much of it towards his father.  In fact, he stated
> that he did not want to return home if his father was there.  Diagnostically,
> Seifullah presented an Adjustment Reaction with Mixed Disturbance of Emotions
> and Conduct.

(Pet. Appendix, Doc. 11, Ex. 22.)  As a result, the evaluator recommended, *inter alia*, that the
issues between Abdul-Salaam and his father be addressed and resolved before his return to the
home.  (*Id*.)

Lehigh County Juvenile Probation Department, where he remained until April 1988.  (*Id.*)  In his Discharge Summary, it was noted that he was assigned goals such as "developing self-awareness" because of his "inappropriate attitude and behavior, his resistance toward authority figures, and his tendency not to accept responsibility for his actions."  (*Id.*)  Although his initial response to treatment was slow, he began to make progress after a few months.  (*Id.*)  In early 1988, however, his "overall attitude and behavior [was] sporadic."  (*Id.*)  By the end of his stay at ARC, it was determined that, "Seifullah's stay at ARC, even through the adversities, ha[d] been a very productive one.  He ha[d] matured and appear[ed] to be getting his life in order.  Seifullah ha[d] developed to the point where it would be safe to say that he should, given the internalization that he ha[d] obtained, remain out of the legal system."  (*Id.*)

### iv.    <u>**Mental Health Experts**</u>

At the PCRA hearing, Abdul-Salaam's counsel presented the testimony of four mental health professionals.  In its case in rebuttal, the Commonwealth presented two mental health experts.  Again, no mental health expert testimony was presented at trial.  A summary of the PCRA testimony is set forth below.

Patricia Fleming, Ph. D., a clinical psychologist, testified that she conducted a clinical evaluation of Abdul-Salaam in connection with the PCRA proceedings.

(PCRA NT 4/16/1998, at 49.)  In connection with the evaluation, Dr. Fleming

reviewed affidavits of family members, evaluations of other mental health experts

Drs. Kessel, Armstrong and Rotenberg, the related legal documents such as court

decisions and trial testimony, and various background records of Abdul-Salaam.

(*Id*.)  She also conducted a clinical interview of Abdul-Salaam in order to "gain

information regarding his background and how he happened to be who he was

when I saw him."  (*Id*. at 51.)

Initially, Dr. Fleming reported that her impression of Abdul-Salaam at the

time of the interview was of "a young man who had a severely dysfunctional

background starting at an early age."  (*Id*. at 52.)  She opined as to Abdul-Salaam

Sr.'s mental health and the possibility of abuse involving Abdul-Salaam.  (*Id*. at

71-79.)  She further noted that an evaluation from June 1986 reported Abdul-

Salaam to have a full-scale I.Q. of 85.  (*Id*. at 59.)  Significantly, she noted Dr.

Mildvan's report from February 1977 indicating that Abdul-Salaam had signs of

"minimal cerebral dysfunction,"[34] including a possible learning disability.[35]  (*Id*. at

---

[34] Dr. Julie Kessel, who testified at the PCRA hearing conducted on April 22, 1998, testified that "minimal cerebral dysfunction" is the "old name" for "attention deficit hyperactivity disorder."  (PCRA NT 4/22/1998, at 120.)

[35] Specifically, Dr. Fleming testified as follows:

It says that Dr. Mildvan was concerned.  And that she went further to say that he needed a special class for - - she was suspecting a learning disability, which could be an after-effect or one of the things if he were diagnosed with minimal cerebral

67.)

Following this testimony, Dr. Fleming discussed the psychological tests she administered to Abdul-Salaam relating to intelligence and personality.[36]  (*Id*. at 82-94.)  She emphasized that the tests represent a "description" of a subject's symptoms, and not a "diagnosis."  (*Id*. at 92.)  The results of one personality test, the MMPI-2, revealed to her that, in part, Abdul-Salaam "has throughout had periods of depression, has thought about suicide, has wanted to commit suicide when he is in despair.  He had a high anxiety.  He had a high anger."  (*Id*. at 91.)  As a result of another personality test, the MCMI-II, Dr. Fleming found Abdul-Salaam to express antisocial and aggressive traits, as well as avoidance and social ineptitude.  (*Id*. at 92-94.)  Based on her review of records and test results, Dr. Fleming concluded that Abdul-Salaam has "antisocial behaviors."  (*Id*. at 94.)  On

---

dysfunction.

Often at that time, in 1977, in the schools there was - - the schools often diagnose minimal brain dysfunction of children with this constellation of traits, the poor attention span.  They were not adjusting well.  They were having interpersonal problems.  And the term learning disability wasn't used as prevalent as the minimum brain dysfunction because it was emphasized that that was a probable causation of the learning disability.

(PCRA NT 4/16/1998, at 67-68.)  She did stress, however, that most children were not referred for special help.  (*Id*. at 68.)

[36] Dr. Fleming administered the Wechsler Adult Intelligence Scale-Revised ("WAIS-R"); a category test from the Halstead-Reitan battery of tests; Seashore Rhythm test; Speech Sounds Perception test; and personality tests Minnesota Multiphasic Personality Inventory- 2 ("MMPI-2") and Millon Multiaxial Clinical ("MCMI-II").  (PCRA NT 4/16/1998, at 82-94.)

130

cross-examination, she also described him as "hyperactive," but emphasized that she was not "diagnosing" him with hyperactivity.  (*Id*. at 115.)  While she ruled out schizophrenia, she stated that he presented with some criteria of schizo-typical personality disorder.[37]  (*Id*. at 130.)  Finally, she testified that there is a correlation between child abuse and neglect and organic brain disease as an adult.  (*Id*. at 140.)

Carolyn Crutchley, M.D., a psychiatrist with a specialty in forensic psychiatry, testified that she was contacted by Abdul-Salaam's counsel prior to trial in order to evaluate Abdul-Salaam for mental health issues relating to mitigation.  (PCRA NT 4/22/1998, at 69.)  Prior to an evaluation, Dr. Crutchley asked counsel for background materials on Abdul-Salaam's schooling and juvenile delinquency, but counsel did not comply with her request.  (*Id*. at 70-71, 73.)  Further, Attorney Lappas asked Dr. Crutchley not to speak with Abdul-Salaam about the offenses at issue in this case.  (*Id*. at 73-74.)  When she told him this

---

[37] Specifically, Dr. Fleming testified:

He had some of that fixed belief, the delusion.  I believe he had visual and auditory hallucinations when he was younger and also when he was in prison.  He had difficulty with interpersonal relationships.  He had difficulty with intimacy.  The school records show that the other children avoided him.  But all the behaviors were part of it, the acting-out behavior.  Part of it was that he didn't socialize well and never has.  Those were the outstanding characteristics.

(PCRA NT 4/16/1998, at 130-31.)

restriction would "seriously impair [her] ability to evaluate him," (*Id*. at 74),

counsel withdrew his request for an evaluation. (*Id*.)

Despite not personally evaluating Abdul-Salaam prior to trial, Dr. Crutchley

reviewed various background materials and reports of other mental health experts

prior to the PCRA hearing, and the PCRA court permitted her to testify regarding

her opinions on Abdul-Salaam's mental health.  (*Id*. at 79-87.)  Based on her

review of the neuropsychological testing, Dr. Crutchley opined that Abdul-Salaam

possessed a neuropsychological impairment that could have an impact on his

behavior, his ability to control his behavior, and his ability to cooperate with

counsel.  (*Id*. at 82-83.)  In her opinion, the tests results also only "raise[d]

questions" as to the presence of brain damage.[38]  (*Id*. at 84.)

Julie Kessel, M.D., a psychiatrist, testified that she conducted a clinical

evaluation of Abdul-Salaam in connection with the PCRA proceedings.  (*Id*. at

---

[38] On redirect examination, Abdul-Salaam's PCRA counsel and Dr. Crutchley had the following exchange:

Q:    Assume hypothetically that the testimony of family members at the time
      of trial and in proceedings at this time indicated that Mr. Abdul-Salaam
      was beaten and abused as a child, would that fact be consistent or
      inconsistent with the presence of organic brain damage?

A:    It could go either way, depending upon how he was beaten.  If he was
      beaten about the head, for instance, knocked out, then that could be a
      contributing factor to organic brain damage.

(PCRA NT 4/22/1998, at 110.)

132

115-16.)  As part of her evaluation, Dr. Kessel reviewed family member affidavits,

Veterans Administration records of Abdul-Salaam, Sr., prior mental health

evaluations, the related legal documents such as court decisions and trial

testimony, and various background records of Abdul-Salaam.  (*Id*. at 116-17.)  She

also conducted a clinical interview of Abdul-Salaam at SCI-Greene.  (*Id*. at 117.)

Further, Dr. Kessel was present during the evaluation performed by the

Commonwealth's expert, Dr. Rotenberg.  (*Id*.)

        In her review of Abdul-Salaam's early childhood records, Dr. Kessel found

that Abdul-Salaam had "severe behavioral problems" from the age of four and

required placement in classes for socially and emotionally disturbed children

because of his inability to sit still, listen, concentrate, and avoid fighting.  (*Id*. at

120.)  He performed poorly in school and had difficulty learning.  (*Id*.)  Childhood

testing revealed that he suffered from "attention deficit hyperactivity disorder"

("ADHD"), and had "severe behavioral disruptions," as well as "some type of

behavioral disinhibitions syndrome that's best characterized at this point as a

cognitive disorder, not otherwise specified.  Perhaps at that point as some kind of

impulse control disorder."  (*Id*. at 120-21.)  She stated that this diagnosis suggested

"organic impairment" or dysfunction.[39]  (*Id*.)  She added that, as he aged, Abdul-

Salaam's symptoms indicated a schizotypal personality disorder.[40]  (*Id*. at 125-26.)

Carol Armstrong, Ph. D., a neuropsychologist, testified that she conducted a

neuropsychological evaluation of Abdul-Salaam in connection with the PCRA

proceedings.  (PCRA NT 4/23/1998, at 27.)  In connection with the evaluation, Dr.

Armstrong reviewed Abdul-Salaam's juvenile history records, previous evaluation

records, and progress and treatment records from childhood.  (*Id*. at 29.)  From the

records, Dr. Armstrong opined that the abuse Abdul-Salaam suffered as a child was

"moderate," in that it was "repetitive and chronic."  (*Id*. at 81-82.)

Dr. Armstrong also administered forty (40) neuropsychological tests to

Abdul-Salaam, finding Abdul-Salaam to be within average limits regarding verbal

---

[39] From her review of the Green Tree School records, she found "the likely presence of organic dysfunction" in Abdul-Salaam's "gross impulsivity, his gross aggressivity, his gross inattention, his gross inability to follow instruction, his gross inability to sit still, to concentrate and to focus."  (PCRA NT 4/22/1998, at 126.)

[40] Dr. Kessel gave the following working definition of schizotypal personality disorder:

[P]ersonality disorders in general refer to after the age of eighteen how an individual has developed a life-long pattern at this point of interacting with the world. . . .  And basically schizotypal persons relate to the world in a suspicious manner.  They have a lot of anxiety with interacting with others.  They tend to have very few significant relationships outside of their family because of their interpersonal anxiety.  They have magical thinking.  They have oddity of the use of language and of their thought and associations.  And they tend not to do as well as other people.

(PCRA NT 4/22/1998, at 142-43.)

memory, (*Id*. at 37), but impaired in manual movement, (*Id*. at 33), visual selective

attention, (*Id*. at 35), verbal fluency, (*Id*. at 36-37), logical and deductive

reasoning, and cognitive flexibility, (*Id*. at 38-39), and frontal lobe functioning, (*Id*.

at 42).  Dr. Armstrong opined that these deficits explained Abdul-Salaam's poor

responses "in so many situations."  (*Id*. at 44.)  She also opined that, based on his

deficits, Abdul-Salaam suffered from extreme mental and emotional disturbance

and impairments in understanding expectations of society and the law.  (*Id*. at 50.)

Turning to the Commonwealth's case on rebuttal, Paul Delfin, Ph. D, a

clinical psychologist, testified that, although he did not personally examine Abdul-

Salaam, he reviewed the data from the other experts' evaluations, including data

from evaluations Abdul-Salaam had in his childhood.  (PCRA NT 5/1/1998, at 19,

21.)  From his review of the records, Dr. Delfin found Abdul-Salaam to be an

individual with "low average general intellectual functioning," with "[n]o evidence

of neuropsychological problems."  (*Id*. at 30.)  He also stated that the objective

personality tests results suggested "antisocial personality and aggressive sadistic

personality."[41]  (*Id*.)  Dr. Delfin disagreed with Dr. Armstrong that Abdul-

---

[41] Dr. Delfin explained an "antisocial personality" to be one where the subject is "very impulsive, very angry or angry with authority, does not control angry impulses well.  And typically is prone to commit antisocial and criminal acts, often associated with drug abuse or alcohol abuse."  (PCRA NT 5/1/1998, at 31.)  He also explained "sadistic characteristics" as

Salaam was under the influence of extreme mental or emotional disturbance, or that his capacity to appreciate the criminality of his conduct was impaired. (*Id.*) Further, based on his review of the results, he saw no evidence of schizotypal disorder, as the results indicated no psychotic thinking or thought disorders. (*Id.* at 32.) He also found no evidence of organic brain damage.[42] (*Id.*) Dr. Delfin stressed, however, that because he did not personally examine Abdul-Salaam, he was not rendering a "diagnosis." (*Id.* at 35.)

Larry Rotenberg, M.D., a psychiatrist, testified that he conducted a clinical evaluation of Abdul-Salaam in connection with the PCRA proceedings. (*Id.* at 87-89; 94-96.) In connection with the evaluation, Dr. Rotenberg reviewed family member affidavits, prior mental health evaluations, the related legal documents such as court decisions and trial testimony, and various background records of Abdul-Salaam. (*Id.* at 87-89.) He also conducted a clinical interview of Abdul-Salaam at Cumberland County Prison in December 1997. (*Id.* at 95.) Dr. Kessel

---

possessed by someone for whom "the angry impulses are very hostile, [who wants] to hurt people, [is] willing to hurt people, and [is] not terribly concerned about the consequences of hurting people." (*Id.*)

[42] In one of the tests administered to Abdul-Salaam, the Thematic Apperception Test ("TAT"), it was noted that Abdul-Salaam had several pauses during the test. (PCRA NT 5/1/1998, at 46-47.) Dr. Delfin explained, "Pauses are not indicators of brain damage. Pauses may be indicators of a number of things, including a slow speed of thinking. And a slow speed of thinking can be an indicator of many things. One of which is brain damage. One of which is evasion." (*Id.* at 48-49.) He did note, too, that he reached no conclusions as to whether Abdul-Salaam was malingering. (*Id.* at 49.)

and Ms. Holly Evans-Schaffer, a graduate student who aided in administering various tests, were also present during the evaluation.  (*Id*.)

From his review of the background records, Dr. Rotenberg noted that a young Abdul-Salaam was described as "a very difficult acting behaviorally disturbed child, who is described on one occasion as violent, impulsive youngster, for example, who feels little guilt over his aggressive action."  (*Id*. at 100.) Beginning in his early years, Abdul-Salaam was described as manipulative and lied repeatedly.  (*Id*. at 110.)  "Major areas of difficulty were defiance, refusal to accept responsibility for his actions, explosive temper, and conflictual peer relationship." (*Id*.)  He was also described as a "strong dominating leader," which Dr. Rotenberg stated was incompatible with a schizotypal person.  (*Id*. at 111.)

Based on his examination,[43] Dr. Rotenberg noted that Abdul-Salaam's had an early childhood filled with family dysfunction, ranging from his tumultuous relationship with his father to his "mixed feelings" about his siblings.  (*Id*. at 117-

---

[43] Dr. Rotenberg made the following findings, in part, in relation to his "mental status examination" of Abdul-Salaam in 1997:

> [H]e was presented as pleasant, alert, cooperative, even an ingratiating young man with no unusual mannerisms.  Psychomotorically he was normal.  His speech was productive and coherent.  There was no evidence of any thought disorder.  There were no delusions or hallucinations.  His effect was adequate.  His mood was eurythmic, Your Honor, which means normal.

(PCRA NT 5/2/1998, at 128.)

137

121.)  When Dr. Rotenberg asked Abdul-Salaam about his difficulties in school, he responded that "whatever he had trouble with by way of school really wasn't his fault," and that it was "the problem that other people didn't do enough for him." (*Id*. at 122.)

After reviewing the background records and conducting the examination, Dr. Rotenberg concluded that Abdul-Salaam had a strong history of marijuana dependence and cocaine abuse, and had a personality disorder, not otherwise specified ("NOS"), with antisocial obsessive-compulsive and narcissistic features. (*Id*. at 132-33.)  He disagreed with previous evaluations that indicated a schizotypal personality disorder or clinically significant organic brain damage.  (*Id*. at 136.)  Along those lines, Dr. Rotenberg stated that Abdul-Salaam had "no significant and clinically relevant or material neurological problem."  (*Id*. at 159.) Finally, he concluded that, while it was apparent that Abdul-Salaam had learning problems and ADHD in his childhood, his behavior problems and inability to conform to societal norms was "far more serious."  (*Id*. at 199.)

### c.      State Court Decisions

After the evidentiary hearing, the PCRA court denied relief on this claim, finding that trial counsel's decision not to inquire into the mental health of Abdul-Salaam during the penalty phase was "strategic in nature and that the decision had

138

a reasonable basis." (Doc. 19-2 at 16-19, PCRA Op.)  A divided Pennsylvania

Supreme Court affirmed.  *See Abdul-Salaam-II*, 808 A.2d 561-62 (holding that

trial counsel's performance at sentencing was not deficient based on counsel's

PCRA testimony on strategy); *cf. id*. at 564-66 (Saylor, J., concurring) (finding

trial counsel was not deficient based on the PCRA court's requisite credibility

assessments and judgments specific to the case on an adequate record rather than

simply counsel's PCRA testimony).  In doing so, the Pennsylvania Supreme Court

resolved this claim as follows:

> Appellant claims that counsel was ineffective for failing to locate
> evidence of his mental illness and his organic brain damage and
> present such evidence as mitigation at his penalty phase hearing.
> Even if this claim had arguable merit, we agree with the PCRA court
> that counsel had a reasonable basis for not presenting such evidence.
> At the PCRA hearing, counsel specifically stated his reasons for not
> presenting mental health mitigation evidence in this particular case,
> testifying that:
>
>> When you begin to defend a person's actions or excuse
>> them by the use of mental health expert testimony, you
>> hold yourself open to the risk that you are essentially
>> relitigating the crime.  I heard this today during your
>> cross-examination of Dr. Armstrong [one of the mental
>> health experts presented by Appellant].  You asked her if
>> she could tell that there was a specific time on August
>> 19th, 1994 [the date Appellant shot and killed Officer
>> Cole], when the organic brain disorder manifested itself
>> in compelling the defendant's actions, and she said she
>> could not and no one could.  The risk of that is that it
>> often provides the prosecutor with an opportunity to not
>> just describe the defendant's acts in a factual context, but

in almost a moral context.  For example if a person -
taking this case as an example, if a person was afflicted
by organic brain disorder or some psychiatric disease or
some mental health problem, I've heard asked repeatedly
in other cases, isn't this inconsistent with the type of
planning that goes into the perpetration of this crime?
Isn't this inconsistent with the fact that the person,
according to the evidence and testimony, had the
wherewithal to try to escape?  Isn't this inconsistent with
the fact that he returned to the scene of the crime for
perhaps no other reason than to open fire?  In a case like
this, in this case in particular, the emotional impact of the
testimony throughout the trial was such that I would have
thought it unlikely that a jury would accept psychiatric
mitigation as a factor, especially one that would outweigh
the really very devastating emotional impact of the
several days of testimony that they just heard.

N.T. 4/23/98, at 179-80.  *See also Commonwealth v. Pirela*, 556 Pa.
32, 726 A.2d 1026, 1035 (1999) (presentation of evidence of
defendant's troubled childhood might be viewed as attempt to
trivialize brutal murder).  This testimony sufficiently supports the
PCRA court's finding that counsel had a reasonable basis for not
presenting the mitigating evidence Appellant now claims counsel
should have offered.

*Abdul-Salaam-II*, 808 A.2d at 561-62.  Thus, the Pennsylvania Supreme Court held

that Abdul-Salaam's attorney had not performed deficiently because he had a

reasonable basis for not presenting evidence of mental illness and organic brain

damage as mitigation.  Further, with respect to a specific finding of organic brain

damage or other mental illness, the court concluded as follows:

Based on an independent review of the record, we note that we find no
error in the PCRA court's conclusion that the testimony at the PCRA

140

hearing failed to establish that Appellant suffers from organic brain
damage or any other mental illness. *See* PCRA Ct. Op., 11/12/98, at
11, 13. As the Commonwealth observes in its brief, the defense
mental health experts could not testify as to when Appellant
contracted organic brain damage, how he contracted it, or what effect,
if any, it had on him on the day he murdered Officer Cole. Moreover,
there was testimony from Dr. Lawrence Rotenberg, who also
examined Appellant, that Appellant does not, in his opinion, have
organic brain damage. *See* N.T., 5/1/98, at 136.

*Id.*, 808 A.2d at 561 n.4. Additionally, the court found the following with respect

to Abdul-Salaam's claim relating to counsel's presentation of his family history:

Appellant also claims that trial counsel was ineffective for failing to
present evidence of the abuse he suffered as a child. This claim is
specious in light of the fact that even Appellant concedes that counsel
presented the testimony of several family members who described
Appellant's abusive upbringing. If Appellant is suggesting that
counsel should have called additional family members to reiterate that
Appellant had been abused as a child, this claim also fails as such
testimony would have merely been cumulative. *See Commonwealth v.
Whitney*, 550 Pa. 618, 708 A.2d 471, 477 (1998) (counsel not
ineffective for failing to call witness at penalty phase would merely
have given cumulative mitigating evidence). In addition, we note that
the jury specifically found Appellant's abusive background to be a
mitigating circumstance.

*Id.*, 808 A.2d at 562 n.5.

### d.    <u>Analysis</u>

As stated above, Abdul-Salaam argues that counsel was ineffective for

failing to investigate and present mitigating evidence relating to his background

and mental health. The Court will discuss both prongs of the *Strickland* test in our

disposition of this claim.

Under the Sixth and Fourteenth Amendments, a criminal defendant has the right to effective assistance of counsel. That right is violated if the attorney's performance falls "below an objective standard of reasonableness" and "the petitioner suffer[s] prejudice as a result of the deficiency." *Blystone v. Horn*, 664 F.3d 397, 418 (3d Cir. 2011) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Once a *Strickland* claim has already been adjudicated on the merits by the state court, a habeas petitioner has the additional burden of showing that the state court's decision about the reasonableness of counsel's performance was itself unreasonable. *Id*. "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington*, 131 S. Ct. at 788. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.

A successful claim of ineffective assistance of counsel requires proving both deficient performance and prejudice. In its review of the PCRA court decision, the Pennsylvania Supreme Court correctly identified the governing standard relating to an ineffectiveness claim, *see supra* note 4 at 29, but only made a determination as to deficient performance, and therefore did not address prejudice. *Abdul-Salaam-*

*II*, 808 A.2d at 561-62.  As a result, our review of the Supreme Court's

determination of deficient performance must apply the § 2254(d) deference, but a

review of the prejudice prong is *de novo*.

### a.   Deficient Performance

To establish ineffectiveness, a "defendant must show that counsel's

representation fell below an objective standard of reasonableness."  *Strickland*, 466

U.S. at 688.  The United States Supreme Court explained a lawyer's duty to

investigate and the deference owed to decisions surrounding that investigation:

> [S]trategic choices made after thorough investigation of law and facts
> relevant to plausible options are virtually unchallengeable; and
> strategic choices made after less than complete investigation are
> reasonable precisely to the extent that reasonable professional
> judgments support the limitations on investigation.  In other words,
> counsel has the duty to make reasonable investigations or to made a
> reasonable decision that makes particular investigations unnecessary.
> In any ineffectiveness case, a particular decision not to investigate
> must be directly assessed for reasonableness in all the circumstances,
> applying a heavy measure of deference to counsel's judgments.

*Id*. at 690-91.  The relevant inquiry here "is not whether counsel should have

presented a mitigation case.  Rather, we focus on whether the investigation

supporting counsel's decision not to introduce mitigating evidence of [Abdul-

Salaam's] background *was itself reasonable*."  *Wiggins v. Smith*, 539 U.S. 510, 523

(2003) (emphasis in original).

A counsel's failure to make a reasonable investigation of a defendant's

psychiatric history and family background, and to present mitigating evidence to the judge or jury at sentencing, can constitute ineffective assistance. *Id.* "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 521 (quotation marks omitted). Where a jury in a capital case has been precluded from hearing mitigating evidence concerning the defendant's character or background because counsel has made an objectively unreasonable decision not to look for it, counsel's performance violates the dictates of *Strickland*. *See Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005); *Wiggins*, 539 U.S. at 519-34; *Outten v. Kearney*, 464 F.3d 401, 417 (3d Cir. 2006); *Marshall v. Cathel*, 428 F.3d 452, 469 (3d Cir. 2005); *Laird v. Horn*, 159 F. Supp. 2d 58, 112 (E.D. Pa. 2001), *aff'd on other grounds*, 414 F.3d 419 (3d Cir. 2001).

Further, in assessing the reasonableness of an attorney's investigation, the quantum of evidence known to counsel must be considered, as well as whether that evidence should have led a reasonable attorney to investigate further. *Wiggins*, 539 U.S. at 527. Further, in assessing counsel's investigation, the Court must conduct an objective review of his performance measured for reasonableness under prevailing professional norms, including a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time. *Id.* at 522-27

(quoting *Strickland*, 466 U.S. at 688-89) (internal quotations omitted); *see also*

*Bobby v. Van Hook*, 538 U.S. 4, 5-12 (2009). The Third Circuit has explained that

it is "only the rare claim of ineffective assistance of counsel that should succeed

under the properly deferential standard to be applied in scrutinizing counsel's

performance." *United States v. Kauffman*, 109 F.3d 186, 190 (3d Cir. 1997)

(quoting *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989)).

Counsel in capital cases are under an obligation to understand the

fundamental shift in their duties once their client has been found guilty and a

sentencing hearing begins:

> The existence of a penalty phase in capital trials makes such trials
> radically different from ordinary criminal trials. A full capital trial is
> in fact two separate but intimately related trials: a preliminary guilt
> trial focusing on issues pertaining to the commission of a capital
> offense, and a subsequent penalty trial about the convicted
> defendant's worthiness to live. The guilt trial establishes the elements
> of the capital crime. The penalty trial is a trial for life. It is a trial for
> life in the sense that the defendant's life is at stake, and it is a trial
> about life, because a central issue is the meaning and value of the
> defendant's life.

*Marshall v. Hendricks*, 307 F.3d 36, 99 (3d Cir. 2002) (citation omitted). "The

penalty phase focuses not on absolving the defendant from guilt, but rather on the

production of evidence to make the case for life. The purpose of the investigation

is to find witnesses *to help humanize* the defendant, given that the jury has found

him guilty of a capital offense." *Id*. at 103 (emphasis in original). Reasonable

145

counsel should recognize that "death is different," *see Marshall*, 428 F.3d at 467,

and that a person facing the death penalty has a constitutionally protected right to

have available mitigating evidence presented on his behalf, *Williams*, 529 U.S. at

393 (stating that the petitioner "had a right - indeed, a constitutionally protected

right - to provide the jury with the mitigating evidence that his trial court either

failed to discover or failed to offer").

Finally, satisfying *Strickland*'s investigation mandate ultimately turns on

counsel's adherence to the professional standards for investigation and preparation

of a mitigation case at the time of trial.  In defining what constitutes a complete

investigation in this matter, therefore, we look to the prevailing professional norms

as they existed in 1995.

In 1995, the ABA Standard for Criminal Justice ("Standard") stated:

It is the duty of the lawyer to conduct a prompt investigation of the
circumstances of the case and to explore all avenues leading to facts
relevant to the merits of the case and the penalty in the event of
conviction. The investigation should always include efforts to secure
information in the possession of the prosecution and law enforcement
authorities. The duty to investigate exists regardless of the accused's
admissions or statements to the lawyer of facts constituting guilt or
the accused's stated desire to plead guilty.

1 ABA Standards for Criminal Justice: Prosecution Function and Defense

Function, 4–4.1 (2d ed.1982 Sup.); *see also Strickland*, 466 U.S. at 688–89

(discussing the use of ABA standards as guides for determining "prevailing norms

of practice"); *Rompilla v. Horn*, 355 F.3d 233, 259 n.14 (3d Cir. 2004) (referring to the ABA standards as "important guides" although cautioning against viewing them as "a codification of the requirements of the Sixth Amendment").  The ABA standards, coupled with *Strickland*'s explicit language requiring a thorough investigation into facts relevant to both guilt and sentencing, clearly show that a separate penalty phase investigation was the very foundation of reasonable representation in 1995.  *See Strickland*, 466 U.S. at 690-91.

The United States Supreme Court frequently cites ABA standards in its discussions of reasonableness of a lawyer's performance.  *See, e.g.*, *Wiggins*, 539 U.S. at 524 (explaining that the Court has "long referred" to ABA standards "as guides to determining what is reasonable" (internal quotation omitted)); *Williams*, 529 U.S. at 396; *Rompilla*, 545 U.S. at 387.  The ABA guidelines in force at the time of Abdul-Salaam's trial providing varying advice for lawyers representing a defendant facing the death penalty.  In a recent decision in *Bridges v. Beard*, 941 F. Supp. 2d 584 (E.D. Pa. 2013), the Honorable Anita Brody aptly summarized these guides as follows:

> The ABA guidelines . . . advised lawyers to begin investigations
> relevant to sentencing immediately, and stressed that such an
> investigation "should comprise efforts to discover all reasonably
> available mitigating evidence and evidence to rebut any aggravating
> evidence that may be introduced by the prosecutor."  ABA Guidelines
> for the Appointment and Performance of Counsel in Death Penalty

Cases (hereinafter "Guidelines") 11.4.1(C) (1989).  The Guidelines
advised counsel to investigate the client's medical history, educational
history, and family and social history, among other areas.  Guidelines
11.4.1(D).  The Guidelines also advised counsel to secure expert
assistance for the investigation and presentation of mitigation
evidence, Guidelines 11.4.1(D)(7)(D), and recommended that lawyers
use expert witnesses "to provide medical, psychological, sociological
or other explanations for the offense(s) for which the client is being
sentenced."  Guidelines 11.8.3(F)(2).  Indeed, the Guideline
commentary conveyed the importance of experts: "The assistance of
one or more experts (e.g., social worker, psychologist, psychiatrist,
investigator, etc.) may be determinative as to outcome."
Commentary, Guideline 11.8.6.  The Guidelines emphasized that
counsel had a duty to present "*all* reasonably available evidence in
mitigation unless there are strong strategic reasons to forego some
portion of such evidence," Guidelines 11.8.6(A) (emphasis added),
and that such a presentation should include medical history, family
and social history, and expert testimony, Guidelines 11.8.6(B).

*Bridges*, 941 F. Supp. 2d at 613.

As set forth above, in *Abdul-Salaam-II*, the Pennsylvania Supreme Court

addressed and affirmed the PCRA court's finding that counsel was not deficient,

*i.e.*, counsel "had a reasonable basis for not presenting the mitigating evidence

[Abdul-Salaam] now claims counsel should have offered."  *Abdul-Salaam-II*, 808

A.2d at 562.  Therefore, AEDPA's standard of review applies to this prong of the

*Strickland* test.  *See* 28 U.S.C. § 2254(d).  In applying this standard, we are

mindful that a federal habeas court is deferential to the merits determinations made

by a state court.  28 U.S.C. § 2254(d), (e); *Lockyer v. Andrade*, 538 U.S. 63, 75-76

(2003).[44]  Further, as stated by the United States Supreme Court, "when § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington v. Richter*, ___ U.S. ___, ___. 131 S. Ct. 770, 788 (2011).

As stated above, during the sentencing phase, Attorney Lappas presented three lay witnesses on behalf of Abdul-Salaam, family members who spoke about the tumultuous relationship Abdul-Salaam had with his father, and how that relationship affected other aspects of Abdul-Salaam's life.  Attorney Lappas presented no further evidence during sentencing.  While he did request a mental health evaluation of Abdul-Salaam from Dr. Crutchley prior to trial, he withdrew that request when she could not guarantee that she would not discuss with Abdul-Salaam the events leading to his current incarceration.  More importantly here, there is nothing in the record indicating that Attorney Lappas obtained any background materials on Abdul-Salaam, such as school records and possibly previous mental health evaluations.  As made clear by the testimony of Abdul-

---

[44] Under 28 U.S.C. § 2254(d)(2), a factual determination made by a state court should be adjudged as unreasonable only if the district court finds that a rational jurist could not reach the same finding on the basis of the evidence in the record.  § 2254(d)(2); *Porter*, 276 F. Supp. 2d at 296.  Under 28 U.S.C. § 2254(e), a petitioner may only rebut the presumption that a state court's findings of fact are correct with clear and convincing evidence of the state court's error. § 2254(e)(1); *Miller-El*, 537 U.S. at 341.

149

Salaam's mother at sentencing, Attorney Lappas was aware that, when he was young, Abdul-Salaam had been tested because of problems he was having in school, that he was eventually placed in a special school, and that he attended a rehabilitative ARC program in his teens as a result of a juvenile adjudication.  That evidence should have prompted Attorney Lappas to more fully explore Abdul-Salaam's childhood and early mental health issues, and to consider introducing additional evidence at the sentencing phase.

Turning to the state court decision in this matter, we conclude that the Pennsylvania Supreme Court's determination that Abdul-Salaam's attorney satisfied *Strickland*'s deferential standard on performance with respect to investigating and presenting mitigating evidence was an unreasonable application of *Strickland* and was based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(1); *Werts*, 228 F.3d at 204.  "[I]nvestigation is essential to the lawyer's duties as both advisor and advocate."  *Blystone*, 664 F.3d at 419 (citing 1 ABA Standards for Criminal Justice 4–4.1 (2d ed. 1980)).  "[C]ounsel's general duty to investigate takes on supreme importance to a defendant in the context of developing mitigating evidence to present to a judge or jury considering the sentence of death."  *Hendricks*, 307 F.3d at 99 (quotation marks omitted).  Counsel must make sufficient "efforts to discover all reasonably available mitigating

150

evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins*, 539 U.S. at 524. "Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant." *Blystone*, 664 F.3d at 420 (quoting 1 ABA Standards, *supra*, 4–4.1).

In the case at bar, the Pennsylvania Supreme Court found that "counsel had a reasonable basis for not presenting the mitigating evidence [Abdul-Salaam] now claims counsel should have offered." *Abdul-Salaam-II*, 808 A.2d at 562. In so finding, the court relied solely on Attorney Lappas' statements with regard to the risk of "relitigating the crime" by putting on expert mental health evidence. *See id*. at 561. Attorney Lappas also claimed to have made a strategic decision to not present further mitigation evidence when he stated:

> [I]n this case in particular, the emotional impact of the testimony throughout the trial was such that I would have thought it unlikely that a jury would accept psychiatric mitigation as a factor, especially one that would outweigh the really very devastating emotional impact of the several days of testimony that they just heard.

*Id*. at 562. In a footnote, the court also concluded that Attorney Lappas was not deficient in light of the several family members he presented with evidence of Abdul-Salaam's abusive upbringing because any additional family member testimony would have been cumulative. *Id*. at 562 n.5. Upon our review of the

record, however, we believe that the state court's reliance on counsel's statement here was objectively unreasonable in light of the evidence before it.  With an awareness that we are looking back at Attorney Lappas's performance under the well-formed guidance of *Strickland* and its progeny, we note that the evidence he gathered through family members, as well as the few records from the Lehigh County juvenile probation department and the Department of Corrections relating to Abdul-Salaam's previous criminal history, should have prompted further investigation rather than a fear that Abdul-Salaam's crime would be "relitigated." *See Abdul-Salaam-III*, 808 A.2d at 561.  Moreover, we are constrained to find that counsel's investigation, which did not include a mental health evaluation or collection of any substantial background materials, was not the result of the type of reasoned tactical decision to which we owe deference under *Strickland*.  Indeed, at the PCRA hearing, Attorney Lappas expressly stated that he had no strategic reason for not obtaining any records relating to Abdul-Salaam's background, schooling, prior mental health evaluations, or anything relating to his social history.  Further, despite an initial desire to obtain a mental health evaluation for purposes of presentation of mitigating evidence at sentencing, once Dr. Crutchley made it known to him that she could not comply with his limitations for the interview, Attorney Lappas withdrew his request for an evaluation and sought no

further expert assistance of that type.

As the Third Circuit did in *Blystone*, this Court recognizes that "[t]he right to counsel does not require that a criminal defense attorney leave no stone and no witness unpursued." *Blystone*, 664 F.3d at 423 (quoting *Jermyn v. Horn*, 266 F.3d 257, 308 (3d Cir. 2001) (alteration in original) (quotation marks omitted)). However, the Sixth Amendment "require[s] a reasoned judgment as to the amount of investigation the particular circumstances of a given case require." *Jermyn*, 266 F.3d at 308; *see also Strickland*, 466 U.S. at 691. From a review of the record in this case, and again cognizant that we are acting with the benefit of hindsight and in accordance with the *Strickland* mandate, we find that counsel's amount of investigation was not the result of any such reasoned judgment. Rather, the action counsel did take and the subsequent decision he made to not introduce further mitigating evidence was itself not reasonable. *Wiggins*, 539 U.S. at 522-23.

In sum, viewing the record as a whole, including evidence introduced at sentencing and in the subsequent PCRA proceedings, the Court concludes that there is no reasonable argument to sustain the Pennsylvania Supreme Court's decision that counsel had a reasonable basis for not presenting available mitigating evidence. Furthermore, there could be no disagreement among "fairminded jurists" that the state court's decision was incorrect. *Harrington*, ___ U.S. ___,

___, 131 S. Ct. at 786 ("[A] state court's determination that a claim lack merits

precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

correctness of the state court's decision.") (quoting *Yarborough v. Alvarado*, 541

U.S. 652, 664 (2004)).  As such, the state court's application of *Strickland* here

was objectively unreasonable.  *See* 28 U.S.C. § 2254(d)(1).  Also, the state court

decision involved an unreasonable determination of the facts in light of Abdul-

Salaam's demonstration of clear and convincing evidence to the contrary.  *See* 28

U.S.C. § 2254(d)(2), (e).

### b.    Prejudice

Notwithstanding that counsel's performance was deficient under *Strickland*,

we find that Abdul-Salaam was not prejudiced by his counsel's failure to

investigate and present mitigating evidence at the penalty phase.[45]  In

Pennsylvania, the jury's decision on the death penalty must be unanimous.

*Jermyn*, 266 F.3d at 308.  Accordingly, a petitioner can satisfy the prejudice prong

if he can show that the presentation of the available mitigating evidence would

have convinced even one juror to find that the mitigating factors outweighed the

aggravating factors.  *Id*.  Therefore, this Court must weigh the totality of the

---

[45] As stated above, because the Pennsylvania Supreme Court did not reach the merits of the prejudice prong, the deferential AEDPA standard of review does not apply.  Instead, we will review this portion of Abdul-Salaam's claim *de novo*.  *Porter v. McCollum*, 558 U.S. 30, 39 (2009).

mitigating evidence that could have been presented at trial with the aggravating evidence that was presented and determine whether, "had the jury been confronted with this . . . mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Wiggins*, 539 U.S. at 534, 536.

Applying these principles, we find that a sufficient showing has not been made that the outcome of the penalty phase of Abdul-Salaam's trial would have been different. The mitigating evidence at issue relates to Abdul-Salaam's early mental health issues and abuse history. Had counsel's investigation not been deficient, the jury would have heard from the later proffered witnesses more extensive testimony on Abdul-Salaam, Sr.'s drug abuse and aggressive behavior,[46] along with more specific instances of physical and mental abuse by Abdul-Salaam's father. From the introduction of background materials, the jury would have learned that Abdul-Salaam had severe behavioral and emotional problems prior to entering the Green Tree School at age seven, and those behavioral and emotional problems continued through age fifteen and while he was on juvenile probation. From mental health expert testimony, the jury would have heard that in childhood, Abdul-Salaam had signs of "minimal cerebral dysfunction," also known

---

[46] Notably, other than Ms. Reeves' testimony, most of the PCRA testimony of family members focused on the background of Abdul-Salaam, Sr. rather than providing additional evidence of abuse of Abdul-Salaam that might lead us to believe that the jury would have returned with a different sentence.

as ADHD or hyperactivity, and which could be characterized as organic brain damage, and, as an adult, Abdul-Salaam developed some criteria of schizotypal personality disorder.  However, through the testimony presented at sentencing, the jury *did* hear the following: (1) Abdul-Salaam suffered mental and physical abuse at the hands of his father; (2) Abdul-Salaam's father was a drug user who was verbally abusive towards Abdul-Salaam's mother and siblings; (3) Abdul-Salaam had problems in school as a child; (4) Abdul-Salaam had a learning disorder in childhood and required placement in a special school; (5) and, as a teenager, Abdul-Salaam was placed in a rehabilitative ARC program as a result of a juvenile adjudication.  The jury also heard that Abdul-Salaam had close relationships with his sisters, and that both sisters wished to continue a relationship with their brother while he was incarcerated.  In addition, during his closing, Attorney Lappas reminded the jury of Abdul-Salaam's problems with school as a child as well as his father's abuse and mistreatment of the family, and argued that the jury should consider such evidence in weighing mitigating evidence with the aggravating factors.

Importantly, and certainly not to be overlooked, the jury did in fact find the catch-all mitigator, specifically stating, "The background that includes both physical and mental abuse does have a negative impact on a person's development

and therefore his future behavior." (Sentencing NT 3/16/1995, at 121.) This finding alone demonstrates that the jury took into account the evidence of Abdul-Salaam's childhood mental and physical abuse, problems with school and socializing, and financially-distressed family life, as presented through family witness testimony and Attorney Lappas's plea to the jury in his closing argument to weigh the effect of those issues in mitigation. However, the jury was tasked with the burden of weighing this mitigation evidence with the overwhelming evidence in support of four aggravating factors offered by the Commonwealth. Therefore, the Court is not persuaded that the introduction of the additional evidence presented at the PCRA hearing "might well have influenced [at least one juror's] appraisal of [Abdul-Salaam's] moral culpability." *Williams*, 429 U.S. at 398. The United States Supreme Court has stated that "'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable . . . to emotional and mental health problems, may be less culpable than defendants who have no such excuse.'" *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987)). Here the jury heard evidence of Abdul-Salaam's background, including mental health issues and abuse history. In light of what the jury heard *and* what the jury did find in mitigation, the Court

157

concludes that Abdul-Salaam has not demonstrated a reasonable probability that the result of his sentencing hearing would have been different had counsel presented additional evidence after conducting a more thorough investigation of mitigating circumstances.  Thus, habeas relief on this claim will be denied.

**I.      Claim X -  The prosecution also withheld from defense counsel documents in its possession that would have mitigated punishment in violation of the due process clause.**

Abdul-Salaam contends that he is entitled to a new sentencing hearing because the Commonwealth withheld exculpatory mitigating evidence material to punishment in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  Specifically, Abdul-Salaam argues that the prosecution violated the requirements of *Brady* when it withheld materials containing evidence of Abdul-Salaam's troubled youth, family dysfunction, abusive upbringing, organic brain damage, and emotional illness.[47]  Upon review, the Court finds Abdul-Salaam is not entitled to habeas relief on this claim.

The background of this claim is as follows.  The materials in question are records from Lehigh County detailing Abdul-Salaam's juvenile adjudications, including records from the juvenile probation department; Wiley House Diagnostic

---

[47] In their answer to the habeas petition, Respondents argue that Abdul-Salaam's trial counsel was not ineffective for failing to obtain this evidence and therefore no *Brady* violation occurred.  (Doc. 19 at 81-84.)  This argument, however, is misplaced, as Abdul-Salaam does not raise an ineffectiveness claim in connection with this issue.

Center records from the mid-1980's; ARC records from the mid-1980's; and Glen

Mills School for Boys records from the mid-1980's.[48]  (Doc. 11, Ex. 23.)  Abdul-

Salaam claims that these records were in the possession of the Cumberland County

District Attorney's office prior to trial, and were gathered specifically for use in the

trial on three separate occasions by two individuals.  Initially, the Assistant District

Attorney assisting in the prosecution, Alison Taylor, Esquire, called the Lehigh

County juvenile probation department in order to secure the court orders of Abdul-

Salaam's juvenile adjudications for use during the penalty phase.  (PCRA NT

10/3/1997, at 11, 14, 32.)  The material within those juvenile adjudication records

consisted of police reports and court orders.  (*Id*. at 12, 19-21.)  Attorney Taylor

traveled to the Lehigh County Clerk of Court office prior to trial in order to

examine the records.  (*Id*. at 15.)  She recalled seeing "some sort of evaluations" in

the records, but no mental health or psychiatric evaluations.  (*Id*. at 17, 24.)

Further, Attorney Taylor provided Abdul-Salaam's trial counsel with these records

prior to trial.[49]  (*Id*. at 22, 23.)  In addition, Darby Christlieb, a probation/parole

---

[48] These records have been discussed in detail in connection with Claim IX, and therefore further elaboration here is not necessary.  *See supra*, Section III.I.

[49] During Attorney Taylor's testimony at the PCRA hearing, other exhibits containing Abdul-Salaam's criminal history, juvenile case history, records from ARC, the Wiley House and Glen Mills School, and a group of letters were identified, but in the case of each exhibit, Attorney Taylor had not gathered these records from the Lehigh County Clerk's office or probation department.  (PCRA NT 10/3/1997, at 24-25; 28-32.)

officer from Cumberland County assigned to both generate a pre-sentence

evaluation of Abdul-Salaam in connection with his 1989 robbery charges in

Cumberland County and gather information for Abdul-Salaam's penalty phase in

the instant case, collected juvenile records from the Lehigh County juvenile

probation department that contained evaluations of Abdul-Salaam from ARC, the

Wiley House, and Glen Mills School, as well as police reports relating to his

juvenile adjudications.  (PCRA NT 12/11/1997, at 236-239; 242.)  Mr. Christlieb

testified that Abdul-Salaam signed a release form in order for Mr. Christlieb to

gather the Lehigh County records prior to his 1989 juvenile adjudication.  (*Id*. at

243.)  Further, Mr. Christlieb testified that he gathered the information for this

matter at the behest of the Cumberland County District Attorney's Office.  (*Id*. at

238, 242.)  He stated that had Abdul-Salaam's trial counsel requested the same

records, he would have directed Mr. Lappas to the source of the records, such as

Lehigh County or Glen Mills School, rather than turn over the records himself.

(*Id*. at 246.)

Abdul-Salaam raised this claim in his first PCRA petition.  *See Abdul-*

*Salaam-II*, 808 A.2d at 560.  The PCRA court denied the claim, concluding the

following:

> The petitioner's claim fails because of two reasons: (1) the records
> were not exculpatory; and (2) they were still available to the petitioner

even though the prosecution had copies of them.  The petitioner's
claim that these records contained anything that was exculpatory is
groundless.  The records show that the petitioner was an unhappy
child with violent tendencies.  They show that petitioner's home life
was unfortunate, maybe even tragic.  However, there is not one report
in those records that states petitioner was mentally ill, or that
petitioner suffered from organic brain damage.  Furthermore, the
petitioner could have obtained these records despite the fact the
Commonwealth had copies of them.  In conclusion, petitioner's
assertion that the withholding of these records satisfies a *Brady*
violation is without merit, and as such we deny the petitioner's claim
for relief.

(Doc. 19-2 at 13-14, PCRA Op.)  On appeal, the Pennsylvania Supreme Court

deemed this claim waived because Abdul-Salaam could have raised it in his direct

appeal but failed to do so, and therefore the court could not review it under the

PCRA.  *Abdul-Salaam-II*, 808 A.2d at 560 (citing 42 Pa. Cons. Stat. § 9543(a)(3)).

"Although the State is obliged to 'prosecute with earnestness and vigor,' it

'is as much [its] duty to refrain from improper methods calculated to produce a

wrongful conviction as it is to use every legitimate means to bring about a just

one." *Cone v. Bell*, 556 U.S. 449, 469 (2009) (citing *Berger v. United States*, 295

U.S. 78, 88 (1935)).  Further, the Due Process Clause imposes upon the

prosecution an "affirmative duty" to disclose evidence to the accused that is

favorable to the defense and material to guilt or punishment.  *Brady*, 373 U.S. at

87; *Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (noting the prosecution's

"affirmative duty").  As stated here, *supra* Part III.A, "[a] *Brady* violation occurs

161

if: (1) the evidence at issue is favorable to the accused, because either exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.'" *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011) (internal citations omitted); *see also Banks v. Dretke*, 540 U.S. 668, 691 (2004). The requirement that the prosecution disclose such information extends not only to information that is actually known to the prosecutors, but also to "all information in the possession of the prosecutor's office, the police, and others acting on behalf of the prosecution." *Wilson v. Beard*, 589 F.3d 651, 659 (3d Cir. 2009) (citing *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006)); *see also Kyles*, 514 U.S. at 437-38. Willful or morally culpable suppression of *Brady* evidence is not necessary for relief to be granted. The Supreme Court has long recognized that "[i]f the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *United States v. Agurs*, 427 U.S. 97, 110 (1976). Even a criminal defendant's failure to request favorable evidence does not abrogate the prosecution's disclosure obligations, and a *Brady* violation might arise even "where the Government failed to volunteer exculpatory evidence never requested, or requested only in a general way." *Kyles*, 514 U.S. at 433 (citing *Agurs*, 427 U.S. at 108).

"Materiality" of suppressed evidence is established when a petitioner shows "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (internal quotation marks omitted).  As stated in *Kyles*,

> A showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . .  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.

*Id*. at 434.  Moreover, the materiality of *Brady* evidence must be "considered collectively, not item by item." *Id*. at 436.  In addition, the prosecution's obligation to disclose *Brady* materials applies even to evidence that appears redundant.  "Redundancy may be factored into the materiality analysis, but it does not excuse disclosure obligations." *Monroe v. Angelone*, 323 F.3d 286, 301 (4th Cir. 2003).  Finally, the determination of materiality of evidence under *Brady* is a mixed question of law and fact that is not subject to the presumption of correctness of § 2254(e)(1). *Simmons v. Beard*, 590 F.3d 223, 233 n.5 (3d Cir. 2009).

As stated above, Abdul-Salaam raised this claim in the state courts, but it was deemed waived by the Pennsylvania Supreme Court.  Reviewing this claim *de*

*novo*, therefore, and in keeping with the mandates of *Brady*, we find that the facts pertaining to Abdul-Salaam's own troubled youth, including his dysfunctional family and abusive upbringing, were known or readily available to Abdul-Salaam well before trial.  Further, any records containing mental health evaluations marking Abdul-Salaam's potential organic brain damage and emotional illness were also known or readily available to him prior to trial.  It is well-settled that the government does not violate *Brady* by failing to disclose exculpatory or impeachment evidence that is available to the defense from other sources in the exercise of due diligence.  *See, e.g.*, *United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir. 1991) (stating in dicta, "Evidence is not considered suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence."); *United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990) (holding that nondisclosure of possible exculpatory material does not violate *Brady* when the "defendant was aware of the essential facts that would enable him to take advantage of the exculpatory evidence"); *United States v. Romo*, 914 F.2d 889, 899 (7th Cir. 1990) (directing that, when defense counsel knows about a witness with possible exculpatory information and had an opportunity to subpoena that witness, prosecutor has no obligation to seek out and provide the information); *United States v. Hicks*, 848 F.2d 1, 4 (1st cir.

1988) (finding no *Brady* violation for failure to disclose grand jury testimony of potential witness not called to testify at trial because defense knew of and had access to witness and thus was "on notice of the essential facts required to enable him to take advantage of [the] exculpatory testimony"); *Lugo v. Munoz*, 682 F.2d 7, 9-10 (1st Cir. 1982) (holding that government has no *Brady* burden when facts are readily available to a diligent defender).

In this case, with respect to Abdul-Salaam's troubled youth, Abdul-Salaam himself was a direct "participant" in his own upbringing - a first-hand observer of his own childhood experiences with his family and any abuse at the hands of his father.  Thus, any information with respect to his troubled youth, including dysfunctional family life and abuse, does not fall within *Brady* because Abdul-Salaam himself possessed knowledge of his own upbringing long before a prosecutor was required to hand over records.  Indeed, even the witnesses presented at trial on behalf of Abdul-Salaam, such as his mother, provided this information to the jury.  Moreover, since Abdul-Salaam's mother, his own witness at trial, had knowledge of the evaluations from the various schools and centers Abdul-Salaam attended as a child, it stands to reason that Abdul-Salaam "should have known of the essential facts permitting him to take advantage of any exculpatory evidence" contained in those evaluations.  *See Perdomo*, 929 F.2d at

973.

Next and importantly, there is no evidence of record that the prosecutor willfully or inadvertently suppressed the records in question here.  The record reflects that Attorney Taylor provided Abdul-Salaam's trial counsel with the records of his Lehigh County juvenile adjudications  prior to trial.  Moreover, the records were not intentionally withheld by the District Attorney's Office.  In fact, Mr. Christlieb stated that, even though he would not have personally handed over the records to Abdul-Salaam's counsel, he would have directed Attorney Lappas to the source of the records.

Lastly, the Court finds that Abdul-Salaam has not established that these additional background records were material and would have changed the outcome of the trial.  In order to demonstrate a reasonable probability of a different outcome, the defendant must show "the favorable evidence [withheld] could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Kyles*, 514 U.S. at 420.  In making this determination, the assessment of the omitted evidence must take account of the cumulative effect of the suppressed evidence in light of the other evidence, not merely the probative value of the suppressed evidence standing alone.  *Id*. at 436-37.

Here, in light of the strong evidence of Abdul-Salaam's guilt, as discussed

166

extensively herein, the Court finds that, even had the Commonwealth produced the evaluations and other records in connection with Abdul-Salaam's juvenile adjudications, Abdul-Salaam has failed to establish a reasonable probability that the outcome of the trial would have been different in light of the duplicative nature of the contents of the records and Abdul-Salaam's mother's testimony.  Abdul-Salaam is not entitled to relief on this claim.

> **J.**     **Claim XI - Trial counsel was also ineffective when he failed to request instructions that the jury could consider evidence of Petitioner's abusive and dysfunctional upbringing under 42 Pa. Cons. Stat. § 9711(e)(2) &(3) and the trial court erred when it failed to provide such instructions.**

Abdul-Salaam next contends that his due process rights and rights under the Eighth Amendment were violated when trial counsel failed to request, and the trial court failed to instruct, that the jury be charged on two mitigating circumstances related to mental health for which he argues some evidence was presented.  Those two mitigating circumstances at issue here, set forth under 42 Pa. Cons. Stat. § 9711(e)(2) and (e)(3), are "The defendant was under the influence of extreme mental or emotional disturbance" and "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired."  Upon review, the Court finds that Abdul-Salaam is not entitled to habeas relief on this claim.

The background of this claim is as follows.  At the beginning of the sentencing phase, the trial court asked Abdul-Salaam's counsel at sidebar if he wanted the court to mention any specific aggravating and mitigating circumstances that may be argued or simply read the entire list from the sentencing code to the jury.  (Sentencing NT 3/16/1995, at 4.)  Trial counsel responded, "I would rather you say nothing about it."  (*Id.*)  After further brief discussion, the trial court gave the jury a preliminary instruction prior to opening statements and testimony with general language regarding the nature of aggravating and mitigating circumstances.  (*Id.* at 16-18.)  The court included in this instruction two aggravating circumstances the Commonwealth planned to argue from the evidence adduced in the case: (1) that the victim was a peace officer who was killed in the performance of his duty; and (2) that the defendant committed the killing in the perpetration of a felony.  (*Id.* at 17.)  The court also included the following instruction on mitigating circumstances:

> Mitigating circumstances are also set forth in the Sentencing Code. They are several and include basically any and all evidence of mitigating matters concerning the character or the record of the defendant, or the circumstances of the offense, which tend to mitigate this sentence and suggest life imprisonment as opposed to the death penalty.

(*Id.* at 18.)  Following preliminary instructions, the Commonwealth gave an opening statement, but Abdul-Salaam's trial counsel declined to do so.  Further,

after the jury heard the evidence, Abdul-Salaam's trial counsel did not expressly

state any of the eight mitigating circumstances as set forth in Pennsylvania's

sentencing procedures, but made the following relevant remarks during closing

arguments:

> [F]rom the history of civilization the decisions in any kind of criminal
> case, the sentencing decisions, have been based upon the upbringing,
> the record, the influences on the defendant.  Not because it excuses
> the crime, not even because it always explains it, but often it does
> mitigate it.
>
> * * *
>
> What is the mitigation?  What is the weight of mitigation as
> mitigation?  Of growing up thinking because your own father tells you
> this that you are no good, that you are worthless.  What is the effect in
> mitigation of living in a house where you have to tiptoe around so that
> somebody doesn't beat you until you can't breathe.  What is the
> weight and mitigation of having it droned into you from youth that
> you are trouble?  The schools can't help you.  Your mother can't help
> you.  And when you reach a certain age, and you are in a bedroom
> with your little brother, and your father comes in and takes a ball bat
> to the both of you, and you can't help him because you are little.
> Does that mean that he is not guilty.  By your verdict he is guilty.
> That's not vague abuse.

(*Id*. at 102; 107.)  The trial court then provided the jury with the following charge

on mitigating circumstances:

> Now, under the Sentencing Code the following matters, if proven to
> your satisfaction by a preponderance of the evidence, can be
> mitigating circumstances.  And they are these.  Namely, any evidence
> of mitigation concerning the character and record of the defendant and
> the circumstances of his offense.  And these could include

circumstances of the defendant and his past life, and may be regarded by you as a mitigating circumstance, provided you find that they are supported by the evidence and are not merely an emotional response.

In other words, mitigating circumstances are those which, while they do not constitute a justification or excuse for this particular crime, may in fairness and mercy, be considered as extenuating or reducing the degree of blame, provided, of course, as I said, that they are supported by the evidence and not merely an emotional reaction.

* * *

And in deciding whether aggravating circumstances outweigh mitigating circumstances, of course, you do not simply count the number of them.  You compare the seriousness and the importance of the aggravating and the mitigating circumstances.  And if you all agree on one of the two general findings, then you can and you must sentence the defendant to death in this case.

Now, when voting on the general findings, you are to regard a particular aggravating circumstance as present only if you all agree that it is present.  On the other hand, each of you is free to regard a particular mitigating circumstance as present despite what other jurors believe.

(*Id*. at 114-15; 116.)  After deliberation, the jury found all four aggravating

circumstances charged, and found one catchall mitigating circumstance: "The

background that includes both physical and mental abuse does have a negative

impact on a person's development and therefore his future behavior."  (*Id*. at 121.)

Abdul-Salaam raised this issue in his PCRA petition, but the PCRA court

did not address it.  *See Abdul-Salaam-II*, 808 A.2d at 560.  On appeal, the

Pennsylvania Supreme Court deemed the claim waived because Abdul-Salaam

170

could have raised it in his direct appeal but failed to do so, and therefore the court

could not review it under the PCRA.  *Abdul-Salaam-II*, 808 A.2d at 560 (citing 42

Pa. Cons. Stat. § 9543(a)(3)).  Because there was no decision on the merits in state

court, we will review this claim *de novo*.

The United States Supreme Court has long recognized the importance which

mitigating evidence plays in ensuring that a capital trial is at once consistent and

principled but also human and sensible to the uniqueness of the individual.  *See*

*Eddings v. Oklahoma*, 455 U.S. 104, 110-11 (1982); *Lockett v. Ohio*, 438 U.S. 586,

604 (1978).  The Court has further held that the Eighth and Fourteenth

Amendments require that the sentencer not be precluded from considering as a

mitigating factor any aspect of a defendant's character or record and any of the

circumstances of the offense that the defendant proffers as a basis for a sentence

less than death.  *Peterkin v. Horn*, 176 F. Supp. 2d 342, 378 (E.D. Pa. 2001) (citing

*Penry v. Lynaugh*, 492 U.S. 302, 317 (1989)).

The Pennsylvania death penalty statute sets forth the trial court's obligations

to provide instructions to the jury on the statutory mitigating circumstances.

Specifically, the statute states, in part, "the court shall instruct the jury on . . . the

mitigating circumstances specified in subsection(e) as to which there is some

evidence."  42 Pa. Cons. Stat. § 9711(c)(1)(ii).  *Accord Commonwealth v.*

*Saranchak*, 866 A.2d 292, 305 (Pa. 2005) (holding that where there is "some

evidence" to support one of the statutory mitigators, the trial court must instruct the

jury on that circumstance) (citing *Commonwealth v. Frey*, 475 A.2d 700, 704 (Pa.

1984)).

   As set forth above, the trial court instructed the jury on four aggravating

circumstances and one mitigating circumstance.  The mitigating circumstance is

known under Pennsylvania law as the "catchall" mitigator, as it relates to any

evidence regarding a defendant's character and record, as well as the circumstances

of the offense.  *See* 42 Pa. Cons. Stat. § 9711(e)(8).  In his petition, Abdul-Salaam

argues that the lack of an instruction on the subsection (e)(2) and (e)(3) mitigating

factors failed to inform the jurors that the Constitution requires them to consider in

mitigation that Abdul-Salaam had mental health mitigation in his background.

However, as the record clearly shows, the jury did in fact consider in mitigation

Abdul-Salaam's mental health background.  Specifically, the jury found the

catchall mitigator, and expressly stated it as: "The background that includes both

physical and mental abuse does have a negative impact on a person's development

and therefore his future behavior."  (Sentencing NT 3/16/1995, at 121.)  Given the

nature of that language, it is apparent that the jury actually used the mental health

evidence presented to find the subsection (e)(8) mitigating factor.  There is nothing

172

in the record to persuade us that other evidence was used to find this factor or, for that matter, that there was further evidence to find subsection (e)(2) and (e)(3) mitigating factors in addition to the catchall mitigator.

Moreover, in his petition, Abdul-Salaam argues generally that "his history and other indicia of mental illness contained in his background" would have led the jury to a finding of the (e)(2) and (e)(3) mitigating factors.  Without a more specific reference to what "history and other indicia of mental illness" Abdul-Salaam believes the jury should have heard, the Court is left to look to the additional record presented in Claim III.  Notably, we have already determined that the additional evidence presented at the PCRA hearing does not prove mental illness, and that additional history would not have caused a reasonable jurist to question the outcome of the trial.  As such, in light of all the evidence on record, the Court cannot conclude that the jury would have found, in addition to the catchall mitigator, these two other mitigating circumstances.

Even assuming *arguendo* that the trial court incorrectly instructed the jury as to the subsection (e)(2) and (e)(3) mitigating factors, habeas relief is not warranted. The question for consideration in evaluating an allegedly erroneous jury instruction is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  *Estelle v. McGuire*, 502 U.S. 62, 72

(1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  The instruction is

considered in the context of the instructions as a whole and the trial record, *Cupp*,

414 U.S. at 147, and reviewed to determine "whether there is a reasonable

likelihood that the jury has applied the challenged instruction in a way" that

violates the Constitution, *Boyde v. California*, 494 U.S. 370, 380 (1990).

Abdul-Salaam has not met that standard here.  Rather, the instructions as a

whole and the rest of the record confirm that the jury was free to consider any

mitigating evidence under the catchall provision 42 Pa. Cons. Stat. § 9711(e)(8).

Further, the evidence presented relating to Abdul-Salaam's troubled youth does not

show that Abdul-Salaam was extremely mentally or emotionally disturbed at the

time of the killing.  Nor does the evidence show that Abdul-Salaam's capacity to

appreciate the criminality of his conduct or to conform his conduct to the

requirements of law was substantially impaired at the time of the killing.  Thus,

Abdul-Salaam has not demonstrated that there is a reasonable likelihood that the

jury applied the instructions in a way that violates his constitutional rights.

Additionally, because the jury was free to consider evidence of Abdul-Salaam's

mental health and his being abused under the umbrella of the catchall provision of

42 Pa. Cons. Stat. § 9711(e)(8), Abdul-Salaam has not shown here that the absence

of the (e)(2) and (e)(3) mitigating circumstances violated his federal constitutional

rights or that he was prejudiced by his counsel's decision not to request the

relevant instructions to the jury.  Habeas relief on this claim will therefore be

denied.

**K.    Claim XII - The jury improperly found the existence of the (d)(6) aggravating circumstance in violation of due process of law and the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

In his final habeas claim, Abdul-Salaam contends that his constitutional

rights were violated when the jury improperly found the existence of the (d)(6)

aggravating circumstance after the trial court provided a faulty guilt phase

instruction on criminal homicide and failed to provide a corrective instruction at

the penalty phase.  Abdul-Salaam argues that, as a result of the trial court's error,

the jury found an invalid (d)(6) aggravator and therefore his death sentence

violates his Fifth, Eighth, and Fourteenth Amendment rights.  Upon careful review,

the Court finds that Abdul-Salaam is not entitled to habeas relief on this claim.

The background of this claim is as follows.  At a penalty phase of trial, the

Commonwealth is required to prove aggravating circumstances for which there is

some evidence beyond a reasonable doubt.  *See* 42 Pa. Cons. Stat. §§ 9711(c)(i),

(iii).  In this case, the jury was asked to consider, *inter alia*, the aggravating

circumstance: "The defendant committed a killing while in the perpetration of a

felony."  42 Pa. Cons. Stat. § 9711(d)(6).  As background in connection with this

aggravator, the trial court gave the jury the following instruction at the guilt phase:

> The burden of proof is on the Commonwealth to establish the defendant's guilt, and that guilt must be established beyond a reasonable doubt.  Thus in order to convict the defendant in this particular case, you must be satisfied that the Commonwealth has established each and every element of the offense as I'm about to describe them to you, and that it was, in fact, the defendant who committed the offense beyond a reasonable doubt.

<div align="center">* * *</div>

> Now, I suggest to you that you should first consider whether the defendant was, of course, present at the scene, and whether he or one of his co-defendants discharged the firearm leading to Officer Cole's death.  Once you've resolved this question then you should go on to consider the various degrees of murder, if any, or the various degree of murder, if any, in which he is guilty.

<div align="center">* * *</div>

> You many find the defendant guilty of first degree murder if you are satisfied that the following elements have been proven beyond a reasonable doubt.  First, that Willis Cole is dead.  Secondly, that the defendant killed him.  And, thirdly, that the defendant did so with the specific intent to kill, and with malice.

(Trial NT 3/15/1995, at 145, 153-54.)  After deliberating for some time, the jury

asked the trial court for a copy of the "definition" of each degree of murder.  (*Id*. at

180.)  Although the court refused to send out written instructions to the jury, it did

explain again the degrees of murder.  (*Id*. at 181-86.)  Specifically, with respect to

first degree murder, the court stated:

> [I]n order to find the defendant guilty of first degree murder, you must

<div align="center">176</div>

be satisfied that at the time of the shooting the defendant had the - - number one, of course, *that he was the person who shot Officer Cole*, and at the time that he did so that he did so with the specific intent to kill Officer Cole.  Or said another way, with the specific intent that Officer Cole die as a result of what he did or was doing.

(*Id*. at 181) (emphasis added).  After further deliberation, the jury found Abdul-Salaam guilty of first degree murder.  (*Id*. at 187.)

At the sentencing phase, the trial court set forth the aggravating circumstances argued by the Commonwealth, including "the defendant committed a killing while in the perpetration of a felony."  (*See* Sentencing NT 3/16/1995, at 113.)  In explaining those aggravating circumstances, the trial court also stated,

[T]he fact that you found Seifullah Abdul-Salaam guilty beyond a reasonable doubt of murder of the first degree, or the crime of conspiracy, for example, are not themselves aggravating circumstances.  Though as I indicated the commission of this murder while in the perpetration of a felony or robbery rather is an aggravating circumstance.

(*Id*. at 114.)  After deliberation, the jury found all four aggravating circumstances and one mitigating circumstance, and sentenced Abdul-Salaam to death.  (*Id*. at 121.)

Abdul-Salaam raised this issue in his PCRA petition, but the PCRA court did not address it.  *See Abdul-Salaam-II*, 808 A.2d at 560.  On appeal, the Pennsylvania Supreme Court deemed the claim waived because Abdul-Salaam could have raised it in his direct appeal but failed to do so, and therefore the court

177

could not review it under the PCRA.  *Abdul-Salaam-II*, 808 A.2d at 560 (citing 42 Pa. Cons. Stat. § 9543(a)(3)).  Because there was no decision on the merits in state court, we will review this claim *de novo*.

When language in jury instructions is challenged, the language in question "must be considered in the context of the instructions as a whole and the trial record."  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  The Court must then consider "'whether there is a reasonable likelihood that the jury has applied the challenged instructions in a way' that violates the Constitution."  *Smith v. Horn*, 120 F.3d 400, 411 (3d Cir. 1997) (quoting *Estelle*, 502 U.S. at 72).

In his petition, Abdul-Salaam argues that, in light of the guilt phase instruction the jury received and the absence of any corrective instruction during the penalty phase, the jury should have been precluded from considering what was an invalid (d)(6) aggravator.  Specifically, he contends that the (d)(6) aggravator was invalidated by the trial court's statement that Abdul-Salaam could be found guilty of criminal homicide if either "he or one of his co-defendants discharged the firearm leading to Officer Cole's death."  (Trial NT 3/14/1995, at 153.)  By so instructing, the trial court "left the jury with the impression that this circumstance could be found beyond a reasonable doubt whether Petitioner 'or one of his codefendants' did the actual shooting," (Doc. 8-5 at 14-15.)  In making this

argument, Abdul-Salaam contends that the jury may have relied upon a theory of accomplice liability as a basis for its first degree murder conviction, and therefore when it sentenced Abdul-Salaam to death based, in part, on the (d)(6) aggravator of "committ[ing] a killing while in the perpetration of a felony," which is an invalid aggravating circumstance.[50]   However, viewing the trial court's instructions as a whole, it is apparent that the trial court instructed the jury that to find Abdul-Salaam guilty of first degree murder, it had to determine beyond a reasonable doubt that, *inter alia*, he was the person who killed Officer Cole.  Notably, when the jury returned with a question as to degrees of murder, the trial court responded that in order to find Abdul-Salaam guilty of first degree murder, it had to be satisfied that at the time of the shooting, Abdul-Salaam "was the person who shot Officer Cole, and at the time that he did so that he did so with the specific intent to kill Officer Cole."  (Trial NT 3/15/1995, at 181.)  Further, as discussed and found herein, there is no evidence on record that Abdul-Salaam was in fact an accomplice in the act of killing Officer Cole.  Therefore, in view of the instructions given as well as the record, it is not reasonably likely that the jury interpreted the trial court's comment that Abdul-Salaam could be found guilty of criminal homicide if

---

[50] In *Commonwealth v. Lassiter*, 722 A.2d 657, 662 (Pa. 1998), the Pennsylvania Supreme Court held that "Section 9711(d)(6) may not be applied to an accomplice who does not 'commit' the killing in the sense of bringing it to completion or finishing it."

either "he or one of his co-defendants discharged the firearm leading to Officer Cole's death," (Trial NT 3/14/1995, at 153), to mean that they could consider accomplice liability as a possible ground for conviction. Instead, because the jury found Abdul-Salaam guilty of first degree murder based in part on its finding that he was the person who shot and killed Officer Cole, the subsequent consideration of the (d)(6) aggravator should not have been precluded upon a theory that the jury considered Abdul-Salaam to be an accomplice rather than the shooter. Therefore, the jury's finding here does not broaden the application of the death penalty statute in a manner that is inconsistent with the Eighth Amendment and due process of law. Habeas relief on this claim will be denied.

## IV.   CONCLUSION

Nearly two decades have passed since Officer Willis Cole was murdered. Over nineteen years have elapsed since the trial that resulted in Abdul-Salaam's conviction. And yet this Memorandum and the Order that follows will not end the legal maneuvering that seeks to overturn both his conviction and resulting sentence of death at the hands of a jury of his peers.

It was not until well after the founding of this nation that the federal writ of habeas corpus was extended to prisoners in state custody. But like a rolling freight train, the use of the Great Writ gathered speed in the ensuing decades. It was

adopted by the federal courts, codified by Congress, revised, and to some degree

limited in certain respects.  But the case at bar amply demonstrates that there is

something grievously amiss in both our laws and jurisprudence as they relate to

federal habeas practice.  For while we admire zealous advocacy and deeply respect

the mission and work of the attorneys who have represented Abdul-Salaam in this

matter, they are at bottom gaming a system and erecting roadblocks in aid of a

singular goal – keeping Abdul-Salaam from being put to death.  The result has

been the meandering and even bizarre course this case has followed.  Its time on

our docket has spanned nearly all of our service as a federal judge – almost twelve

years.  We have given Abdul-Salaam every courtesy and due process, perhaps even

beyond what the law affords.  And yet for the family of Willis Cole, and indeed for

Abdul-Salaam and his family as well, there has been no closure.  Rather, they have

endured a legal process that is at times as inscrutable as it is incomprehensible.

Moreover, it will soon take another turn as the Third Circuit Court of Appeals

reviews our determination.

It is right and proper to insure that criminal defendants are given fair and

open trials that fully comport with the protections afforded to them in the

Constitution.  But we fear that a process has evolved that in reality is based on the

goal of perfection rather than constitutionality.  There are no perfect trials, and

Abdul-Salaam's was no exception.  However, at the end of the day, this Court is

fully convinced that Abdul-Salaam was afforded a trial and sentencing that did not

violate the Constitution of the United States in any single respect.

Based on the foregoing, the Court will deny Abdul-Salaam's petition for

writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to Local Appellate

Rule 22.2 of the Rules of the United States Court of Appeals for the Third Circuit,

at the time a final order denying a petition under 28 U.S.C. § 2254, the district

court must make a determination as to whether a certificate of appealability should

issue.  3d.Cir. L.A.R. 22.2.  A certificate of appealability should issue "only if the

applicant has made a substantial showing of the denial of a constitutional right."

28 U.S.C. § 2253(c)(2).  To meet this burden a petitioner must show "that

reasonable jurists could debate whether (or, for that matter, agree that) the petition

should have been resolved in a different manner or that the issues presented were

adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529

U.S. 473, 484-5 (2000) (internal citations and quotations omitted).  In the present

matter, the Court will deny a certificate of appealability because jurists of reason

would not debate whether the Court properly resolved the issues presented.

An appropriate order will issue.